Blake S. Atkin ISB# 6903
Atkin Law Offices, P.C.
7579 North Westside Highway
Clifton, Idaho 83228
Telephone: (801) 533-0300
Facsimile: (801) 533-0380
Email: blake@atkinlawoffices.net

*Attorney for Plaintiff/Counterdefendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| YELLOWSTONE POKY, LLC, an Idaho Limited Liability Company,<br><br>        Plaintiff,<br><br>vs.<br><br>FIRST POCATELLO ASSOCIATES, L.P.,<br><br>        Defendants.<br><hr>FIRST POCATELLO ASSOCIATES, L.P.,<br><br>        Counterclaimant,<br><br>vs.<br><br>YELLOWSTONE POKY, LLC, FEATHERSTONE HOLDINGS, INC., and ROGER FEATHERSTON,<br><br>        Counterdefendants. | **MEMORANDUM IN SUPPORT OF MOTION TO COMPEL RETURN OF DOCUMENTS AND FOR ENTRY OF A PROTECTIVE ORDER**<br><br>Case No. 4:16-cv-00316-DCN |

On June 2, 1017, Defendants purported to terminate Plaintiff's tenancy in what is known

as building 3.  The next day, Defendants changed the locks on the doors to the tenancy thus

converting Plaintiff's property on the location.  Fifteen days later, Defendants took actual physical possession of Plaintiff's property that contained highly confidential information and trade secrets, thus converting the property.  Defendants are not willing to cooperate with the entry of a protective order that protects Plaintiff from continued exploitation of its trade secrets. Plaintiff therefore requests that the court order return of the property and enter an appropriate protective order in this case.

## FACTS

1. On December 23, 2015, Plaintiff's predecessor and assignor (hereafter referred to simply as "Plaintiff") entered into a contract to purchase what is known as the Gateway West Industrial Center.  Exhibit "A".  The original agreement called for $100,000 earnest money.

2. When Plaintiff was a few days late getting the money deposited because of banking hours preceding a weekend, Defendants took the opportunity to increase the sales price from $19 Million to $21 Million.  Exhibit "A", p. 1.  In addition an additional $125,000 earnest money was required for a total of $225,000.  Also a $50,000 nonrefundable payment was made directly to the Defendants on January 28, 2016.  Exhibit "A", Addendum No. 4.

3. On February 27, 2018, this Court ruled that the transaction contemplated by this agreement failed under the Idaho Statute of Frauds.

4. As part of the transaction contemplated by the parties, the Plaintiff became a tenant in what is known as "building 3" which became the nerve center of the Plaintiff's planning for the future development of the property and due diligence aiming toward closing the purchase of the property.  Declaration of Earl T. Swift dated August 17, 2017 at paragraph 9. Exhibit "B". Prior to Plaintiff's occupation of the premises building 3 had

not been used for over 30 years.  Plaintiff paid nearly $700.00 to have the tenancy cleaned.  In that cleaning, they discovered 154 poisonous spiders, including black widows, brown recluse, and hobos.  Plaintiff was allowed to and did install phone services and other utilities in the tenancy.  Declaration of Earl T. Swift at paragraph 9.

5.   Over the course of several months, while a tenant in building 3, the Plaintiff amassed, organized, analyzed, and developed a large amount of data relating to the property and plans for development of the property which contained highly confidential information and indeed trade secrets relating to Plaintiff's future development plans which are extremely valuable in the hands of the owner of the property. Declaration of Roger Featherston dated July 27, 2017.  Exhibit "C".

6.   It was Plaintiff's intention to keep the information contained in the documents used in building 3 confidential and secret.  Id.

7.   On June 2, 2016, the Defendants gave Plaintiff one day notice to vacate the premises and remove all the confidential and trade secret information from building 3.  Email from Barbara Wischerath to Roger Featherston dated June 2, 2016.   Exhibit "D".  The next day the locks were changed.  Declaration of Earl T. Swift at paragraph 9. Exhibit "B".

8.   Three days before this unlawful eviction, Defendants had demanded and received from its tenant, in cash, the payment of 800 dollars in utility bills incurred by the Plaintiff as a tenant of building 3.  Defendants demanded that the utility bills be paid in cash just days before their unlawful eviction. Receipt for cleaning tenancy and utility payment attached hereto as Exhibit "E".

9.   On June 17, 2016, without having followed the procedures required in Idaho for termination of Plaintiff's tenancy in building 3, the Defendants took possession and

control of Plaintiff's confidential and trade secret documents being used and stored on the premises.  Email from Mike Baldner of the Hawley Troxell firm to counsel for Roger Featherston dated June 17, 2016. Exhibit "F".

10. Defendants assert that the documents have been available for pick up by Roger Featherston, and even assert that after the complaint had been amended to assert a theft of trade secrets claim, they were willing to agree to return of the documents, after copying, with an "attorney's eyes only" protective order.  Declaration of Earl T. Swift at paragraph 9. Exhibit "B".

11. Plaintiff's counsel agreed to allow copying of the building 3 documents, for purposes of this litigation only, upon entry of an appropriate protective order.  Plaintiff's counsel sent a copy of Exhibit "G" and Defendants refused to negotiate for entry of an appropriate protective order.

12. Plaintiff then suggested that in order to expedite return of the building 3 documents that an "attorney's eyes only" protective order be agreed to with respect to the building 3 documents until such time as an appropriate general protective order be entered. Defendants refused.  See, Stipulation for Protective Order emailed to Howard Burnett on April 5, 2018.  Exhibit "H".

13. At this point, it is appropriate that the building 3 documents be returned.  That an "attorney's eyes only" protective order be entered with respect to any copies to be made of those documents, and that an appropriate protective order be entered with respect to future production in this case.

**DEFENDANTS STOLE PLAINTIFF'S TRADE SECRETS**

Plaintiff was a tenant in building 3.  It could be argued that Plaintiff was a paying tenant, given that authorization to use building 3 was given in connection with a $21 Million deal, $225,000 of which was escrowed as a down payment, and Defendants were given $50,000 to put in their pocket before the close of escrow.  But the Court need not go that far to find that the Defendants unlawfully ejected Plaintiff from building 3 and therefore converted Plaintiff's property that was being used and kept in that building.  Plaintiff was at least a tenant at will as shown by the Defendants demanding and being paid by Plaintiff, just three days before the unlawful eviction, of over $800 in utility bills incurred by Plaintiff as a tenant on the property.

Under Idaho law, a tenancy at will, which Plaintiff was endowed with, at least, cannot be terminated on only one day notice.  Rather, a tenant at will is entitled to a notice that cannot be less than 30 days.   Idaho Code Section 55-208.  Attached hereto as Exhibit "I".

That procedure was never followed by the Defendants.  Indeed, had the proper procedure been followed, on June 17, 2018 when Plaintiff's trade secrets were pilfered and confiscated by the Defendants and their lawyers, the Plaintiff was still a lawful tenant of the property.  To this day, Plaintiff has not been properly ejected from the property.

A conversion takes place when "(1) the charged party wrongfully gained dominion of property; (2) that property is owned or possessed by plaintiff at the time of possession; and (3) the property in question is personal property."  *Peasley Transfer & Storage Co. v. Smith,* 132 Idaho 732, 743, 979 P.2d 605, 616 (1999).

At the time of the conversion of Plaintiff's trade secrets, the personal property in which those trade secrets were contained was possessed by the Plaintiff in its lawful tenancy that had

not been terminated in accordance with the law.  Defendant put Plaintiff's property under lock and key and promised to arrange for its return through the broker Don Zebe.  Email of Mike Baldner, Exhibit "F".

Even if Defendants' "offers" to return the documents to Plaintiff had been made in good faith, it does not undo the conversion.  Conversion was complete upon the seizing of the property by the Defendants at a time when the Plaintiff's tenancy had not been terminated.  A conversion is not undone by a return of the property.

"The conversion is complete when the defendant takes, detains or disposes of the chattel. The defendant cannot undo his wrong by forcing the goods back upon their owner, either as a bar to the action, or in mitigation of damages. *Read v. Downey State Bank*, 392 P. 2d 681, 686 (Id. 1964)

## CONCLUSION

Given Defendants' conversion of Plaintiff's trade secret property, Defendants should be ordered to return the property unlawfully taken from Plaintiff's tenancy and if any copies are made that they be ordered "attorney's eyes only."  Plaintiff also requests that a protective order in the nature of Exhibit H be entered by the Court.

Dated this 11th day of May, 2018.

Atkin Law Offices, P.C.
Blake S. Atkin

_____
Attorneys for the Plaintiff/Counterdefendants

## CERTIFICATE OF SERVICE

I hereby certify that on May 11, 2018, I served the foregoing MEMORANDUM IN

SUPPORT OF MOTION TO COMPEL RETURN OF DOCUMENTS AND FOR ENTRY OF

A PROTECTIVE ORDER on the following party via U.S. mail:


Howard D. Burnett
Hawley Troxell Ennis & Hawley
412 W. Center St., Suite 2000
P.O. Box 100
Pocatello, ID  83204
Email: hburnett@hawleytroxell.com
Phone:  (208) 233-0845
Fax:  (208) 233-1304



_____
Jennifer Mariscal

Exhibit A



# RE-23 COMMERCIAL/INVESTMENT
# REAL ESTATE PURCHASE AND SALE AGREEMENT

JULY 2014 EDITION

**Idaho Association of Realtors®**
*The Home of Real Estate in Idaho*

THIS IS A LEGALLY BINDING CONTRACT. READ THE ENTIRE DOCUMENT, INCLUDING ANY ATTACHMENTS.
IF YOU HAVE ANY QUESTIONS, CONSULT YOUR ATTORNEY AND/OR ACCOUNTANT BEFORE SIGNING.

Page 1 of 6

NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF HABITABILITY, AGREEMENTS
OR REPRESENTATIONS NOT EXPRESSLY SET FORTH HEREIN SHALL BE BINDING UPON EITHER PARTY.

1  ID# FH 122315

2                                                                           DATE___ 23 December 2015

3  **LISTING AGENCY** Coldwell Banker Commercial Advisors _____ Office Phone # _____ Fax # _____
4  Listing Agent Don Zebe _____ E-Mail _____ Phone # _____
5  **SELLING AGENCY** Coldwell Banker Commercial Advisors _____ Office Phone # _____ Phone # _____
6  Selling Agent Don Zebe _____ E-Mail don.zebe@cbcadvisors.com _____ Phone # 208 403 1973
7

8  **1. BUYER:** Featherstone Holdings or Assigns
9  (Hereinafter called "BUYER") agrees to purchase, and **SELLER** First Pocatello Associates LP
10 (Hereinafter called "SELLER") agrees to sell the following described real estate hereinafter referred to as "PROPERTY"
11 **COMMONLY KNOWN AS** 669 Quinn Road
12 City POCATELLO _____ County BANNOCK _____, Idaho, Zip 83201 _____ legally described as: _____
13 _____ RPCPP023305 _____
14 OR Legal Description Attached as exhibit A Site Map _____ **(Exhibit must accompany original offer and be signed or initialed by**
15 **BUYER and SELLER.)**
16

17 **2.** 19,000,000 21,000,000 **PURCHASE PRICE:** Nineteen Million Twenty One Million
18 which shall be payable by federal wire transfer or other collected funds at Closing, unless otherwise specified in an addendum hereto. Title of SELLER is to **DOLLARS,**
19 be conveyed by X warranty deed ____ special warranty deed or _____ deed (not including closing costs).
20

21 **3. FINANCING CONTINGENCY: THIS IS NOT AN ALL CASH OFFER.** If this is an all cash offer, BUYER'S OBLIGATION TO CLOSE SHALL NOT
22 BE SUBJECT TO ANY FINANCING CONTINGENCY. **If this is not an all cash offer and an appraisal is required by lender, the PROPERTY must**
23 **appraise at not less than purchase price** and BUYER'S Earnest Money shall be returned at BUYER'S request. BUYER may also apply for a loan with
24 different conditions and costs and close transaction provided all other terms and conditions of this Agreement are fulfilled, and the new loan does not
25 increase the costs or requirements of the SELLER. This Agreement is only subject to a satisfactory appraisal and final lender underwriting after the release
26 of all contingencies, inspections, due diligence and feasibility studies have been completed to the satisfaction of BUYER.
27

28 **4. EARNEST MONEY:** BUYER hereby deposits $ Two Hundred Twenty Five Thousand Dollars _____ as Earnest Money, together with interest
29 thereon, if any.  Evidenced by: ...cash personal check **x** cashier's check ...note (due date): _____
30 ...other _____ and a receipt is hereby acknowledged.  Earnest Money to be deposited in trust account
31 ...upon receipt or X upon acceptance by BUYER and SELLER or X other FIRST AMERICAN TITLE COMPANY 223 N 15TH STREET POCATELLO
32 IDAHO 83201 Attn: Melissa Raschke  208 232 6224 and shall be held by: ...Listing Broker  ...Selling Broker
33 X other FIRST AMERICA TITLE, POCATELLO _____ for the benefit of the parties hereto.
34 Unless otherwise agreed to in writing, the Earnest Money shall be applicable to the purchase price.
35 THE RESPONSIBLE BROKER SHALL BE: Steve Bogden, COLDWELL BANKER COMMERCIAL ADVISORS
36

37 **5.   OTHER TERMS AND/OR CONDITIONS:** This Agreement is made subject to the following special terms, considerations, addenda and/or
38 contingencies which must be satisfied prior to closing 1. Buyer understands the purchase of the property is "AS IS"
39 2. Upon removal of due diligence earnest money shall be non-refundable and earnest money shall be applied to the purchase price
40 3. Seller to provide all leases, rent rolls, maintenance records, surveys, inspections, reports, clearances, that are in sellers possession, upon delivery due
41 diligence shall commence.
42 4. Buyer shall have one option to extend due diligence for 60 days with 5 day written notice.
43 _____
44 _____
45 _____
46 _____

47 **6. DEADLINES:** The following deadlines shall be binding on the parties and referred by name in this Agreement. TIME IS OF THE ESSENCE IN THIS
48 **AGREEMENT.**
         (A) "SELLER DISCLOSURE DEADLINE":          20  CALENDAR DAYS (ten [10] if left blank)
         (B) "DUE DILIGENCE DEADLINE":               90 CALENDAR DAYS (thirty [30] if left blank)
         (C) "SETTLEMENT AND CLOSING DEADLINE":      28 June 2016

49 **7. TITLE COMPANY:** The parties agree that First American Title Company
50 Title Company located at 223 N 15 St. Pocatello, Idaho 83201  208 232 6224 Att: Melissa Raschke _____ shall provide the title
51 policy and preliminary report of commitment.

52 **8. ACCEPTANCE:** This offer is made subject to the acceptance of SELLER and BUYER on or before (Date) 2 January 2016 at  (Local
53 Time in which PROPERTY is located) 5 _____ ...A.M. XP.M.

54 **9. ASSIGNMENT:** This Agreement and any rights or interests created herein X may ... may not be sold, transferred, or otherwise assigned.

BUYER'S Initials (_____)(_____) Date 12/24/15        SELLER'S Initials (_____)(_____) Date 12/30/15

This form is printed and distributed by the Idaho Association of REALTORS®, Inc. This form has been designed and is provided for use by the real estate professionals who are members of the Idaho Association of REALTORS®. USE BY ANY OTHER PERSON IS PROHIBITED. ©Copyright Idaho Association of REALTORS®, Inc. All rights reserved.

JULY 2014 EDITION      RE-23 COMMERCIAL INVESTMENT REAL ESTATE PURCHASE AND SALE AGREEMENT      Page 2 of 6

PROPERTY ADDRESS:  669 Quinn Road                                                          ID#: FH 122315

**10. ITEMS INCLUDED & EXCLUDED IN THIS SALE:** All existing fixtures and fittings that are attached to the PROPERTY are **INCLUDED IN THE PURCHASE PRICE** (unless excluded below), and shall be transferred free of liens. Unless specifically excluded below, the fixtures and fittings included in the purchase price shall include (1) all personal property owned by the SELLER and used primarily in connection with the PROPERTY, and (2) all rights and easements appurtenant to the PROPERTY.
**ITEMS SPECIFICALLY INCLUDED IN THIS SALE:**  **All materials, equipment, parts, vehicles, used for property maintenance. Equipment inventory.**
_____
_____
_____
_____

**ITEMS SPECIFICALLY EXCLUDED IN THIS SALE:** Sellers personal property
_____
_____
_____
_____

**11. SETTLEMENT AND CLOSING:**

(A). **SETTLEMENT:** Settlement and Closing shall take place on the Settlement and Closing Deadline, unless the parties to this Agreement agree upon another date in writing.  Settlement and Closing shall be deemed to have occurred only when all of the following have been fully completed: (a) BUYER and SELLER have signed and delivered to the Escrow Agent all documents required by this Agreement, by any lender, or by applicable law; (b) any monies required to be paid by the BUYER under this Agreement (including any proceeds of any new loan) have been delivered by BUYER, or BUYER's lender, to the Escrow Agent; (c) any monies required to be paid by the SELLER under this Agreement have been delivered by SELLER to the Escrow Agent; and (d) the applicable closing documents have been recorded in the official records of the County Recorder of the county in which the PROPERTY is located. At Closing, SELLER and BUYER shall execute an Assignment and Assumption Agreement transferring all leases and vendor contracts assumed by BUYER through written agreement of the Parties.

(B). **SETTLEMENT AND CLOSING COSTS:** SELLER and BUYER shall each pay one-half of the fee charged by the Escrow Agent for its services in the Settlement and Closing.  Taxes and assessments for the current year, rents, and interest on any assumed obligations shall be prorated at Settlement as set forth in this section. Tenant deposits (including, but not limited to, security deposits and prepaid rents) shall be paid or credited by SELLER to BUYER at Settlement.  Prorations set forth in this section shall be made by the Escrow Agent as of the Settlement Date unless otherwise agreed to by the parties in writing.

**12. TITLE INSURANCE:** There may be types of title insurance coverages available other than those listed below and parties to this agreement are advised to talk to a title company about any other coverages available that will give the BUYER additional coverage.

(A). **PRELIMINARY TITLE COMMITMENT:** No later than the Seller Disclosure Deadline, SELLER shall furnish to BUYER, at SELLER's sole cost and expense, a preliminary commitment of a title insurance policy showing the condition of the title to said PROPERTY, together with a copy of each instrument, agreement or document listed as an exception to title in the title commitment that is reasonably available to SELLER. BUYER shall have fifteen (15) business days from receipt of the preliminary commitment within which to object in writing to the condition of the title as set forth in the preliminary commitment. If BUYER does not so object, BUYER shall be deemed to have accepted the conditions of the title. It is agreed that if the title of said PROPERTY is not marketable, or cannot be made so within ten (10) business days after notice containing a written statement of defect is delivered to SELLER, then BUYER, at BUYER's option, may either: (a) terminate this agreement by written notice to the SELLER, in which BUYER's Earnest Money deposit shall be returned to BUYER and neither party shall have any further rights, obligations or liabilities except as expressly set forth in this Agreement; or (b) continue with this Agreement and, if closing occurs, accept title subject to the uncured title defects other than monetary liens.  SELLER covenants and agrees that all monetary liens shall be removed by SELLER at closing or insured against by the title insurer, whether or not BUYER has designated such monetary liens as title defects.

(B). **STANDARD COVERAGE OWNER'S POLICY:** At Settlement, SELLER shall, at SELLER's sole expense, furnish to BUYER a title insurance policy in the amount of the purchase price of the PROPERTY showing marketable and insurable title subject to the liens, encumbrances and defects to be discharged or assumed by BUYER as provided herein. BUYER, at its sole option, cost and expense, may elect to obtain an Extended Coverage ALTA policy of title insurance or additional specific endorsements.

**13. SQUARE FOOTAGE VERIFICATION:** BUYER IS AWARE THAT ANY REFERENCE TO THE SQUARE FOOTAGE OF THE REAL PROPERTY OR IMPROVEMENTS IS APPROXIMATE. IF SQUARE FOOTAGE IS MATERIAL TO THE BUYER, IT MUST BE VERIFIED BY BUYER DURING THE INSPECTION PERIOD.

**14. COVENANTS, CONDITIONS AND RESTRICTIONS (CC&Rs):** As part of the BUYER'S due diligence and inspection of the PROPERTY as set forth in Section 16, BUYER is responsible for obtaining and reviewing a copy of any CC&Rs which may affect the PROPERTY. BUYER shall have 10 business days to review and approve of any such CC&Rs that may affect the PROPERTY. Unless BUYER delivers to SELLER a written and signed objection to the terms of any applicable CC&Rs with particularity describing BUYER'S reasonable objections within such time period as set forth above, BUYER shall be deemed to have conclusively waived any objection to the terms of any CC&Rs affecting the PROPERTY.

**15. SELLER DISCLOSURES.** No later than the Seller Disclosure Deadline, SELLER shall disclose, and provide copies if available, to BUYER the following:

(a) any studies and/or reports that have previously been performed in connection with or for the PROPERTY, including without limitation, environmental reports, soil studies, seismic studies, site plans and surveys;

(b) any notices relating to a violation of applicable law including, without limitation, environmental law and laws relating to land use, zoning or compliance with building codes;

BUYER'S Initials ( _RTR_ )( )  Date  _12/24/15_          SELLER'S Initials ( _QK_ )( )  Date  _12/30/15_

This form is printed and distributed by the Idaho Association of REALTORS®, Inc. This form has been designed and is approved for use by the real estate professionals who are members of the Idaho Association of REALTORS®. USE BY ANY OTHER PERSON IS PROHIBITED. ©Copyright Idaho Association of REALTORS®, Inc. All rights reserved.

**PROPERTY ADDRESS: 669 Quinn**                                                                      **ID#: FH 122315**

134    (c) SELLER shall make available for inspection all documents in SELLER's possession relating to ownership, operation, renovation or
135    development of the PROPERTY including: statements for real estate tax assessments and utilities for the last year; property management agreements;
136    leases or other occupancy agreements; maintenance records, accounting records and audit records for the past year; and installment purchase contracts or
137    leases of personal property used in connection with the PROPERTY; and
138    (d) all other documents described in any Addenda or Counteroffer to this Agreement.
139

**16. FEASIBILITY CONTINGENCY:**

**(A).** BUYER's obligations under this Agreement are conditioned upon BUYER's satisfaction, in BUYER's sole discretion, concerning all aspects of the
feasibility of the PROPERTY for BUYER's intended purpose.    This shall include, but is not limited to: the contracts and leases affecting the
PROPERTY; the potential financial performance of the PROPERTY; the availability of government permits and approvals; and the outcome of any
appraisals and lender underwriting.    This contingency shall be deemed waived unless BUYER gives written notice to SELLER on or before the Due
Diligence Deadline that the PROPERTY is unfit for BUYER's intended purpose.    If such notice is given, the Earnest Money shall be refunded to
BUYER.

**(B).** INSPECTION OF VENDOR CONTRACTS: In addition to the documents to be disclosed under the Seller Disclosures, SELLER shall make
available for inspection by BUYER and its agents by the Seller Disclosure Deadline all "Vendor Contracts" which shall include maintenance and service
contracts, and installment purchase contracts or leases and personal property or fixtures used in connection with the PROPERTY.    BUYER shall
determine by the Due Diligence Deadline: (i) whether SELLER will agree to terminate any objectionable Vendor Contracts; and (ii) whether SELLER will
agree to pay any damages or penalties resulting from the termination of objectionable Vendor Contracts.    BUYER's voluntary waiver of the Feasibility
contingency shall signify BUYER's acceptance of all Vendor Contracts that SELLER has not agreed in writing to terminate.    BUYER shall be solely
responsible for obtaining any required consents to assumptions of Vendor Contracts and the payment of any assumption fees.    SELLER shall
cooperate with BUYER's efforts to receive any such consents but shall not be required to incur any additional expenses or liabilities in doing so.

**17. INSPECTION/DUE DILIGENCE:**

**(A).** In conducting BUYER's due diligence prior to the Due Diligence Deadline, or at any time thereafter if and to the extent required by the lender,
BUYER shall have the right to conduct inspections, investigations, tests, surveys and other studies at BUYER'S expense unless otherwise agreed
upon in writing by the parties.    BUYER must provide reasonable advance notice of BUYER's intent to inspect or test the PROPERTY, and all
inspections, investigations, tests, surveys and other studies must be conducted at reasonable times.    SELLER shall have the right to accompany
BUYER and any of its agents on the PROPERTY at all times.    All inspections and tests shall be conducted in a manner that does not unreasonably
disrupt the activities and business of SELLER and its tenants.    BUYER shall indemnify, hold harmless and defend SELLER, its tenants and employees
for any claims for liens, physical damage or personal injury resulting from BUYER's due diligence inspections and/or tests.

**(B).** SATISFACTION/REMOVAL OF INSPECTION DUE DILIGENCE CONTINGENCIES:

(1). If BUYER, in BUYER's sole discretion, determines that the results of the BUYER's due diligence are not acceptable, then BUYER, no later
than the Due Diligence Deadline, shall either: (a) cancel this Agreement providing written notice to SELLER, in which event the Earnest Money deposit
shall be returned to BUYER; or (b) providing to SELLER a written notice setting forth BUYER's disapproved items.

(2). If BUYER does not within the strict time period specified take either of the actions stated in Section 17(B)(1), BUYER shall conclusively be
deemed to have: (a) completed all inspections, investigations, review of applicable documents and disclosures; (b) elected to proceed with the
transaction; (c) assumed all liability, responsibility and expense for repairs or corrections other than for items which SELLER has otherwise agreed
in writing to repair or correct; and (d) unless another condition or contingency set forth in an Addendum or Counteroffer remains unsatisfied, the
Earnest Money deposit shall become nonrefundable except upon an instance of SELLER's default.

(3). If BUYER timely provides notice of disapproved items to SELLER, BUYER and SELLER shall have five (5) business days after SELLER's
receipt of the notice of disapproved items in which to agree in writing upon the manner of resolving the disapproved items.    If BUYER and SELLER
have not agreed in writing upon the manner of resolving the disapproved items by the deadline, BUYER may cancel this Agreement by delivering
written notice to SELLER no later than fifteen (15) days after SELLER's receipt of the notice of disapproved items; whereupon the Earnest Money
deposit shall be returned to BUYER and neither party shall have any further rights or obligations under this Agreement.    If BUYER does not give such
written notice of cancellation within the strict time periods specified, BUYER shall conclusively be deemed to have elected to proceed with the
transaction without repairs or corrections other than for items which SELLER has otherwise agreed in writing to repair or correct and the Earnest Money
deposit shall become nonrefundable except upon an instance of SELLER's default.

**18. SELLER REPRESENTATIONS AND WARRANTIES:** SELLER represents and warrants that the following statements are true and complete as
of the date of SELLER's execution of this agreement and shall be true as of the date of Settlement and Closing:

(a). There is no action, suit, administrative proceeding or other proceeding pending in any court or before any arbitrator of any kind or before or by
any governmental body or, to SELLER's knowledge, threatened against SELLER and/or the PROPERTY which may adversely affect this transaction;

(b). All work which will be performed in, on or about the PROPERTY or materials furnished to the PROPERTY which might, in any circumstance,
give rise to a mechanic's or materialman's lien will be paid and no such liens shall encumber the PROPERTY at the time of Settlement and Closing;

(c). SELLER has not received any written notice or citation indicating that the PROPERTY is in material violation of any applicable law;

(d). Neither SELLER nor any other person, to SELLER's knowledge, have ever caused or permitted any hazardous materials to be placed, held,
located or disposed of on, under, or at the PROPERTY in violation of applicable law; and

(e). To SELLER's knowledge, the consummation of the transaction contemplated by this Agreement does not and will not conflict with or result in a
material breach of any of the terms or provisions of any other agreement, arrangement, undertaking, accord, document or instrument to which SELLER is a
party or by which SELLER or the PROPERTY is bound.

**19. CONDITION OF PROPERTY AT CLOSING:** Upon expiration of the Due Diligence Deadline, BUYER agrees to purchase the PROPERTY in as-
is-condition with all faults and with no further repairs required, subject only to the representations and warranties stated herein, or unless otherwise agreed
upon by the parties in writing.    Upon Closing, BUYER will assume all obligations with respect to the PROPERTY.

BUYER'S Initials ( RTP )( ) Date 12/24/15        SELLER'S Initials ( M )( ) Date 12/30/15

This form is printed and distributed by the Idaho Association of REALTORS®, Inc. This form has been designed and is provided for use by the real estate professionals who are members of the
Idaho Association of REALTORS®. USE BY ANY OTHER PERSON IS PROHIBITED. ©Copyright Idaho Association of REALTORS®, Inc. All rights reserved.

PROPERTY ADDRESS: 669 Quinn ID#: FH 122315

**20. OPERATIONS PRIOR TO CLOSING:** Between the parties' execution of this Agreement and Closing, and except otherwise agreed to by the parties in writing, SELLER: (a) shall not execute any lease affecting the PROPERTY; (b) shall comply with all applicable laws affecting the PROPERTY; (c) shall not create or force to be created any further monetary liens on the PROPERTY; (d) shall not make any substantial alterations or improvements to the PROPERTY; (e) shall continue and maintain all current casualty and liability insurance policies covering the PROPERTY; (f) shall not use, produce manufacture, generate, treat, handle, store, release or dispose of any hazardous material in, on or under the PROPERTY, except as permitted by applicable environmental laws; (g) SELLER shall continue to operate the PROPERTY in the ordinary course of its business; and (h) maintain the PROPERTY in the same or better condition than as existing on the date of Mutual Acceptance but shall not be required to repair material damage from casualty except as otherwise provided by this Agreement. After the Feasibility Period, SELLER shall not enter into or modify existing rental agreements or leases (except that SELLER may enter into, modify, extend, renew or terminate residential rental agreements or residential leases in the ordinary course of its business), service contracts, or other agreements affecting the PROPERTY which have terms extending beyond Closing without first obtaining BUYER's consent, which shall not be unreasonably withheld.

**21. CLOSING COSTS AND PRORATIONS:** SELLER shall deliver an updated rent roll to Closing Agent not later than five (5) days before the scheduled Closing date and any other information reasonably requested by Closing Agent to allow Closing Agent to prepare a settlement statement for Closing. SELLER certifies that the information contained in the rent roll is correct as of the date submitted. SELLER and BUYER shall each pay one-half of the escrow fees. Real and personal property taxes and assessments payable in the year of closing; collected rents on any existing tenancies; interest; utilities; and other operating expenses shall be pro-rated as of Closing. If tenants pay any of the foregoing expenses directly, then Closing Agent shall only pro rate those mortgage reserves for assumed financing for which BUYER receives the benefit after Closing. BUYER shall pay all costs of financing including the premium for the lender's title policy. If the PROPERTY was taxed under a deferred classification prior to Closing, then SELLER shall pay all taxes, interest, penalties, deferred taxes or similar items which result from removal of the PROPERTY from the deferred classification. At Closing, all refundable deposits on tenancies shall be credited to BUYER or delivered to BUYER for deposit in a trust account if required by state or local law. BUYER shall pay any sales or use tax applicable to the transfer of personal property included in the sale.

**22. POST-CLOSING ADJUSTMENTS, COLLECTIONS AND PAYMENTS:** To the extent any items were prorated or credited at Closing based upon estimates, BUYER and SELLER shall reconcile the actual amount of revenues or liabilities upon receipt or payment thereof after Closing. Any bills or invoices received by BUYER after Closing which relate to services rendered or goods delivered to the SELLER or the PROPERTY prior to Closing shall be paid by SELLER upon presentation of such bill or invoice. At BUYER's option, BUYER may pay such bill or invoice and be reimbursed the amount paid plus interest at the rate of 12% per annum beginning fifteen (15) days from the date of BUYER's written demand to SELLER for reimbursement until such reimbursement is made. Notwithstanding the foregoing, if tenants pay certain expenses based on estimates subject to a post-closing reconciliation to the actual amounts of those expenses, then BUYER shall be entitled to any surplus and shall be liable for any credit resulting from the reconciliation. Rents collected from each tenant after Closing shall be applied first to rentals due most recently from such tenant for the period after closing, and the balance shall be applied for the benefit of SELLER for delinquent rentals owed for a period prior to closing. The amounts applied for the benefit of SELLER shall be turned over by BUYER to SELLER promptly after receipt. SELLER shall be entitled to pursue any lawful methods of collection of delinquent rents but shall have no right to evict tenants after Closing.

**23. RISK OF LOSS OR NEGLECT:** Prior to closing of this sale, all risk of loss shall remain with SELLER. In addition, should the PROPERTY be materially damaged by fire, neglect, or other destructive cause prior to closing, this agreement shall be voidable at the option of BUYER.

**24. SECTION 1031 TAX DEFERRED EXCHANGE:** If applicable, each party shall cooperate with the other Party in effectuating an exchange under IRS Section 1031; provided however, that the other Party's cooperation shall be conditioned on the following: (a) the exchange shall be at no additional liability and/or cost to the other Party; (b) the exchange shall not delay Settlement or Closing; and (c) the other Party shall not be required to acquire title to any proposed exchange properties to accommodate an exchange. The exchanging party shall indemnify, defend and hold the other Party harmless from and against any and all claims, demands, costs and expenses which the other Party may sustain or incur resulting from the attempt by the exchanging Party to consummate the sale or acquisition of the PROPERTY as a 1031 exchange.

**25. POSSESSION:** SELLER shall deliver physical possession of the PROPERTY to BUYER with twenty-four (24) hours following Closing or at such other date and time as is agreed to by the parties in writing.

**26. TRANSMISSION OF DOCUMENTS:** Facsimile or electronic transmission of any signed original document, and retransmission of any signed facsimile or electronic transmission shall be the same as delivery of an original. At the request of either the BUYER or SELLER, or the lender, or the Closing Agency, the BUYER and SELLER will confirm facsimile or electronic transmitted signatures by signing an original document.

**27. BUSINESS DAYS:** A business day is herein defined as Monday through Friday, 8:00 A.M. to 5:00 P.M. in the local time zone where the subject PROPERTY is physically located. A business day shall not include any Saturday or Sunday, nor shall a business day include any legal holiday recognized by the state of Idaho as found in Idaho Code §73-108. The time in which any act required under this agreement is to be performed shall be computed by excluding the date of execution and including the last day. The first day shall be the day after the date of execution. If the last day is a legal holiday, then the time for performance shall be the next subsequent business day.

**28. CALENDAR DAYS:** A calendar day is herein defined as Monday through Sunday, 8:00 A.M. to 5:00 P.M., in the local time zone where the subject PROPERTY is physically located. A calendar day shall include any legal holiday. The time in which any act required under this agreement is to be performed shall be computed by excluding the date of execution and including the last day, thus the first day shall be the day after the date of execution. Any reference to "day" or "days" in this agreement means the same as calendar day, unless specifically enumerated as a "business day."

**29. DEFAULT:** <u>If BUYER defaults</u> in the performance of this Agreement, SELLER shall be entitled, as SELLER's sole and exclusive remedy, to terminate this Agreement by written notice to the BUYER, in which event the Earnest Money deposit shall be paid to SELLER as liquidated damages.
<u>If SELLER defaults,</u> having approved said sale and fails to consummate the same as herein agreed, BUYER's Earnest Money deposit shall be returned to him/her and SELLER shall pay for the costs of title insurance, escrow fees, credit report fees, inspection fees, Brokerage fees and attorney's fees, if any. This shall not be considered as a waiver by BUYER of any other lawful right or remedy to which BUYER may be entitled.

BUYER'S Initials (RTR)( ) Date 12/24/15 SELLER'S Initials ( )( ) Date 12-30-15

This form is printed and distributed by the Idaho Association of REALTORS®, Inc. This form has been designed and is provided for use by the real estate professionals who are members of the Idaho Association of REALTORS®. USE BY ANY OTHER PERSON IS PROHIBITED. ©Copyright Idaho Association of REALTORS®, Inc. All rights reserved.

**PROPERTY ADDRESS:** 669 Quinn                                      ID#: FK 122315

**30. EARNEST MONEY DISPUTE / INTERPLEADER:** Notwithstanding any termination or breach of this Agreement, BUYER and SELLER agree that in the event of any controversy regarding the Earnest Money and things of value held by Broker or closing agency, Broker may reasonably rely on the terms of this Agreement or other written documents signed by both parties to determine how to disburse the disputed money. However, Broker or closing agency shall not be required to take any action but may await any proceeding, or at Broker's or closing agency's option and sole discretion, may interplead all parties and deposit any moneys or things of value into a court of competent jurisdiction and shall recover all costs which were incurred as a result of the dispute including, but not limited to, reasonable attorney's fees. If either parties' Broker incurs attorney's fees as a result of any Earnest Money dispute, whether or not formal legal action is taken, said Broker is entitled to recover actual fees incurred from either BUYER or SELLER.

**31. ATTORNEY'S FEES:** If either party initiates or defends any arbitration or legal action or proceedings which are in any way connected with this Agreement, the prevailing party shall be entitled to recover from the non-prevailing party reasonable costs and attorney's fees, including such costs and fees on appeal.

**32. SEVERABILITY:** In the case that any one or more of the provisions contained in this Agreement, or any application thereof, shall be invalid, illegal or unenforceable in any respect, the validity, legality or enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

**33. COUNTERPARTS:** This Agreement may be executed in counterparts. Executing an agreement in counterparts shall mean the signature of two identical copies of the same agreement. Each identical copy of an agreement signed in counterparts is deemed to be an original, and all identical copies shall together constitute one and the same instrument.

**34. AUTHORITY OF SIGNATORY:** If BUYER or SELLER is a corporation, partnership, trust, estate, or other entity, the person executing this agreement on its behalf warrants his or her authority to do so and to bind BUYER or SELLER.

**35. ENTIRE AGREEMENT:** This Agreement, including any Addendums or exhibits, constitutes the entire Agreement between the parties and no warranties, including any warranty of habitability or representations have been made or shall be binding upon either party unless herein set forth. All implied warranties of merchantability and/or fitness for a particular purpose are hereby excluded.

**36. ACKNOWLEDGMENT OF PROFESSIONAL REVIEW:** BUYER and SELLER hereby acknowledge that their Broker and/or Agent advised both parties to obtain professional inspections of the PROPERTY, including inspections of the PROPERTY's title and platting, zoning requirements and the PROPERTY's services and utilities. Additionally, BUYER and SELLER have been advised to obtain appropriate tax, accounting, legal or other professional advice or counsel when necessary, including, but not limited to, independent legal review of this Agreement. Furthermore, it is acknowledged that the parties Brokers and/or Agents have not made any representations or warranties or conducted any independent investigation of the condition or financial feasibility of the PROPERTY. BUYER and SELLER have not relied on any marketing material or assertions of any Broker and/or Agent in determining the viability or fitness of the PROPERTY for its intended purpose.

**37. REPRESENTATION CONFIRMATION:** Check one (1) box in Section 1 and one (1) box in Section 2 below to confirm that in this transaction, the brokerage(s) involved had the following relationship(s) with the BUYER(S) and SELLER(S).

Section 1:
... A. The brokerage working with the BUYER(S) is acting as an AGENT for the BUYER(S).
... B. The brokerage working with the BUYER(S) is acting as a LIMITED DUAL AGENT for the BUYER(S), without an ASSIGNED AGENT.
... C. The brokerage working with the BUYER(S) is acting as a LIMITED DUAL AGENT for the BUYER(S) and has an ASSIGNED AGENT acting solely on behalf of the BUYER(S).
X D. The brokerage working with the BUYER(S) is acting as a NONAGENT for the BUYER(S).

Section 2:
X A. The brokerage working with the SELLER(S) is acting as an AGENT for the SELLER(S).
... B. The brokerage working with the SELLER(S) is acting as a LIMITED DUAL AGENT for the SELLER(S), without an ASSIGNED AGENT.
... C. The brokerage working with the SELLER(S) is acting as a LIMITED DUAL AGENT for the SELLER(S) and has an ASSIGNED AGENT acting solely on behalf of the SELLER(S).
... D. The brokerage working with the SELLER(S) is acting as a NONAGENT for the SELLER(S).

Each party signing this document confirms that he has received, read and understood the Agency Disclosure Brochure adopted or approved by the Idaho real estate commission and has consented to the relationship confirmed above. In addition, each party confirms that the brokerage's agency office policy was made available for inspection and review. EACH PARTY UNDERSTANDS THAT HE IS A "CUSTOMER" AND IS NOT REPRESENTED BY A BROKERAGE UNLESS THERE IS A SIGNED WRITTEN AGREEMENT FOR AGENCY REPRESENTATION.

BUYER'S Initials (_____)(_____) Date 12/24/15          SELLER'S Initials (_____)(_____) Date 12/30/15

This form is printed and distributed by the Idaho Association of REALTORS®, Inc. This form has been designed and is provided for use by the real estate professionals who are members of the Idaho Association of REALTORS®. USE BY ANY OTHER PERSON IS PROHIBITED. ©Copyright Idaho Association of REALTORS®, Inc. All rights reserved.





THIS SKETCH IS MADE SOLELY
FOR THE PURPOSE OF ASSISTING
IN LOCATING THE PREMISES.
THE COMPANY ASSUMES NO
LIABILITY FOR ALLEGED LOSS OR
DAMAGE WHICH MAY RESULT
FROM RELIANCE ON THIS MAP.

— EXHIBIT A —



## ADDENDUM NO. 4
## TO
## REAL ESTATE PURCHASE AND SALES AGREEMENT

**THIS IS AN ADDENDUM** to that REAL ESTATE PURCHASE AND SALES AGREEMENT (the "REPSA") with an Effective Date of December 30, 2015 between Featherston Holdings or Assigns. Buyer, and First Pocatello Associates, L.P., ID# FH 122315, regarding the Property located at **669 Quinn Road Pocatello, Idaho**. The following terms are hereby incorporated as part of the REPSA.

1. Earnest Money Paragraph #4, including Addendum #3, replaced with the following: Buyer shall deposit no later than 28 January, 2016 $150,000. Of which Fifty Thousand Dollars ($50,000.00) shall be immediately released to the Seller, applied to the closing and shall become NON REFUNDABLE.

2. Buyer shall have one options to extend the Due Diligence by sixty (60) days, by depositing and additional One Hundred Twenty-Five Thousand Dollars ($125,000) as Earnest money of which Twenty Five Thousand Dollars ($25,000) shall be immediately released to Seller, applied to the closing and shall become NON REFUNDABLE.

**Entire Agreement.** The Agreement, the First Addendum, Second Addendum, Third Addendum and this Forth Addendum constitute the entire agreement between the Parties.

**No Changes to Other Terms:** All other terms and provisions of the Agreement shall remain as they are presently stated. To the extent the terms of this Addendum modify of conflict with any provisions of the Agreement, the terms of this Addendum shall control.

To the extend the terms of this Addendum modify or conflict with any provisions of the REPSA, including all prior addenda and counteroffers, these terms shall control. All other terms of the REPSA, by Addendum One, Two and this Addendum shall remain the same.

Upon its execution by the Parties, the Addendum is made an integral part of the Agreement.

## ACCEPTANCE

☐ Buyer ☐ Seller Signature   (Date) (Time)       ☐ Buyer ☐ Seller Signature   (Date) (Time)



# ADDENDUM TO REAL ESTATE PURCHASE AND SALE AGREEMENT

This **ADDENDUM TO REAL ESTATE PURCHASE AND SALE AGREEMENT** ("Addendum") is made effective this 30ᵗʰ day of December, 2015, by and among **FEATHERSTONE HOLDINGS**, a California corporation ("Buyer") and **FIRST POCATELLO ASSOCIATES, L.P.**, a New Jersey limited partnership qualified to transact business in Idaho ("Seller"). Buyer and Seller are collectively referred to herein as the "Parties."

## *RECITALS*

**WHEREAS**, Buyer signed the Real Estate Purchase and Sale Agreement dated as of December 23, 2015 (the "Agreement") for the sale of real property from Seller to Buyer; and

**WHEREAS**, the Parties mutually desire to revise the Agreement on the terms set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the recitals above, and in consideration of the promises and the mutual representations, covenants, agreements contained hereinafter, Buyer and Seller represent, covenant, and agree as follows:

## AGREEMENT

1. **Purchase Price.** Section 2 of the Agreement is hereby amended to increase the Purchase Price of the Property to Twenty-One Million and no/100ths dollars ($21,000,000.00).

2. **Allocation of Purchase Price.** The Purchase Price shall be allocated for federal and state tax purposes among real property, personal property, and intangibles by the Parties on terms as the Parties may mutually agree at a later date.

3. **Demonstration of Financial Capacity.** Before the Buyer conducts any Due Diligence on the Property, the Buyer shall deliver to Seller a financing commitment valid through the Closing Date from a state chartered or nationally chartered bank or lending institution for the full amount of the Purchase Price, less Earnest Money deposited by Buyer.

4. **Conveyance of Title.** Title to the Property shall be conveyed by a Warranty Deed. Title to the Property shall be marketable and insurable and shall be free and clear of all liens, encumbrances, and restrictions, subject to the following matters, which shall be deemed to be Permitted Exceptions (i) the lien of all ad valorem real estate taxes and assessments not yet due and payable as of the Closing Date, subject to adjustment as herein provided; (ii) the rights of tenants, as tenants only, under any existing leases and any new leases entered into between the date of the Agreement and Closing and, where required, approved by Buyer in accordance with the terms of the Agreement; (iii) local, state and federal laws, ordinances or governmental regulations, including but not limited to, building and zoning laws, ordinances and regulations, now or hereafter in effect relating to the Property; and (iv) items appearing of record, including, but not limited to, exceptions shown on the Preliminary Title Commitment or shown on any survey (or, if no survey is furnished by Buyer, any matter that would be shown on a current ALTA

Client:4034788.1 

survey of the Property) and, in either case, not objected to by Buyer prior to the Due Diligence Deadline.

5.   **Assumption of Leases and Indemnification.**  At the Closing, Seller shall execute an assignment of leases then in effect on the Property ("Leases"), in such form as is reasonably agreeable by the parties so that the Leases are assigned to Buyer as of the Closing (the "Assignment").  A form of the Assignment shall be presented to Buyer by Seller within thirty (30) days of the date of this Addendum.  Such Assignment shall also provide that effective as of the day immediately following the date of closing of the sale under the Agreement, Buyer will assume and perform all of Seller's obligations with respect to the Leases.  Buyer will indemnify, defend, and hold harmless Seller with respect to all obligations of Lessor, and claims against Lessor accruing under the Leases and relating to periods falling after Closing.  Buyer's obligation under this paragraph will specifically survive the Closing.  Seller will indemnify, defend, and hold harmless Buyer with respect to all obligations of Seller, and claims against Lessor accruing under, the Leases, and relating to periods occurring prior to the date of sale closing under this Agreement.   Seller's obligations under this paragraph will specifically survive the Closing.

6.   **Settlement and Closing Costs.**   The second sentence of Subparagraph 11(B) ("Settlement and Closing Costs") is hereby deleted and replaced with the following:

> Utilities (including but not limited to water, sewer, trash, gas, and electricity), taxes and assessments for the current year, rents, and interest on any assumed obligations shall be prorated at Settlement as set forth in this section.

Subparagraph 11(B) is otherwise unchanged.

7.   **Items Specifically Excluded In This Sale.**   The following items are specifically excluded from sale under the Agreement:

A.   The Seller's personal residence, commonly described as 1499 Partridge Cove, Pocatello, Idaho 83201; and

B.   The Seller's personal vehicles: (i) a 2009 white Ford F-150 pickup truck; (ii) a 2014 red Ford F-350 pickup truck; (iii) a 2013 red Ford Explorer; and (iv) a Gooseneck trailer.

8.   **Seller Representations and Warranties.**   Subparagraphs 18(c) and 18(d) of the Agreement ("Seller Representations and Warranties") are hereby deleted and replaced with the following:

> (c)     Seller has not received any written notification from any governmental or public authority that the Property is in violation of any applicable hazardous substance or environmental, fire, health, building, use, occupancy, or zoning laws where such violation remains outstanding.

**ADDENDUM TO REAL ESTATE PURCHASE AND SALE AGREEMENT** – 2/5

Client:4034788




## ADDENDUM NO. 3
## TO
## REAL ESTATE PURCHASE AND SALES AGREEMENT

**THIS IS AN ADDENDUM** to that REAL ESTATE PURCHASE AND SALES AGREEMENT (the "REPSA") with an Effective Date of December 30, 2015 between Featherston Holdings or Assigns. Buyer, and First Pocatello Associates, L.P., ID# FH 122315, regarding the Property located at **669 Quinn Road Pocatello, Idaho**. The following terms are hereby incorporated as part of the REPSA.

**Addendum #2.** Item 1 (One) to be deleted in its entirety and replaced with, Within 90 days from the start of the due diligence period Buyer shall provide Seller with proof of funds. The Buyer may extend the deadline for an additional 60 days to show proof of funds by depositing an additional $50,000 earnest money which shall be credited at closing.

**Earnest Money Paragraph #4 deposit date to be replace with.** First deposit of Earnest Money of $100,000 to be deposited on or before 26 January, 2016 which shall be the effective date of the agreement.

**Entire Agreement.** The Agreement, the First Addendum, Second Addendum and this Third Addendum constitute the entire agreement between the Parties.

**No Changes to Other Terms:** All other terms and provisions of the Agreement shall remain as they are presently stated. To the extent the terms of this Addendum modify of conflict with any provisions of the Agreement, the terms of this Addendum shall control.

To the extend the terms of this Addendum modify or conflict with any provisions of the REPSA, including all prior addenda and counteroffers, these terms shall control. All other terms of the REPSA, by Addendum One, Two and this Addendum shall remain the same.

Upon its execution by the Parties, the Addendum is made an integral part of the Agreement.

## ACCEPTANCE

☐ Buyer ☐ Seller Signature    (Date) (Time)        ☐ Buyer ☐ Seller Signature   (Date) (Time)

later than seventy-five (75) days after the execution of the Second Addendum.

2.  **Confidentiality.**  The following provision is hereby inserted into the First Addendum immediately after Subparagraph 10(A):

B.  Prior to Closing, Seller and its representatives shall hold in strictest confidence all data and information obtained with respect to Buyer, its business, or the Property, whether obtained before or after the execution and delivery of the Agreement, and shall not disclose the same to others except pursuant to court order or as otherwise required by law; provided, however, that it is understood and agreed that Seller may disclose such data and information to the employees, consultants, accountants, lenders and attorneys of Seller provided that such persons are instructed to treat such data and information confidentially.  The foregoing shall not apply to information obtained from a source other than Buyer or otherwise available in the public domain.  If the Agreement is terminated or Seller fails to perform hereunder, Seller shall promptly return to Buyer any statements, documents, schedules, exhibits or other written information obtained from Buyer in connection with the Agreement or the transaction contemplated herein.  In the event of a breach or threatened breach by Seller or its agents or representatives of this Section, Buyer shall be entitled to an injunction restraining Seller or its agents or representatives from disclosing, in whole or in part, such confidential information.  Nothing herein shall be construed as prohibiting Buyer from pursuing any other available remedy at law or in equity for such breach or threatened breach.  This Section of the Addendum shall survive Closing or any termination of the Agreement.

3.  **Entire Agreement.**  The Agreement, the First Addendum and this Second Addendum constitute the entire agreement between the Parties.

4.  **Defined Terms.**  Terms used but not defined in this Second Addendum shall have the meanings ascribed thereto in the Agreement.

5.  **No Change to Other Terms.**  All other terms and provisions of the First Addendum and the Agreement shall remain as they are presently stated.  To the extent the terms of this Second Addendum modify or conflict with any provision of the First Addendum or the Agreement, the terms of this Second Addendum shall control.  To the extent the terms of the First Addendum modify or conflict with any provision in the Agreement, the terms of the First Addendum shall control.  Upon its execution by the Parties, this Second Addendum is made an integral part of the Agreement.

6.  **Counterparts.**  This Second Addendum may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

*{Remainder of Page Intentionally Blank, Signature Page follows}*

**SECOND ADDENDUM TO REAL ESTATE PURCHASE AND SALE AGREEMENT — 2**

Client:4036101.2

IN WITNESS WHEREOF, the Parties have set their hands effective the date first written above, and state that they are authorized to execute this agreement.

**BUYER:**

FEATHERSTONE HOLDINGS, a California corporation

By_____

Its_____

**SELLER:**

FIRST POCATELLO ASSOCIATES, L.P. an Idaho limited partnership

By_____

Its_____

14 of



THIS SKETCH IS MADE SOLELY
FOR THE PURPOSE OF ASSISTING
IN LOCATING THE PREMISES.
THE COMPANY ASSUMES NO
LIABILITY FOR ALLEGED LOSS OR
DAMAGE WHICH MAY RESULT
FROM RELIANCE ON THIS MAP.

- EXHIBIT A -

RTF 12/24/15



## SECOND ADDENDUM TO REAL ESTATE PURCHASE AND SALE AGREEMENT

This **SECOND ADDENDUM TO REAL ESTATE PURCHASE AND SALE AGREEMENT** ("Second Addendum") is made effective this 31 day of _December, 2015_ by and among **FEATHERSTONE HOLDINGS**, a California corporation ("Buyer") and **FIRST POCATELLO ASSOCIATES, L.P.**, a New Jersey limited partnership qualified to transact business in Idaho ("Seller"). Buyer and Seller are collectively referred to herein as the "Parties."

### RECITALS

**WHEREAS**, Buyer signed the Real Estate Purchase and Sale Agreement dated as of December 23, 2015 (the "Agreement") for the sale of real property from Seller to Buyer;

**WHEREAS**, Seller executed the Agreement subject to the terms of the Addendum to the Real Estate Purchase and Sale Agreement dated December 30, 2015 ("First Addendum"); and

**WHEREAS**, the Parties mutually desire to revise the Agreement as amended on the terms set forth herein.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the recitals above, and in consideration of the promises and the mutual representations, covenants, agreements contained hereinafter, Buyer and Seller represent, covenant, and agree as follows:

### AGREEMENT

1. **Demonstration of Financial Capacity.** The third paragraph in the First Addendum ("Demonstration of Financial Capacity") is hereby deleted and replaced with the following:

   **Demonstration of Financial Capacity.**

   A.    No later than ten (10) days after the execution of the Second Addendum, Buyer shall provide Seller a financial statement in the form of a balance sheet signed by an officer of the Buyer dated no earlier than December 1, 2015.

   B.    No later than ninety (90) days after the execution of the Second Addendum, Buyer shall deliver to Seller a financing commitment valid through the Closing Date from a state chartered or nationally chartered bank or lending institution for the full amount of the Purchase Price, less Earnest Money deposited by Buyer (the "Financing Commitment"). The Buyer may extend the deadline for providing the Financing Commitment by an additional sixty (60) days by depositing an additional fifty-thousand and no/100ths dollars ($50,000.00) of Earnest Money no

Client:4036101.2

12/31/15



EXHIBIT A



Subparagraph 18(c) of the Agreement is hereby re-designated Subparagraph 18(d).

9.    **Condition of Property at Closing.**  Paragraph 19 in the Agreement ("Conditions of Property at Closing") is hereby deleted in its entirety and replaced with the following:

> 19.    **Condition of Property at Closing.**  Upon expiration of the Due Diligence Deadline, and subject only to the representations and warranties stated herein, BUYER agrees to purchase the PROPERTY in as-is condition, without representations, warranties, and covenants, express or implied, of any kind of nature from Seller to Buyer in connection with this sale as to the condition, quality, or suitability of the property sold or its environmental condition. Upon Closing, BUYER shall assume all obligations with respect to the Property.

10.   **Confidentiality.**

> A.    Prior to Closing, Buyer and its representatives shall hold in strictest confidence all data and information obtained with respect to Seller, its business, or the Property, whether obtained before or after the execution and delivery of the Agreement, and shall not disclose the same to others except pursuant to court order or as otherwise required by law; provided, however, that it is understood and agreed that Buyer may disclose such data and information to the employees, consultants, accountants, lenders and attorneys of Buyer provided that such persons are instructed to treat such data and information confidentially. The foregoing shall not apply to information obtained from a source other than Seller or otherwise available in the public domain. If the Agreement is terminated or Buyer fails to perform hereunder, Buyer shall promptly return to Seller any statements, documents, schedules, exhibits or other written information obtained from Seller in connection with the Agreement or the transaction contemplated herein. In the event of a breach or threatened breach by Buyer or its agents or representatives of this Section, Seller shall be entitled to an injunction restraining Buyer or its agents or representatives from disclosing, in whole or in part, such confidential information. Nothing herein shall be construed as prohibiting Seller from pursuing any other available remedy at law or in equity for such breach or threatened breach. This Section of the Addendum shall survive Closing or any termination of the Agreement.

11.   **Entire Agreement.**  The Agreement and this Addendum constitute the entire agreement between the Parties.

12.   **Defined Terms.**  Terms used but not defined in this Addendum shall have the meanings ascribed thereto in the Agreement.

13.   **No Change to Other Terms.**  All other terms and provisions of the Agreement shall remain as they are presently stated. To the extent the terms of this Addendum modify or conflict with any provision of the Agreement, the terms of this Addendum shall control.

Client:4034788.1

Upon its execution by the Parties, this Addendum is made an integral part of the Agreement.

14.   **Counterparts.**  This Addendum may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

*{Remainder of Page Intentionally Blank, Signature Page follows}*

Client:4094799.1



IN WITNESS WHEREOF, the Parties have set their hands effective the date first written above, and state that they are authorized to execute this agreement.

**BUYER:**

FEATHERSTONE HOLDINGS, a California corporation

By _____

    Its _____

**SELLER:**

FIRST POCATELLO ASSOCIATES, L.P.
an Idaho limited partnership

By _____

    Its GENERAL PARTNER



## SECOND ADDENDUM TO REAL ESTATE PURCHASE AND SALE AGREEMENT

This **SECOND ADDENDUM TO REAL ESTATE PURCHASE AND SALE AGREEMENT** ("Second Addendum") is made effective this 31 day of December, 2015 by and among **FEATHERSTONE HOLDINGS**, a California corporation ("Buyer") and **FIRST POCATELLO ASSOCIATES, L.P.**, a New Jersey limited partnership qualified to transact business in Idaho ("Seller"). Buyer and Seller are collectively referred to herein as the "Parties."

### *RECITALS*

**WHEREAS**, Buyer signed the Real Estate Purchase and Sale Agreement dated as of December 23, 2015 (the "Agreement") for the sale of real property from Seller to Buyer;

**WHEREAS**, Seller executed the Agreement subject to the terms of the Addendum to the Real Estate Purchase and Sale Agreement dated December 30, 2015 ("First Addendum"); and

**WHEREAS**, the Parties mutually desire to revise the Agreement as amended on the terms set forth herein.

**NOW, THEREFORE,** for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in consideration of the recitals above, and in consideration of the promises and the mutual representations, covenants, agreements contained hereinafter, Buyer and Seller represent, covenant, and agree as follows:

### AGREEMENT

1.   **Demonstration of Financial Capacity.**  The third paragraph in the First Addendum ("Demonstration of Financial Capacity") is hereby deleted and replaced with the following:

     **Demonstration of Financial Capacity.**

     A.   No later than ten (10) days after the execution of the Second Addendum, Buyer shall provide Seller a financial statement in the form of a balance sheet signed by an officer of the Buyer dated no earlier than December 1, 2015.

     B.   No later than ninety (90) days after the execution of the Second Addendum, Buyer shall deliver to Seller a financing commitment valid through the Closing Date from a state chartered or nationally chartered bank or lending institution for the full amount of the Purchase Price, less Earnest Money deposited by Buyer (the "Financing Commitment"). The Buyer may extend the deadline for providing the Financing Commitment by an additional sixty (60) days by depositing an additional fifty-thousand and no/100ths dollars ($50,000.00) of Earnest Money no

12/31/15

**SECOND ADDENDUM TO REAL ESTATE PURCHASE AND SALE AGREEMENT  – 1**

Client:4036101.2

later than seventy-five (75) days after the execution of the Second Addendum.

2. **Confidentiality.** The following provision is hereby inserted into the First Addendum immediately after Subparagraph 10(A):

B. Prior to Closing, Seller and its representatives shall hold in strictest confidence all data and information obtained with respect to Buyer, its business, or the Property, whether obtained before or after the execution and delivery of the Agreement, and shall not disclose the same to others except pursuant to court order or as otherwise required by law; provided, however, that it is understood and agreed that Seller may disclose such data and information to the employees, consultants, accountants, lenders and attorneys of Seller provided that such persons are instructed to treat such data and information confidentially. The foregoing shall not apply to information obtained from a source other than Buyer or otherwise available in the public domain. If the Agreement is terminated or Seller fails to perform hereunder, Seller shall promptly return to Buyer any statements, documents, schedules, exhibits or other written information obtained from Buyer in connection with the Agreement or the transaction contemplated herein. In the event of a breach or threatened breach by Seller or its agents or representatives of this Section, Buyer shall be entitled to an injunction restraining Seller or its agents or representatives from disclosing, in whole or in part, such confidential information. Nothing herein shall be construed as prohibiting Buyer from pursuing any other available remedy at law or in equity for such breach or threatened breach. This Section of the Addendum shall survive Closing or any termination of the Agreement.

3. **Entire Agreement.** The Agreement, the First Addendum and this Second Addendum constitute the entire agreement between the Parties.

4. **Defined Terms.** Terms used but not defined in this Second Addendum shall have the meanings ascribed thereto in the Agreement.

5. **No Change to Other Terms.** All other terms and provisions of the First Addendum and the Agreement shall remain as they are presently stated. To the extent the terms of this Second Addendum modify or conflict with any provision of the First Addendum or the Agreement, the terms of this Second Addendum shall control. To the extent the terms of the First Addendum modify or conflict with any provision in the Agreement, the terms of the First Addendum shall control. Upon its execution by the Parties, this Second Addendum is made an integral part of the Agreement.

6. **Counterparts.** This Second Addendum may be executed in one or more counterparts, each of which shall be deemed an original but all of which together will constitute one and the same instrument.

*{Remainder of Page Intentionally Blank, Signature Page follows}*

**SECOND ADDENDUM TO REAL ESTATE PURCHASE AND SALE AGREEMENT – 2**   Client:4036101.2

22¢

## ADDENDUM NO. 3
## TO
## REAL ESTATE PURCHASE CONTRACT

**THIS IS AN X ADDENDUM** to that REAL ESTATE PURCHASE CONTRACT (the "REPC") with an Effective Date of December 23, 2015 between Featherston Holdings or Assigns. Buyer, and First Pocatello Associates, L.P., regarding the Property located at **669 Quinn Road Pocatello, Idaho** . The following terms are hereby incorporated as part of the REPC.

**Binding Arbitration**. All claims and disputes arising under or relating to this Agreement are to be settled by binding arbitration in the state Idaho or another location mutually agreeable to the parties. The arbitration shall be conducted on a confidential basis pursuant to the Commercial Arbitration Rules of the American Arbitration Association. Any decision or award as a result of any such arbitration proceeding shall be in writing and shall provide an explanation for all conclusions of law and fact and shall include the assessment of costs, and expenses. Any such arbitration shall be conducted by an arbitrator experienced in Real Estate and shall include a written record of the arbitration hearing. The parties reserve the right to object to any individual who shall be employed by or affiliated with a competing organization or entity. The parties agree and waive their right to a trial and agree to accept the arbitrator's decision as final.

**Entire Agreement.** The Agreement, the First Addendum, Second Addendum and this Third Addendum constitute the entire agreement between the Parties.

To the extend the terms of this ADDENDUM modify or conflict with any provisions of the REPC, including all prior addenda and counteroffers, these terms shall control. All other terms of the REPC, not modified by this ADDENDUM shall remain the same.

## ACCEPTANCE

☐ Buyer ☐ Seller Signature      (Date) (Time)          ☐ Buyer ☐ Seller Signature      (Date)(Time)

C:\Users\Don\Desktop\Desktop\1 LISTING FORMS\Addendum to REPC 4_11.doc



# RE-23 COMMERCIAL/INVESTMENT
# REAL ESTATE PURCHASE AND SALE AGREEMENT

JULY 2014 EDITION

Idaho Association of Realtors®
*The Voice for Real Estate® in Idaho*

THIS IS A LEGALLY BINDING CONTRACT, READ THE ENTIRE DOCUMENT, INCLUDING ANY ATTACHMENTS.
IF YOU HAVE ANY QUESTIONS, CONSULT YOUR ATTORNEY AND/OR ACCOUNTANT BEFORE SIGNING.

Page 1 of 6

NO WARRANTIES, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF HABITABILITY, AGREEMENTS
OR REPRESENTATIONS NOT EXPRESSLY SET FORTH HEREIN SHALL BE BINDING UPON EITHER PARTY.

1  ID# FH 122315                                                              DATE  23 December 2015
2
3  LISTING AGENCY Coldwell Banker Commercial Advisors        Office Phone #_____  Fax #_____
4  Listing Agent Don Zebe                        E-Mail_____                Phone #_____
5  SELLING AGENCY Coldwell Banker Commercial Advisors        Office Phone #_____  Fax #_____
6  Selling Agent Don Zebe                  E-Mail don.zebe@cbcadvisors.com        Phone # 208 403 1973
7
8  **1. BUYER:** Featherstone Holdings or Assigns
9  (Hereinafter called "**BUYER**") agrees to purchase, and **SELLER** First Pocatello Associates LP
10 (Hereinafter called "**SELLER**") agrees to sell the following described real estate hereinafter referred to as "PROPERTY"
11 COMMONLY KNOWN AS 669 Quinn Road
12 City POCATELLO            County BANNOCK        , Idaho, Zip 83201            legally described as:_____
13       RPCPP023305
14 OR Legal Description Attached as exhibit  A Site Map        (**Exhibit must accompany original offer and be signed or initialed by**
15 **BUYER and SELLER.**)
16
17 **2.** 19,000,000            **PURCHASE PRICE:** Nineteen Million                        **DOLLARS,**
18 which shall be payable by federal wire transfer or other collected funds at Closing, unless otherwise specified in an addendum hereto. Title of SELLER is to
19 be conveyed by ✗ warranty deed ____ special warranty deed or _____ deed (not including closing costs).
20
21 **3. FINANCING CONTINGENCY: THIS IS NOT AN ALL CASH OFFER.** If this is an all cash offer, BUYER'S OBLIGATION TO CLOSE SHALL NOT
22 BE SUBJECT TO ANY FINANCING CONTINGENCY. **If this is not an all cash offer and an appraisal is required by lender, the PROPERTY must**
23 **appraise at not less than purchase price** and BUYER'S Earnest Money shall be returned at BUYER'S request. *BUYER may also apply for a loan with*
24 *different conditions and costs and close transaction provided all other terms and conditions of this Agreement are fulfilled, and the new loan does not*
25 *increase the costs or requirements of the SELLER.* This Agreement is only subject to a satisfactory appraisal and final lender underwriting after the release
26 of all contingencies, inspections, due diligence and feasibility studies have been completed to the satisfaction of BUYER.
27
28 **4. EARNEST MONEY:** BUYER hereby deposits $ Two Hundred Twenty Five Thousand Dollars        as Earnest Money, together with interest
29 thereon, if any. Evidenced by: ...cash personal check **x** cashier's check ...note (due date):_____
30 ...other_____                        and a receipt is hereby acknowledged.  Earnest Money to be deposited in trust account
31 ...upon receipt or **X** upon acceptance by BUYER and SELLER or X other FIRST AMERICAN TITLE COMPANY 223 N 15TH STREET POCATELLO
32 IDHAO 83201 Attn: Melissa Raschke  208 232 6224  and shall be held by: ...Listing Broker ...Selling Broker
33 X other FIRST AMERICA TITLE, POCATELLO        for the benefit of the parties hereto.
34 Unless otherwise agreed to in writing, the Earnest Money shall be applicable to the purchase price.
35 **THE RESPONSIBLE BROKER SHALL BE:** Steve Bogden, COLDWELL BANKER COMMERCIAL ADVISORS
36
37 **5. OTHER TERMS AND/OR CONDITIONS:** This Agreement is made subject to the following special terms, considerations, addenda and/or
38 conditions which must be satisfied prior to closing 1. Buyer understands the purchase of the property is "AS IS"
39 2. Upon removal of due diligence earnest money shall be non-refundable and earnest money shall be applied to the purchase price
40 3. Seller to provide all leases, rent rolls, maintenance records, surveys, inspections, reports, clearances, that are in sellers possession, upon delivery due
41 diligence shall commence.
42 4. Buyer shall have one option to extend due diligence for 60 days with 5 day written notice.
43 _____
44 _____
45 _____
46 _____
47
48 **6. DEADLINES:** The following deadlines shall be binding on the parties and referred by name in this Agreement. TIME IS OF THE ESSENCE IN THIS
49 AGREEMENT.
50   (A) "SELLER DISCLOSURE DEADLINE":        20  CALENDAR DAYS (ten [10] if left blank)
51   (B) "DUE DILIGENCE DEADLINE":        90 CALENDAR DAYS (thirty [30] if left blank)
52   (C) "SETTLEMENT AND CLOSING DEADLINE":    28 June 2016
53
54 **7. TITLE COMPANY:** The parties agree that First American Title Company
55 Title Company located at 223 N 15 St. Pocatello, Idaho 83201  208 232 6224 Att: Melissa Raschke        shall provide the title
56 policy and preliminary report of commitment.
57
58 **8. ACCEPTANCE:** This offer is made subject to the acceptance of SELLER and BUYER on or before (Date) 2 January 2016 at  (Local
59 Time in which PROPERTY is located) 5            ...A.M. X P.M.
60
61
62 **9. ASSIGNMENT:** This Agreement and any rights or interests created herein X may ... may not be sold, transferred, or otherwise assigned.
63
64
**BUYER'S Initials (_____)(_____)** Date 12/24/15        **SELLER'S Initials (_____)(_____)** Date _____

This form is printed and distributed by the Idaho Association of REALTORS®, Inc. This form has been designed and is provided for use by the real estate professionals who are members of the
Idaho Association of REALTORS®. USE BY ANY OTHER PERSON IS PROHIBITED. ©Copyright Idaho Association of REALTORS®, Inc. All rights reserved.

**PROPERTY ADDRESS:** 669 Quinn Road _____     **ID#:** FH 122315

65 **10. ITEMS INCLUDED & EXCLUDED IN THIS SALE:** All existing fixtures and fittings that are attached to the PROPERTY are **INCLUDED IN THE**
66 **PURCHASE PRICE** (unless excluded below), and shall be transferred free of liens. Unless specifically excluded below, the fixtures and fittings included in
67 the purchase price shall include (1) all personal property owned by the SELLER and used primarily in connection with the PROPERTY, and (2) all rights and
68 easements appurtenant to the PROPERTY.
69 **ITEMS SPECIFICALLY INCLUDED IN THIS SALE:** All materials, equipment, parts, vehicles, used for property maintenance. Equipment inventory.
70 _____
71 _____
72 _____
73 _____
74 _____
75 **ITEMS SPECIFICALLY EXCLUDED IN THIS SALE:** Sellers personal property _____
76 _____
77 _____
78 _____
79 _____
80

81 **11. SETTLEMENT AND CLOSING:**
82

83  (A). **SETTLEMENT:** Settlement and Closing shall take place on the Settlement and Closing Deadline, unless the parties to this Agreement agree upon
84 another date in writing. Settlement and Closing shall be deemed to have occurred only when all of the following have been fully completed: (a) BUYER
85 and SELLER have signed and delivered to the Escrow Agent all documents required by this Agreement, by any lender, or by applicable law; (b) any
86 monies required to be paid by the BUYER under this Agreement (including any proceeds of any new loan) have been delivered by BUYER, or BUYER'S
87 lender, to the Escrow Agent; (c) any monies required to be paid by the SELLER under this Agreement have been delivered by SELLER to the Escrow
88 Agent; and (d) the applicable closing documents have been recorded in the official records of the County Recorder of the county in which the PROPERTY
89 is located. At Closing, SELLER and BUYER shall execute an Assignment and Assumption Agreement transferring all leases and vendor contracts
90 assumed by BUYER through written agreement of the Parties.
91

92  (B). **SETTLEMENT AND CLOSING COSTS:** SELLER and BUYER shall each pay one-half of the fee charged by the Escrow Agent for its services in the
93 Settlement and Closing. Taxes and assessments for the current year, rents, and interest on any assumed obligations shall be prorated at Settlement as
94 set forth in this section. Tenant deposits (including, but not limited to, security deposits and prepaid rents) shall be paid or credited by SELLER to BUYER
95 at Settlement. Prorations set forth in this section shall be made by the Escrow Agent as of the Settlement Date unless otherwise agreed to by the parties
96 in writing.
97

98 **12. TITLE INSURANCE:** There may be types of title insurance coverages available other than those listed below and parties to this agreement
99 **are advised to talk to a title company about any other coverages available that will give the BUYER additional coverage.**
100

101  (A). **PRELIMINARY TITLE COMMITMENT:** No later than the Seller Disclosure Deadline, SELLER shall furnish to BUYER, at SELLER's sole cost and
102 expense, a preliminary commitment of a title insurance policy showing the condition of the title to said PROPERTY, together with a copy of each
103 instrument, agreement or document listed as an exception to title in the title commitment that is reasonably available to SELLER. BUYER shall have
104 fifteen (15) business days from receipt of the preliminary commitment within which to object in writing to the condition of the title as set forth in the
105 preliminary commitment. If BUYER does not so object, BUYER shall be deemed to have accepted the conditions of the title. It is agreed that if the title of
106 said PROPERTY is not marketable, or cannot be made so within ten (10) business days after notice containing a written statement of defect is delivered
107 to SELLER, then BUYER, at BUYER's option, may either: (a) terminate this agreement by written notice to the SELLER, in which BUYER'S Earnest
108 Money deposit shall be returned to BUYER and neither party shall have any further rights, obligations or liabilities except as expressly set forth in this
109 Agreement; or (b) continue with this Agreement and, if closing occurs, accept title subject to the uncured title defects other than monetary liens. SELLER
110 covenants and agrees that all monetary liens shall be removed by SELLER at closing or insured against by the title insurer, whether or not BUYER has
111 designated such monetary liens as title defects.
112

113  (B). **STANDARD COVERAGE OWNER'S POLICY:** At Settlement, SELLER shall, at SELLER's sole expense, furnish to BUYER a title insurance policy
114 in the amount of the purchase price of the PROPERTY showing marketable and insurable title subject to the liens, encumbrances and defects to be
115 discharged or assumed by BUYER as provided herein. BUYER, at its sole option, cost and expense, may elect to obtain an Extended Coverage ALTA
116 policy of title insurance or additional specific endorsements.
117

118 **13. SQUARE FOOTAGE VERIFICATION: BUYER IS AWARE THAT ANY REFERENCE TO THE SQUARE FOOTAGE OF THE REAL PROPERTY OR**
119 **IMPROVEMENTS IS APPROXIMATE. IF SQUARE FOOTAGE IS MATERIAL TO THE BUYER, IT MUST BE VERIFIED BY BUYER DURING THE INSPECTION**
120 **PERIOD.**
121

122 **14. COVENANTS, CONDITIONS AND RESTRICTIONS (CC&Rs):** As part of the BUYER'S due diligence and inspection of the PROPERTY as set
123 forth in Section 16, BUYER is responsible for obtaining and reviewing a copy of any CC&Rs which may affect the PROPERTY. BUYER shall have 10
124 business days to review and approve of any such CC&Rs that may affect the PROPERTY. Unless BUYER delivers to SELLER a written and signed
125 objection to the terms of any applicable CC&Rs with particularity describing BUYER'S reasonable objections within such time period as set forth above,
126 BUYER shall be deemed to have conclusively waived any objection to the terms of any CC&Rs affecting the PROPERTY.
127

128 **15. SELLER DISCLOSURES.** No later than the Seller Disclosure Deadline, SELLER shall disclose, and provide copies if available, to BUYER the
129 following:
130       (a) any studies and/or reports that have previously been performed in connection with or for the PROPERTY, including without limitation,
131 environmental reports, soil studies, seismic studies, site plans and surveys;
132       (b) any notices relating to a violation of applicable law including, without limitation, environmental law and laws relating to land use, zoning or
133 compliance with building codes;

**BUYER'S Initials (** RTR **) Date** 12/24/15          **SELLER'S Initials (** __ )( __ **) Date** _____

This form is printed and distributed by the Idaho Association of REALTORS®, Inc. This form has been designed and is provided for use by the real estate professionals who are members of the
Idaho Association of REALTORS®. USE BY ANY OTHER PERSON IS PROHIBITED. ©Copyright Idaho Association of REALTORS®. All rights reserved.

PROPERTY ADDRESS: 669 Quinn                                                    ID#: FH 122315

134    (c) SELLER shall make available for inspection all documents in SELLER's possession relating to ownership, operation, renovation or
135    development of the PROPERTY including: statements for real estate tax assessments and utilities for the last year; property management agreements;
136    leases or other occupancy agreements; maintenance records, accounting records and audit records for the past year; and installment purchase contracts or
137    leases of personal property used in connection with the PROPERTY; and
138    (d) all other documents described in any Addenda or Counteroffer to this Agreement.
139

### 16. FEASIBILITY CONTINGENCY:
141

142    **(A).** BUYER's obligations under this Agreement are conditioned upon BUYER's satisfaction, in BUYER's sole discretion, concerning all aspects of the
143    feasibility of the PROPERTY for BUYER's intended purpose. This shall include, but is not limited to: the contracts and leases affecting the
144    PROPERTY; the potential financial performance of the PROPERTY; the availability of government permits and approvals; and the outcome of any
145    appraisals and lender underwriting. This contingency shall be deemed waived unless BUYER gives written notice to SELLER on or before the Due
146    Diligence Deadline that the PROPERTY is unfit for BUYER's intended purpose. If such notice is given, the Earnest Money shall be refunded to
147    BUYER.
148

149    **(B). INSPECTION OF VENDOR CONTRACTS:** In addition to the documents to be disclosed under the Seller Disclosures, SELLER shall make
150    available for inspection by BUYER and its agents by the Seller Disclosure Deadline all "Vendor Contracts" which shall include maintenance and service
151    contracts, and installment purchase contracts or leases and personal property or fixtures used in connection with the PROPERTY. BUYER shall
152    determine by the Due Diligence Deadline: (i) whether SELLER will agree to terminate any objectionable Vendor Contracts; and (ii) whether SELLER will
153    agree to pay any damages or penalties resulting from the termination of objectionable Vendor Contracts. BUYER's voluntary waiver of the Feasibility
154    contingency shall signify BUYER's acceptance of all Vendor Contracts that SELLER has not agreed in writing to terminate. BUYER shall be solely
155    responsible for obtaining any required consents to assumptions of Vendor Contracts and the payment of any assumption fees. SELLER shall
156    cooperate with BUYER's efforts to receive any such consents but shall not be required to incur any additional expenses or liabilities in doing so.
157

### 17. INSPECTION/DUE DILIGENCE:
159

160    **(A).** In conducting BUYER's due diligence prior to the Due Diligence Deadline, or at any time thereafter if and to the extent required by the lender,
161    BUYER shall have the right to conduct inspections, investigations, tests, surveys and other studies at BUYER's expense unless otherwise agreed
162    upon in writing by the parties. BUYER must provide reasonable advance notice of BUYER's intent to inspect or test the PROPERTY, and all
163    inspections, investigations, tests, surveys and other studies must be conducted at reasonable times. SELLER shall have the right to accompany
164    BUYER and any of its agents on the PROPERTY at all times. All inspections and tests shall be conducted in a manner that does not unreasonably
165    disrupt the activities and business of SELLER and its tenants. BUYER shall indemnify, hold harmless and defend SELLER, its tenants and employees
166    for any claims for liens, physical damage or personal injury resulting from BUYER's due diligence inspections and/or tests.
167

168    **(B). SATISFACTION/REMOVAL OF INSPECTION DUE DILIGENCE CONTINGENCIES:**
169    (1). If BUYER, in BUYER's sole discretion, determines that the results of the BUYER's due diligence are not acceptable, then BUYER, no later
170    than the Due Diligence Deadline, shall either: (a) cancel this Agreement providing written notice to SELLER, in which event the Earnest Money deposit
171    shall be returned to BUYER; or (b) providing to SELLER a written notice setting forth BUYER's disapproved items.
172

173    (2). If BUYER does not within the strict time period specified take either of the actions stated in Section 17(B)(1), BUYER shall conclusively be
174    deemed to have: (a) completed all inspections, investigations, review of applicable documents and disclosures; (b) elected to proceed with the
175    transaction; (c) assumed all liability, responsibility and expense for repairs or corrections other than for items which SELLER has otherwise agreed
176    in writing to repair or correct; and (d) unless another condition or contingency set forth in an Addendum or Counteroffer remains unsatisfied, the
177    Earnest Money deposit shall become nonrefundable except upon an instance of SELLER's default.
178

179    (3). If BUYER timely provides notice of disapproved items to SELLER, BUYER and SELLER shall have five (5) business days after SELLER's
180    receipt of the notice of disapproved items in which to agree in writing upon the manner of resolving the disapproved items. If BUYER and SELLER
181    have not agreed upon the manner of resolving the disapproved items by the deadline, BUYER may cancel this Agreement by delivering
182    written notice to SELLER no later than fifteen (15) days after SELLER's receipt of the notice of disapproved items; whereupon the Earnest Money
183    deposit shall be returned to BUYER and neither party shall have any further rights or obligations under this Agreement. If BUYER does not give such
184    written notice of cancellation within the strict time periods specified, BUYER shall conclusively be deemed to have elected to proceed with the
185    transaction without repairs or corrections other than for items which SELLER has otherwise agreed in writing to repair or correct and the Earnest Money
186    deposit shall become nonrefundable except upon an instance of SELLER's default.
187

### 18. SELLER REPRESENTATIONS AND WARRANTIES:
SELLER represents and warrants that the following statements are true and complete as
189    of the date of SELLER's execution of this agreement and shall be true as of the date of Settlement and Closing:
190    (a). There is no action, suit, administrative proceeding or other proceeding pending in any court or before any arbitrator of any kind or before or by
191    any governmental body or, to SELLER's knowledge, threatened against SELLER and/or the PROPERTY which may adversely affect this transaction;
192    (b). All work which will be performed in, on or about the PROPERTY or materials furnished to the PROPERTY which might, in any circumstance,
193    give rise to a mechanic's or materialman's lien will be paid and no such liens shall encumber the PROPERTY at the time of Settlement and Closing;
194    (c). SELLER has not received any written notice or citation indicating that the PROPERTY is in material violation of any applicable law;
195    (d). Neither SELLER nor any other person, to SELLER's knowledge, have ever caused or permitted any hazardous materials to be placed, held,
196    located or disposed of on, under, or at the PROPERTY in violation of applicable law; and
197    (e). To SELLER's knowledge, the consummation of the transaction contemplated by this Agreement does not and will not conflict with or result in a
198    material breach of any of the terms or provisions of any other agreement, arrangement, undertaking, accord, document or instrument to which SELLER is a
199    party or by which SELLER or the PROPERTY is bound.
200

### 19. CONDITION OF PROPERTY AT CLOSING:
Upon expiration of the Due Diligence Deadline, BUYER agrees to purchase the PROPERTY in ~~as-~~
202    ~~is-condition~~ with all faults and with no further repairs required, subject only to the representations and warranties stated herein, or unless otherwise agreed
203    upon by the parties in writing. Upon Closing, BUYER will assume all obligations with respect to the PROPERTY.

BUYER'S Initials ( RTP )( ) Date 12/24/15          SELLER'S Initials ( )( ) Date_____

JULY 2014 EDITION    RE-23 COMMERCIAL / INVESTMENT REAL ESTATE PURCHASE AND SALE AGREEMENT    Page 4 of 6

PROPERTY ADDRESS: 669 Quinn    ID#: FH 122315

**20. OPERATIONS PRIOR TO CLOSING:** Between the parties' execution of this Agreement and Closing, and except otherwise agreed to by the parties in writing, SELLER: (a) shall not execute any lease affecting the PROPERTY; (b) shall comply with all applicable laws affecting the PROPERTY; (c) shall not create or force to be created any further monetary liens on the PROPERTY; (d) shall not make any substantial alterations or improvements to the PROPERTY; (e) shall continue and maintain all current casualty and liability insurance policies covering the PROPERTY; (f) shall not use, produce manufacture, generate, treat, handle, store, release or dispose of any hazardous material in, on or under the PROPERTY, except as permitted by applicable environmental laws; (g) SELLER shall continue to operate the PROPERTY in the ordinary course of its business; and (h) maintain the PROPERTY in the same or better condition than as existing on the date of Mutual Acceptance but shall not be required to repair material damage from casualty except as otherwise provided by this Agreement. After the Feasibility Period, SELLER shall not enter into or modify existing rental agreements or leases (except that SELLER may enter into, modify, extend, renew or terminate residential rental agreements or residential leases in the ordinary course of its business), service contracts, or other agreements affecting the PROPERTY which have terms extending beyond Closing without first obtaining BUYER's consent, which shall not be unreasonably withheld.

**21. CLOSING COSTS AND PRORATIONS:** SELLER shall deliver an updated rent roll to Closing Agent not later than five (5) days before the scheduled Closing date and any other information reasonably requested by Closing Agent to allow Closing Agent to prepare a settlement statement for Closing. SELLER certifies that the information contained in the rent roll is correct as of the date submitted. SELLER and BUYER shall each pay one-half of the escrow fees. Real and personal property taxes and assessments payable in the year of closing; collected rents on any existing tenancies; interest; utilities; and other operating expenses shall be pro-rated as of Closing. If tenants pay any of the foregoing expenses directly, then Closing Agent shall only pro rate those mortgage reserves for assumed financing for which BUYER receives the benefit after Closing. BUYER shall pay all costs of financing including the premium for the lender's title policy. If the PROPERTY was taxed under a deferred classification prior to Closing, then SELLER shall pay all taxes, interest, penalties, deferred taxes or similar items which result from removal of the PROPERTY from the deferred classification. At Closing, all refundable deposits on tenancies shall be credited to BUYER or delivered to BUYER for deposit in a trust account if required by state or local law. BUYER shall pay any sales or use tax applicable to the transfer of personal property included in the sale.

**22. POST-CLOSING ADJUSTMENTS, COLLECTIONS AND PAYMENTS:** To the extent any items were prorated or credited at Closing based upon estimates, BUYER and SELLER shall reconcile the actual amount of revenues or liabilities upon receipt or payment thereof after Closing. Any bills or invoices received by BUYER after Closing which relate to services rendered or goods delivered to the SELLER or the PROPERTY prior to Closing shall be paid by SELLER upon presentation of such bill or invoice. At BUYER's option, BUYER may pay such bill or invoice and be reimbursed the amount paid plus interest at the rate of 12% per annum beginning fifteen (15) days from the date of BUYER's written demand to SELLER for reimbursement until such reimbursement is made. Notwithstanding the foregoing, if tenants pay certain expenses based on estimates subject to a post-closing reconciliation to the actual amounts of those expenses, then BUYER shall be entitled to any surplus and shall be liable for any credit resulting from the reconciliation. Rents collected from each tenant after Closing shall be applied first to rentals due most recently from such tenant for the period after closing, and the balance shall be applied for the benefit of SELLER for delinquent rentals owed for a period prior to closing. The amounts applied for the benefit of SELLER shall be turned over by BUYER to SELLER promptly after receipt. SELLER shall be entitled to pursue any lawful methods of collection of delinquent rents but shall have no right to evict tenants after Closing.

**23. RISK OF LOSS OR NEGLECT:** Prior to closing of this sale, all risk of loss shall remain with SELLER. In addition, should the PROPERTY be materially damaged by fire, neglect, or other destructive cause prior to closing, this agreement shall be voidable at the option of BUYER.

**24. SECTION 1031 TAX DEFERRED EXCHANGE:** If applicable, each party shall cooperate with the other Party in effectuating an exchange under IRS Section 1031; provided however, that the other Party's cooperation shall be conditioned on the following: (a) the exchange shall be at no additional liability and/or cost to the other Party; (b) the exchange shall not delay Settlement or Closing; and (c) the other Party shall not be required to acquire title to any proposed exchange properties to accommodate an exchange. The exchanging party shall indemnify, defend and hold the other Party harmless from and against any and all claims, demands, costs and expenses which the other Party may sustain or incur resulting from the attempt by the exchanging Party to consummate the sale or acquisition of the PROPERTY as a 1031 exchange.

**25. POSSESSION:** SELLER shall deliver physical possession of the PROPERTY to BUYER with twenty-four (24) hours following Closing or at such other date and time as is agreed to by the parties in writing.

**26. TRANSMISSION OF DOCUMENTS:** Facsimile or electronic transmission of any signed original document, and retransmission of any signed facsimile or electronic transmission shall be the same as delivery of an original. At the request of either the BUYER or SELLER, or the lender, or the Closing Agency, the BUYER and SELLER will confirm facsimile or electronic transmitted signatures by signing an original document.

**27. BUSINESS DAYS:** A business day is herein defined as Monday through Friday, 8:00 A.M. to 5:00 P.M. in the local time zone where the subject PROPERTY is physically located. A business day shall not include any Saturday or Sunday, nor shall a business day include any legal holiday recognized by the state of Idaho as found in Idaho Code §73-108. The time in which any act required under this agreement is to be performed shall be computed by excluding the date of execution and including the last day. The first day shall be the day after the date of execution. If the last day is a legal holiday, then the time for performance shall be the next subsequent business day.

**28. CALENDAR DAYS:** A calendar day is herein defined as Monday through Sunday, 8:00 A.M. to 5:00 P.M., in the local time zone where the subject PROPERTY is physically located. A calendar day shall include any legal holiday. The time in which any act required under this agreement is to be performed shall be computed by excluding the date of execution and including the last day, thus the first day shall be the day after the date of execution. Any reference to "day" or "days" in this agreement means the same as calendar day, unless specifically enumerated as a "business day."

**29. DEFAULT: If BUYER defaults** in the performance of this Agreement, SELLER shall be entitled, as SELLER's sole and exclusive remedy, to terminate this Agreement by written notice to the BUYER, in which event the Earnest Money deposit shall be paid to SELLER as liquidated damages. **If SELLER defaults,** having approved said sale and fails to consummate the same as herein agreed, BUYER's Earnest Money deposit shall be returned to him/her and SELLER shall pay for the costs of title insurance, escrow fees, credit report fees, inspection fees, Brokerage fees and attorney's fees, if any. This shall not be considered as a waiver by BUYER of any other lawful right or remedy to which BUYER may be entitled.

BUYER'S Initials ( _RTR_ ) Date _12/24/15_        SELLER'S Initials ( ____ )( ____ ) Date _____

This form is printed and distributed by the Idaho Association of REALTORS®, Inc. This form has been designed and is provided for use by the real estate professionals who are members of the Idaho Association of REALTORS®. USE BY ANY OTHER PERSON IS PROHIBITED. ©Copyright Idaho Association of REALTORS®, Inc. All rights reserved.

instanet forms

PROPERTY ADDRESS: 669 Quinn                                                    ID#: FK 122315

271 **30. EARNEST MONEY DISPUTE / INTERPLEADER:** Notwithstanding any termination or breach of this Agreement, BUYER and SELLER agree
272 that in the event of any controversy regarding the Earnest Money and things of value held by Broker or closing agency, Broker may reasonably rely on the
273 terms of this Agreement or other written documents signed by both parties to determine how to disburse the disputed money. However, Broker or closing
274 agency shall not be required to take any action but may await any proceeding, or at Broker's or closing agency's option and sole discretion, may interplead
275 all parties and deposit any moneys or things of value into a court of competent jurisdiction and shall recover all costs which were incurred as a result of the
276 dispute including, but not limited to, reasonable attorney's fees. If either parties' Broker incurs attorney's fees as a result of any Earnest Money dispute,
277 whether or not formal legal action is taken, said Broker is entitled to recover actual fees incurred from either BUYER or SELLER.
278
279 **31. ATTORNEY'S FEES:** If either party initiates or defends any arbitration or legal action or proceedings which are in any way connected with this
280 Agreement, the prevailing party shall be entitled to recover from the non-prevailing party reasonable costs and attorney's fees, including such costs and fees
281 on appeal.
282
283 **32. SEVERABILITY:** In the case that any one or more of the provisions contained in this Agreement, or any application thereof, shall be invalid, illegal or
284 unenforceable in any respect, the validity, legality or enforceability of the remaining provisions shall not in any way be affected or impaired thereby.
285
286 **33. COUNTERPARTS:** This Agreement may be executed in counterparts. Executing an agreement in counterparts shall mean the signature of two
287 identical copies of the same agreement. Each identical copy of an agreement signed in counterparts is deemed to be an original, and all identical copies
288 shall together constitute one and the same instrument.
289
290 **34. AUTHORITY OF SIGNATORY:** If BUYER or SELLER is a corporation, partnership, trust, estate, or other entity, the person executing this
291 agreement on its behalf warrants his or her authority to do so and to bind BUYER or SELLER.
292
293 **35. ENTIRE AGREEMENT:** This Agreement, including any Addendums or exhibits, constitutes the entire Agreement between the parties and no
294 warranties, including any warranty of habitability or representations have been made or shall be binding upon either party unless herein set forth. All implied
295 warranties of merchantability and/or fitness for a particular purpose are hereby excluded.
296
297
298 **36. ACKNOWLEDGMENT OF PROFESSIONAL REVIEW:** BUYER and SELLER hereby acknowledge that their Broker and/or Agent advised both
299 parties to obtain professional inspections of the PROPERTY, including inspections of the PROPERTY's title and platting, zoning requirements and the
300 PROPERTY's services and utilities. Additionally, BUYER and SELLER have been advised to obtain appropriate tax, accounting, legal or other professional
301 advice or counsel when necessary, including, but not limited to, independent legal review of this Agreement. Furthermore, it is acknowledged that the parties
302 Brokers and/or Agents have not made any representations or warranties or conducted any independent investigation of the condition or financial feasibility of
303 the PROPERTY. BUYER and SELLER have not relied on any marketing material or assertions of any Broker and/or Agent in determining the viability or
304 fitness of the PROPERTY for its intended purpose.
305
306
307 **37. REPRESENTATION CONFIRMATION:** Check one (1) box in Section 1 and one (1) box in Section 2 below to confirm that in this transaction, the
308 brokerage(s) involved had the following relationship(s) with the BUYER(S) and SELLER(S).
309
310    Section 1:
311    ... A. **The brokerage working with the BUYER(S) is acting as an AGENT for the BUYER(S).**
312    ... B. **The brokerage working with the BUYER(S) is acting as a LIMITED DUAL AGENT for the BUYER(S), without an ASSIGNED AGENT.**
313    ... C. **The brokerage working with the BUYER(S) is acting as a LIMITED DUAL AGENT for the BUYER(S) and has an ASSIGNED AGENT**
314        **acting solely on behalf of the BUYER(S).**
315    X D. **The brokerage working with the BUYER(S) is acting as a NONAGENT for the BUYER(S).**
316    Section 2:
317    X A. **The brokerage working with the SELLER(S) is acting as an AGENT for the SELLER(S).**
318    ... B. **The brokerage working with the SELLER(S) is acting as a LIMITED DUAL AGENT for the SELLER(S), without an ASSIGNED AGENT.**
319    ... C. **The brokerage working with the SELLER(S) is acting as a LIMITED DUAL AGENT for the SELLER(S) and has an ASSIGNED AGENT**
320        **acting solely on behalf of the SELLER(S).**
321    ... D. **The brokerage working with the SELLER(S) is acting as a NONAGENT for the SELLER(S).**
322
323 Each party signing this document confirms that he has received, read and understood the Agency Disclosure Brochure adopted or approved by the Idaho
324 real estate commission and has consented to the relationship confirmed above. In addition, each party confirms that the brokerage's agency office policy
325 was made available for inspection and review. EACH PARTY UNDERSTANDS THAT HE IS A "CUSTOMER" AND IS NOT REPRESENTED BY A
326 BROKERAGE UNLESS THERE IS A SIGNED WRITTEN AGREEMENT FOR AGENCY REPRESENTATION.
327

BUYER'S Initials (_RF_)(___) Date _12/24/15_          SELLER'S Initials (___)(___) Date_____

This form is printed and distributed by the Idaho Association of REALTORS®, Inc. This form has been designed and is provided for use by the real estate professionals who are members of the
Idaho Association of REALTORS®. USE BY ANY OTHER PERSON IS PROHIBITED. ©Copyright Idaho Association of REALTORS®, Inc. All rights reserved.

PROPERTY ADDRESS: 669 Quinn _____      ID#: FH 122315

## 38. BUYER'S SIGNATURES:

...SEE ATTACHED BUYER'S ADDENDUM(S): _____ (Specify number of BUYER addendum(s) attached.)

BUYER ...does **X** does not currently hold an active Idaho real estate license. BUYER ... IS **X** IS NOT related to agent.

BUYER Signature *Roger T. Featherston*      BUYER (Print Name) *ROGER T. FEATHERSTON*

If BUYER is an entity: Name of Entity *Featherston Holdings*      Signor's Position: *President & CEO*

Date *12/24/15*   Time *10:30 Am* ...A.M. ...P.M.   Phone # ~~_____ 777~~ *818 226 7655*   Cell # _____

Address *23679 Calabasas Rd #957*      E-Mail *FEATHERSTONroger777@Gmail.com*

City *Calabasas*   State *CA*   Zip *91302*   Fax # _____

BUYER ...does **X** does not currently hold an active Idaho real estate license. BUYER ... IS **X** IS NOT related to agent.

BUYER Signature *Roger T. Featherston*      BUYER (Print Name) _____

If BUYER is an entity: Name of Entity *Featherston Holdings*   Signor's Position: _____

Date *12/24/15*   Time *10:35* ...A.M. ...P.M.   Phone # _____   Cell # _____

Address _____      E-Mail _____

City _____   State _____   Zip _____   Fax # _____

## 39. SELLER'S SIGNATURES: On this date, I/We hereby approve and accept the transaction set forth in the above Agreement and agree to carry out all the terms thereof on the part of the SELLER.

SIGNATURE(S) SUBJECT TO ATTACHED COUNTER OFFER.
SIGNATURE(S) SUBJECT TO ATTACHED ADDENDUM(S) # *1*

SELLER ...does **X** does not currently hold an active Idaho real estate license. SELLER ... IS **X** IS NOT related to agent.

SELLER Signature *Earl T. Swift*      SELLER (Print Name) *Earl T. Swift*

If SELLER is an entity: Name of Entity *First Pocatello Associates dba Gateway West*   Signor's Position: *General Partner*

Date *12/30/15*   Time *11:25* (A.M.) ...P.M.   Phone # *732-264-0089*   Cell # 732-245-~~3687~~ *3687*

Address *120 Francis Street*      E-Mail *swiftproperties@optonline.net*

City *Keyport*   State *NJ*   Zip *07735*   Fax # *732-888-0667*

CONTRACTOR REGISTRATION # (if applicable) _____

SELLER ...does ...does not currently hold an active Idaho real estate license. SELLER ... IS ... IS NOT related to agent.

SELLER Signature _____      SELLER (Print Name) _____

If SELLER is an entity: Name of Entity _____   Signor's Position: _____

Date _____   Time _____ ...A.M. ...P.M.   Phone # _____   Cell # _____

Address _____      E-Mail _____

City _____   State _____   Zip _____   Fax # _____

CONTRACTOR REGISTRATION # (If applicable) _____

## LATE ACCEPTANCE

If acceptance of this offer is received after the time specified, it shall not be binding on the BUYER unless BUYER approves of said acceptance within calendar days (three [3] if left blank) by BUYER initialing HERE _____. If BUYER timely approves of SELLER's late acceptance, an initialed copy of this page shall be immediately delivered to SELLER.

This form is printed and distributed by the Idaho Association of REALTORS®, Inc. This form has been designed and is provided for use by the real estate professionals who are members of the Idaho Association of REALTORS®. USE BY ANY OTHER PERSON IS PROHIBITED. ©Copyright Idaho Association of REALTORS®, Inc. All rights reserved.

Instanet forms

IN WITNESS WHEREOF, the Parties have set their hands effective the date first written above, and state that they are authorized to execute this agreement.

**BUYER:**

FEATHERSTONE HOLDINGS, a California corporation
By_____
    Its_____

**SELLER:**

FIRST POCATELLO ASSOCIATES, L.P.
an Idaho limited partnership
By_____
    Its  *GENERAL PARTNER*_____

Exhibit B

Howard D. Burnett, ISB No. 3377
HAWLEY TROXELL ENNIS & HAWLEY LLP
333 South Main Street
P.O. Box 100
Pocatello, ID 83204
Telephone: 208.233.0845
Facsimile: 208.233.1304
Email: hburnett@hawleytroxell.com

Justin Cranney, ISB No. 8061
HAWLEY TROXELL ENNIS & HAWLEY LLP
877 Main Street, Suite 1000
P.O. Box 1617
Boise, ID 83701-1617
Telephone: 208.344.6000
Facsimile: 208.954.5248
Email: jcranney@hawleytroxell.com

Austin Strobel, ISB No. 9803
HAWLEY TROXELL ENNIS & HAWLEY LLP
2010 Jennie Lee Drive
Idaho Falls, ID 83404
Telephone: 208.529.3005
Facsimile: 208.529.3065
Email: astrobel@hawleytroxell.com

Attorneys for Defendant/Counterclaimant
First Pocatello Associates, L.P.

# UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| YELLOWSTONE POKY, LLC, an Idaho Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>FIRST POCATELLO ASSOCIATES, L.P., a New Jersey limited partnership,<br><br>Defendant. | Case No. <u>4:16-CV-00316-BLW</u><br><br>DECLARATION OF EARL T. SWIFT |

DECLARATION OF EARL T. SWIFT - 1

48627.0003.9303455.3

FIRST POCATELLO ASSOCIATES, L.P.,

      Counterclaimant,

vs.

YELLOWSTONE POKY, LLC, and
FEATHERSTON HOLDINGS, INC.,

      Counterdefendants.

EARL T. SWIFT, pursuant to 28 U.S.C. ¶1746, declares as follows:

1.     I am the President of Earl T. Swift Corporation, the General Partner of defendant/counterclaimant First Pocatello Associates, L.P. ("First Pocatello") in this case. I am of the age of majority and of sound mind. I make this declaration based upon my personal knowledge, and I can testify as to the truth of the matters contained herein if called upon as a witness to do so.

2.     Nearly 30 years ago, I purchased the entirety of the real property in Pocatello presently known as Gateway West Industrial Center ("GWIC"), which originally was known as the Naval Ordinance Plant, built by the United States government during World War II. Since my purchase of GWIC, I have owned, managed, maintained and developed the land and buildings comprising GWIC, bringing numerous businesses to Pocatello that lease space and operate at GWIC as First Pocatello's tenants. Currently, the 35 tenants at GWIC collectively account for approximately 425 on-site jobs.

3.     I have read the July 27, 2017 "Declaration of Roger Featherston" ("Featherston Declaration") filed by plaintiff in this action as Docket No. 67-2 in support of Plaintiff's Motion for Preliminary Injunction, and also filed by plaintiff in identical form as Docket No. 68-2 in

DECLARATION OF EARL T. SWIFT - 2

support of Plaintiff's Motion for Order to Allow Expedited Discovery. As addressed below, most of the accusations hurled at me and at First Pocatello in the Featherston Declaration are pure fantasy and simply not factual.

4.   Contrary to the allegations in Paragraph 5 of the Featherston Declaration, First Pocatello is *not* engaged in negotiations with SME Steel (or, for that matter, with any other prospective buyers) for the purchase of GWIC.

5.   Contrary to the allegations in Paragraph 7.b of the Featherston Declaration, First Pocatello has *not* contracted with Optix Corp. to provide underground high-speed fiber services to SME Steel in Building 28 of GWIC.

6.   Contrary to the allegations in Paragraph 7.c of the Featherston Declaration, First Pocatello does not have a "Gateway Site Manager" by the name of "Tim Tomlin" (GWIC's on-site maintenance man is named Tim Tolman), and, in any event, First Pocatello has *not* cut down "an estimated 100 mature cottonwood, alder, birch trees." Rather, in order to maintain GWIC, preserve its commercial value and utility, and for safety and liability reasons, First Pocatello has removed over the course of the past year only four trees from the GWIC property – three of the trees were dead, and the fourth tree was removed at the request of the neighboring FBI facility because that tree's location immediately adjacent to the FBI's new fence line posed a security risk for the FBI. In addition, and for similar reasons, First Pocatello has removed an old, deteriorated, decommissioned and collapsed World War II-vintage structure originally used as a reservoir and thereafter converted into a below-grade building.

7.   Contrary to the allegations in Paragraphs 7.d, 13 and 14 of the Featherston Declaration, First Pocatello is *not* "currently making plans to subdivide the property." First Pocatello has *not* met with the City of Pocatello (or anyone else) regarding subdividing the

DECLARATION OF EARL T. SWIFT - 3

property, nor has First Pocatello undertaken any kind of "new development scheme" to subdivide the GWIC property.

8.      Contrary to the suggestion in Paragraphs 7.a of the Featherston Declaration that the concept of connecting Building 10 of GWIC directly to Idaho Power service somehow was derived by First Pocatello from some kind of secret or proprietary plan of Roger Featherston, the fact is that the plan to connect Building 10 of GWIC directly to Idaho Power service (instead of through an antiquated World War II-vintage substation on GWIC's property) was previously formulated by First Pocatello itself for the GWIC property prior to Roger Featherston's involvement with First Pocatello and GWIC, and that plan of action was disclosed to Roger Featherston in January 2016.   In fact, Roger Featherston attended a meeting I had with representatives of Idaho Power in January 2016 regarding the planned connection of Building 10 directly to Idaho Power.

9.      With respect to the allegations in Paragraphs 11 and 12 of the Featherston Declaration, the actual circumstances surrounding the documents and personal property that Roger Featherston had accumulated in Building 3 of GWIC during the first several months of 2016 is considerably more revealing than Mr. Featherston suggests.  I allowed Roger Featherston to temporarily use, strictly as a favor, one office of approximately 500 square feet in size in the then-unoccupied Building 3 while performing due diligence with respect to the Real Estate Purchase and Sale Agreement.   The office space already was furnished.   Roger Featherston ordered phone service and other utilities for his use in Building 3 (and at the end of December of 2016, First Pocatello was advised by CenturyLink that Roger Featherston still had not paid a very significant accumulated CenturyLink bill for services requested and received by him in Building 3).  During the time that he was using Building 3, we discovered that Roger Featherston

DECLARATION OF EARL T. SWIFT - 4

had been improperly entering other buildings at GWIC besides Building 3, including areas rented by other tenants, after hours and without notification to or authorization from First Pocatello. On June 2, 2016, First Pocatello notified Roger Featherston in writing that, because of his improper actions in Building 3 and other areas of GWIC, he could no longer use Building 3, that he was to immediately remove his belongings from Building 3, that he was to vacate Building 3, and that the locks to Building 3 would be changed and locked at the end of business the following day. The locks were, in fact, changed and locked at the end of business on June 3, 2016. First Pocatello then gathered the documents and other personal items left in Building 3 (there was no computer among those items, only a monitor), consolidated all of it in labeled boxes for retrieval by Roger Featherston, and securely stored it in the vestibule of Building 3 awaiting arrangements to be made by Roger Featherston to retrieve it. First Pocatello, its counsel, and others repeatedly informed Roger Featherston and his counsel, orally and in writing, that Featherston could arrange for the retrieval of the stored materials, but Roger Featherston refused to retrieve the materials or to instruct us regarding the delivery of the materials. After plaintiff filed on September 14, 2016 a motion to amend its complaint to include a new claim for misappropriation of trade secrets against First Pocatello, I requested through our counsel that First Pocatello be allowed to obtain a copy of the written materials (under the joint supervision of the parties' respective attorneys, and subject, if requested by Roger Featherston, to a protective order with an "attorney's eyes only" provision) so that the actual content of that collection of documents could be established in light of the fact that plaintiff was now seeking to inject a trade secret misappropriation claim into the lawsuit. All of those boxed materials have since been moved intact from Building 3 of GWIC to another secure location at GWIC, where they presently

DECLARATION OF EARL T. SWIFT - 5

remain. Neither I nor anyone else has examined, altered or removed from the boxes any of the information left by Roger Featherston in Building 3.

10. In the normal course of its ongoing business, First Pocatello necessarily has continued to enter into and renew short-term leases on the GWIC property. However, contrary to the allegation in Paragraph 16 of the Featherston Declaration, First Pocatello has *not* taken any actions that would constitute "effectively putting the property on the market."

11. Contrary to the allegations in Paragraph 17 of the Featherston Declaration that Roger Featherston is "currently ready, willing, and able to pay the full contract purchase price and close on the Pocatello property," and notwithstanding repeated requests made to Roger Featherston by me over the past twenty months on behalf of First Pocatello, neither Roger Featherston individually nor any entity with which he is affiliated has *ever* provided even a hint of proof of any nature whatsoever of the availability of funds needed to close on the originally-contemplated $21,000,000 purchase of GWIC. In First Pocatello's view, Mr. Featherston has shown himself to be neither credible nor creditworthy, and the various *other* legal proceedings (all of which are matters of public record readily available to any potential lender on the Idaho Supreme Court Data Repository) in which he has been and continues to be involved over the past year and a half since entering into discussions with First Pocatello have only reinforced that view.

I declare under penalty of perjury that the foregoing is true and correct, and was executed within the United States on this 17th day of August, 2017.

/s/ Earl T. Swift
Earl T. Swift

DECLARATION OF EARL T. SWIFT - 6

48627.0003.9303455.3

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 17th day of August, 2017, I electronically filed the foregoing DECLARATION OF EARL T. SWIFT with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Jeffrey D. Brunson                    jeff@beardstclair.com
BEARD ST. CLAIR GAFFNEY PA

John M. Avondet                       javondet@beardstclair.com
BEARD ST. CLAIR GAFFNEY PA

[Attorneys for Plaintiff/Counterdefendants]


                              /s/  Howard D. Burnett
                              Howard D. Burnett


DECLARATION OF EARL T. SWIFT -  7

Exhibit C

Jeffrey D. Brunson, ISB No. 6996
John M. Avondet, ISB No. 7438
BEARD ST. CLAIR GAFFNEY PA
2105 Coronado Street
Idaho Falls, Idaho 83404-7495
Telephone: (208) 523-5171
Facsimile: (208) 529-9732
Email: jeff@beardstclair.com
        javondet@beardstclair.com

Attorneys for the Plaintiffs/Counterdefendants

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| YELLOWSTONE POKY, LLC, an Idaho Limited Liability Company, and FEATHERSTON HOLDINGS, INC., <br><br> Plaintiff, <br><br> vs. <br><br> FIRST POCATELLO ASSOCIATES, L.P., <br><br> Defendant. | Case No.: 4:16-cv-00316-BLW <br><br> DECLARATION OF ROGER FEATHERSTON |
| FIRST POCATELLO ASSOCIATES, L.P., <br><br> Counterclaimant, <br><br> vs. <br><br> YELLOWSTONE POKY, LLC, and FEATHERSTON HOLDINGS, INC., <br><br> Counterdefendants. | |

Roger Featherston, pursuant to 28 U.S.C. § 1746, declares as follows:

Declaration of Roger Featherston - **1**



1. I am the sole member of Yellowstone Poky, LLC, a Plaintiff in the above-entitled action.

2. I am president and CEO of Featherston Holdings, Inc., also a party to the above-entitled action.

3. I am competent to testify and do so through personal knowledge.

4. In July 2017, I consulted with several brokers and other individuals associated with the property and industry in Pocatello, Idaho, including Rad Dye, a senior vice president of CBRE Group, Inc. who worked previously with First Pocatello Associates, L.P. (FPA) to manage and sell its property, and Don Zebe, the real estate broker with Coldwell Banker Commercial Advisors who assisted with the sale of the Pocatello property to me.

5. I have received information from Rad Dye that Earl Swift of First Pocatello Associates, L.P. (FPA) met with Gordon Holladay and Jerry Moyes of SME Steel to negotiate for the sale of FPA's property in Pocatello, Idaho to SME Steel. The parties are discussing sale price.

6. I need to depose Gordon Holladay and Jerry Moyes to elicit testimony regarding these meetings, numerous phone conversations and negotiations.

7. Additionally, the following is a list of people that may have discoverable information related to the injunctive relief I am seeking.

> a. American Electric, Pocatello, Vardel Tait, 208-317-5009. He is an electrical contractor who took building ten electrical power offline and provided the engineering design, meter, circuit breakers and cabling to

Declaration of Roger Featherston - **2**



take the power directly to Idaho Power bypassing the onsite substation. This was reflected in my plans for the property.

b. Optix Corp, LD Barthlome, partner. Optix is a key supplier we had numerous meetings on and off-site with regarding laying underground high-speed fiber optic cable to every building throughout the entire complex. Within the last 90 days I learned from this supplier that the seller has been in contact with Optix and contracted to perform providing underground high-speed fiber services to SME in building 28. I believe this has developed from the seller's use of our master plan, intellectual property and design efforts that the seller obtained in building three.

c. Tim Tomlin- Gateway Site Manager, 208-241-5871. He performed the line trenching from building 10 to Poleline Road. He recently oversaw the cutting of an estimated 100 mature cottonwood, alder, birch trees in an area my group was planning to set aside as a public park, after closing.

d. Don Zebe, Sellers broker, 208-403-1973. Within the last month, Mr. Zebe indicated to me that Earl Swift emphatically stated that he had no desire to subdivide the property. I believe that the seller is currently making plans to subdivide the property.

8. I have received information from Don Zebe that FPA continues to enter new leases, and has apparently leased with tenants at their facility in Pocatello, Idaho. FPA has already apparently leased spaces in bulding 13 in the electrical substation bulding on the property to a cross training gym and a log home manufacturing company, and possibly the Federal Bureau of Investigation.

Declaration of Roger Featherston - **3**

9. I need to request from FPA a list of all tenants, leases, and subleases entered into since entering into the original purchase and sale agreement with me and all pending leases and subleases to substantiate this information.

10. I need to depose all relevant employees of Idaho Power Company, and American Electric to elicit testimony regarding the excavation project and change in power source. I also need to request information from FPA to identify the contractor who conducted the excavation and depose that contractor regarding the project.

11. FPA has held my personal property and that of Yellowstone Poky, LLC, and Featherston Holdings since January 2016. The property includes computers, papers, and file boxes of data related to the purchase of the subject property and my plans for its development. The property that was in building 3 includes trade secrets and confidential/proprietary information of mine and Yellowstone Poky, LLC's. I have received information that my items are no longer in building 3 *and missing.*

12. I received a letter from FPA dated July 15, 2016 prohibiting me from entering the subject property and inviting me to retrieve the items. Attached as Exhibit A is a series of emails related to the return of my items. My attorney sent a letter on my behalf to FPA dated September 30, 2016 explicitly demanding the return of the items and denying FPA's proposal to make copies of my data. Attached as Exhibit B is a copy of the letter. FPA ignored the demand and never returned the property.

13. I have received information from Rad Dye and Done Zebe that FPA is seeking to subdivide its property as part of a new development scheme. According to Don Zebe, FPA said previously he would never subdivide the property. This new action is part of a

Declaration of Roger Featherston - **4**

business plan I developed, which is part of the confidential/proprietary information that has been in FPA's possession since January 2016.

14. I need to depose a member of the Pocatello Planning & Zoning Departments for information regarding FPA's efforts to subdivide the subject property.

15. I formed a development business plan for the Pocatello property when it was first under contract. That business plan depends upon my ability to direct how the property is used, what tenants occupy the property, and how the property is perceived by other businesses in the community. My plan also depends upon maintaining useful relationships with businesses like utility and energy providers.

16. The new leases and alterations FPA is making and its actions in effectively putting the property on the market jeopardize my entire plan for the property.

17. I am currently ready, willing, and able to pay the full contract purchase price and close on the Pocatello property, should limited information be provided by FPA which would allow me to complete the appraisal. The following information is needed:

     a. Complete profit and loss statements from FPA for 2016 and 2017 to the extent available

     b. Full roster of tenants occupying any part of the subject property and copies of all current and expired leases with tenants currently occupying any part of the subject property

     c. Complete copies of environmental reports and/or documents pertaining to the subject property, for the last 3 years.

Declaration of Roger Featherston - **5**

    d.   Completion of a Phase I Environmental Site Assessment (at my expense or Yellowstone Poky LLC's), including access for myself and my agents to complete the assessment

    e.   Return of my, Featherston Holdings, and Yellowstone Poky LLC's personal property items removed from the building I was occupying on the subject property.

DATED: July 2?, 2017

Roger Featherston

# CERTIFICATE OF MAILING OR HAND DELIVERY

I certify I am a licensed attorney in the state of Idaho, I have my office in Idaho

Falls, Idaho, and on July 27, 2017, I served a true and correct copy of the *Declaration of*

*Roger Featherston* upon the following by the method of delivery designated:

| | |
|---|---|
| Howard D. Burnett<br>Hawley Troxell Ennis & Hawley<br>PO Box 100<br>Pocatello, ID 83204 | ☑ CM/ECF |
| John K. Olson<br>Hawley Troxell Ennis & Hawley<br>PO Box 1617<br>Boise, ID 83701-1617 | ☑ CM/ECF |
| U.S. District Court<br>801 E. Sherman<br>Pocatello, ID 83201 | ☑ CM/ECF |

*/s/ Jeffrey D. Brunson*
Jeffrey D. Brunson
John M. Avondet
Of Beard St. Clair Gaffney PA
Attorneys for the Plaintiff

Declaration of Roger Featherston - **7**

# Exhibit D

Yellowstone Poky
Pocatello Idaho, 83201
C/P: 747-477-6199
E-Mail: Featherstonroger777@gmail.com

Sent from my iPhone

On Jun 2, 2016, at 12:45 PM, Barbara Wischerath <barbarawish@aol.com> wrote:

Roger,

It has come to our attention (from our tenants) that you are entering our buildings and tenant spaces after hours without authorization.

This is in direct violation of our agreement and we have addressed this with you in the past. Your disregard of the appropriate boundaries and protocol is creating problems for our business and upsetting our tenants. These actions are boarding on trespassing and any access to tenants spaces should be done in the open and with cooperation. It sends the wrong message to everyone involved.

We have allowed you to use Building 3 in good faith for your due diligence, but it has reached a point where you are taking advantage of the situation. Please remove your belongings from Building 3 immediately and vacate the premises. The locks will be changed and doors locked at the end of the business day tomorrow. A bill for the utilities you owe from the last month will be left on your desk for you to pay.

Barbara Wischerath
Gateway West Industrial Center

4

Exhibit E

*CenturyLink Bills* BLDG 3



GATEWAY
**Bill Date:**        May 1, 2016
**Account No:**      208-237-2202 483B

Visit centurylink.com

| Balance Forward | New Charges | Total Amount Due | Due Date for New Charges |
|---|---|---|---|
| $626.12 | $214.78 | $840.90 | May 21, 2016 |

## Account Summary

| | For questions, call: | Page | |
|---|---|---|---|
| Previous Balance | | | |
| Charges | | | |
| Balance Forward | | | 626.12 |
| | | | $626.12 |
| New Charges | | | |
| CenturyLink | 1 800 603-6000 | 3 | 228.36 |
| Long Distance Service | 1 800 603-6000 | 6 | 13.58% |
| Total New Charges | | | $214.78 |

*Includes late payment charge of $14.00.*



Business needs change regularly. As a valued business customer, we want to work with you to provide a complete and cost effective solution for your business.

Call (888) 544-4495 today for a free account consultation with a dedicated business sales consultant.

For billing or technical questions, please call (877) 453-9407.

*CenturyLink, P O Box 91155, Seattle, WA 98111-9255*

*Please fold, tear here and return this portion with your payment.*



|||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

>003566 6365830 0001 008243 10Z
GATEWAY
BLDG 3
669 W QUINN RD
POCATELLO ID 83202-1938

| **Bill Date:** | May 1, 2016 |
|---|---|
| **Account No:** | 208-237-2202 483B |
| **Bill Due Date:** | May 21, 2016 |
| **Balance Forward:** | $626.12 |
| **New Charges:** | $214.78 |
| **TOTAL AMOUNT DUE:** | $840.90 |

**Amount Enclosed**     $_____

CENTURYLINK
P O BOX 91155
SEATTLE, WA 98111-9255

||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||||

61 03208237220204830 1241050116 000006261200 000008409005

Exhibit F

# John Olson

| | |
|---|---|
| **From:** | Mike Baldner <MBaldner@hawleytroxell.com> |
| **Sent:** | Friday, June 17, 2016 9:35 AM |
| **To:** | 'jason@sumsionsteele.com' |
| **Cc:** | Howard Burnett |
| **Subject:** | Roger Featherston |
| | |
| **Importance:** | High |

Jason-

While we continue to have doubts as to the efficacy of some or all of the provisions of the Purchase and Sale Agreement and related documents between the parties related to the property at issue, my client intends to provide additional responsive documents to certain of your requests, and will do so under separate cover. As we all agreed during our May 15 meeting/conference call, the Due Diligence Deadline has come and gone, and along with it any rights of your client to conduct on-site inspections of the Premises pursuant to the conditional license set forth in Section 17(A) of the Purchase and Sale Agreement. As an accommodation, my client had permitted your client to utilize a portion of a vacant building (known as Building No. 3) during the license period, and your client had accumulated a substantial collection of documents in that building. My client arranged this afternoon for all of those documents to be carefully transferred into labeled banker's boxes, and the entire process was videoed by Don Zebe, the broker for the transaction. Mr. Zebe can arrange for that video to be made available for review by you and your client. The labeled boxes containing your client's documents currently are locked in the vestibule of Building No. 3, and my client, working through Don Zebe, promptly will make arrangements for your client to retrieve or otherwise take delivery of those boxes of documents.

As discussed, your client was required to provide proof of funds to consummate the transaction prior to the expiration of the Due Diligence Deadline. We reserve all rights related to the failure on the part of your client, but would again request evidence regarding the same.

We understood that you and your client were formulating a proposed resolution to this matter and the request was made for us to hold off on responding. To date no such proposal has been made. Below is the latest communication from your client to mine for your review.

My clients have indicated they are willing to consider proposed resolutions, but have asked us to conduct negotiations on their behalf directly through you.

Let me know your thoughts. Please copy my partner, Howard Burnett, on any communications.

MIKE BALDNER
**877 Main Street**
**Suite 1000**
**PO Box 1617**
**Boise ID 83701-1617**
direct 208.388.4861
fax 208.954.5955
e-mail mbaldner@hawleytroxell.com
web hawleytroxell.com

HAWLEY TROXELL
**Attorneys and Counselors**

1

Exhibit G

**Blake Atkin** <batkin@atkinlawoffices.net>                                                                Thu, May 3, 2018 at 7:53 AM
To: Howard Burnett <HBurnett@hawleytroxell.com>

Dear Howard:

I am surprised at the difficulty in trying to get the building three documents issue dealt with.   in response to your latest letter about the documents taken from building 3, I have read over the correspondence you provided and fail to see any justification in it for the conversion of my client's documents.  From talking to my client I am confident that the documents contain significant confidential information of a trade secret nature from which we have significant evidence to show use and profit by your client.

Of course, the best way for your clients to end the impass would be to simply return the documents.  A good way to end a conversion episode is to return the stolen goods.  I am willing to take possession of the documents immediately.  I am not willing to agree to your client copying them and continuing to use them for his benefit however and thus the need, if you, the lawyer, want copies solely for the purpose of this litigation and for no other use or purpose, for a protective order to that effect.  I thought a good way to speed return of the documents was a stipulation to hold your copies for attorneys eyes only until a general protective order is worked out.  Your comment that such an agreement would provide a disincentive to our being willing to work out a protective order is curious since I have long since provided you with a proposed form of protective order and my comments about why the provisions of that proposed protective order is necessary in this case.  Had we simply bit that bullet a protective order would be in place.

I have asked my client to only communicate with your clients through me talking to you.  He tells me that we are not communicating.  That your clients want a conference call with the investor and funding source.  He tells me that he can have them on a conference call this afternoon.  Do your clients want to participate in such a call?

Frankly, I get the sense from your focus on discovery that your clients are not interested in selling the property.  If I am mistaken, and proof of financial ability would pave the way for closing the sale, let me know, and let's get the conference call set up.  Of course, at the beginning of the conference call I would expect your clients to acknowledge that all such meetings and discussions are with an agreement that we are engaging in such interviews with the good faith intent to close the transaction and that no one will use the contacts to "plow around" my client.  Looking forward to hearing from you.

Blake Atkin

Exhibit H

Blake S. Atkin ISB# 6903
Atkin Law Offices, P.C.
7579 North Westside Highway
Clifton, Idaho 83228
Telephone: (801) 533-0300
Facsimile: (801) 533-0380
Email: blake@atkinlawoffices.net

*Attorney for Plaintiff/Counterdefendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| YELLOWSTONE POKY, LLC, an Idaho Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>FIRST POCATELLO ASSOCIATES, L.P.,<br><br>Defendants. | |
| FIRST POCATELLO ASSOCIATES, L.P.,<br><br>Counterclaimant,<br><br>vs.<br><br>YELLOWSTONE POKY, LLC, FEATHERSTONE HOLDINGS, INC., and ROGER FEATHERSTON,<br><br>Counterdefendants. | **STIPULATION FOR PROTECTIVE ORDER**<br><br>Case No. 4:16-cv-00316-DCN |

The parties, by and through their respective counsel of record, hereby stipulate to the Court's entry of the following Protective Order of confidentiality:

1.   "CONFIDENTIAL MATERIAL." As used in this Protective Order, confidential material shall mean all documents and information which the producing party believes in good faith to contain or to constitute proprietary, sensitive, confidential and/or trade secret information of the producing party, including but not limited to financial information, development or commercial information, pricing, vendor/supplier information and material that the parties and their counsel believe in good faith would be-useful or of interest to a recipient in business competition or in a business relationship with the parties,

2.   "HIGHLY CONFIDENTIAL MATERIAL." As used in this Protective Order, "highly confidential material" shall refer to trade secrets and propriety information as designated.

3.   "RECORDS." As used in this Protective Order, records means any electronic records and printed, typewritten and other tangible records.

4.   SCOPE. This Protective Order shall govern confidential or highly confidential material produced or disclosed in response to formal or informal discovery conducted in this matter. Nothing in this Protective Order shall be deemed to preclude any party's right to: (a) oppose discovery on grounds not addressed under the terms of this Protective Order, or (b) object on any grounds to the admission of any confidential material into evidence at trial. Further, nothing contained in this Protective Order shall prejudice the right of any party to contest the alleged relevancy, admissibility, or discoverability of the confidential or highly confidential material sought.

5.   DESIGNATION OF CONFIDENTIAL MATERIAL. The parties may designate all or any portion of documents, things and information they produce formally or informally to other parties to this litigation as confidential or highly confidential material. The designation of confidential or highly confidential material may be made by any practicable means ,

including placing on the thing so designated, such that it will not interfere with its legibility, an appropriate notice such as the following:   "Confidential." or in the case of highly confidential information notice that the material is "Highly Confidential." All materials designated as confidential or highly confidential shall be treated as such pursuant to the terms of this Protective Order until further order by the Court.

6.    OBJECTION TO DESIGNATION. If any party objects to the designation of any records as confidential or highly confidential material, that party shall notify all other parties in writing, specifying the factual and legal basis for the objection. If a dispute arises that cannot be resolved by agreement, then the dispute will be submitted to the Court through motion of the party objecting to the designation. Pending such determination, the records shall be maintained as confidential or highly confidential material.

7.    ACCESS TO CONFIDENTIAL MATERIAL. Access to confidential material shall be limited to authorized persons or entities, solely in the performance of their duties in connection with discovery and trial preparation of this case.   Authorized persons or entities are:

(a) Parties to this civil action who have consented to this Protective Order and signed the Promise of confidentiality;

(b) The office of counsel for the parties to this civil action who have consented to this Protective Order and signed the Promise of Confidentiality; (b) Outside forensic experts and consultants retained by counsel of record in this lawsuit who have first consented to this Protective Order and signed the Promise of Confidentiality and agreed in writing to be bound by its terms and have returned a signed original to retaining counsel who shall preserve the original thereof. C

(c)  Officers, directors and employees of the Parties who have a need to review confidential material to assist in connection with this litigation, subject to the limitations set forth herein who have consented to this Protective Order and signed the Promise of confidentiality;

(d)  Photocopy service personnel who photocopied or assisted in the photocopying or delivering of documents in this litigation;

(e)  Any Person identified on the face of any such confidential material as an author or recipient thereof;

(f)  Any Person who is determined to have been an author and/or previous recipient of the confidential material, but is not identified on the face thereof, provided there is prior evidence of actual authorship or receipt of the confidential material by such Person;

(g)  Court reporters and their staff;

(h)  The Court and any Person employed by the Court whose duties require access to confidential material;

(i)  Witnesses at depositions, pre-trial and trial proceedings, in accordance with the procedures set forth in paragraphs 11 and 12 herein;

(j)  Expert witnesses and consultants retained by counsel of record in this lawsuit who have signed the Promise of Confidentiality attached hereto as Exhibit A.

Access to confidential material shall not be given to any person or entity not specifically described above, including to members of the general public.

Authorized persons shall not include any organization or entity, or any representative thereof that regularly maintains and/or disseminates documents or information regarding

documents, including abstracts or summaries, or any other record as a service to its members, subscribers or others.

ACCESS TO HIGHLY CONFIDENTIAL MATERIAL. Access to highly confidential material shall be limited to authorized persons or entities, solely in the performance of their duties in connection with discovery and trial preparation of this case. Authorized persons or entities are:

(a) The office of counsel for the parties to this civil action, who have consented to this Protective Order and signed the Promise of Confidentiality; and

(b) Outside forensic experts and consultants retained by counsel of record to this civil action who have first consented to this Protective Order and signed the Promise of Confidentiality and agreed in writing to be bound by its terms and have returned a signed original to retaining counsel who shall preserve the original thereof . Access to highly confidential material shall not be given to any person or entity not specifically described above, including parties and members of the general public. Authorized persons shall not include any organization or entity, or any representative thereof that regularly maintains and/or disseminates documents or information regarding documents, including abstracts or summaries, or any other records as a service to its members, subscribers or others.

Should any party want to provide access to Highly Confidential Material to persons other than those designated above, the party shall first request permission from the party designating the material as Highly Confidential.   If no agreement can be reached, the party seeking to expand the use of the Highly Confidential Information shall file a motion with the Court for an order allowing such expanded use.

PROMISE OF CONFIDENTIALITY. Each authorized person or entity who receives access to any confidential material shall first be given a copy of this Protective Order and advised by the trial counsel making the disclosure that such person must not divulge any confidential material to any other person except in the preparation or trial of this lawsuit, unless ordered by a court, and that such disclosure is limited to authorized persons or entities. A Promise of Confidentiality is attached as "Exhibit A" This promise must be signed by each authorized person or entity receiving any confidential material in advance of receipt, except an authorized person described under Paragraph 6(a) and (b) shall not be required to sign a promise of confidentiality to review its own or its client's own confidential material. A copy of each such promise shall be maintained by the disclosing counsel and provided to counsel for all other parties within thirty (30) days after the final termination of this action if requested.

8.    STORAGE OF CONFIDENTIAL MATERIAL. Authorized persons or entities shall maintain all confidential material in a secure location.

9.    USE OF CONFIDENTIAL MATERIAL. Unless ordered by a court, all confidential and highly confidential material shall be used for the purpose of this lawsuit only.

(a) Absent a court order, no confidential or highly confidential material will be produced, disclosed, or otherwise utilized in any other litigation, whether or not that litigation involves parties to this case. Further, no confidential or highly confidential material shall be disseminated to or shared with any organization or entity, or any representative thereof, that regularly maintains and/or disseminates documents or information regarding documents, including abstracts or summaries, or any other records as a service to its members, subscribers, or others, or the representative of such an organization or entity.

(b) If any subpoenas, requests for production, or other forms of discovery in connection with other litigation are served on any party or counsel to this Protective Order requesting confidential or highly confidential material, that party or counsel will immediately notify all other parties' counsel of record in this matter , provide them with a copy of the subpoena or other discovery request, and will seek an order from the appropriate court regarding whether the confidential or highly confidential material must be disseminated outside the scope of this Protective Order.

10.    COURT RECORDS. In the event that any confidential or highly confidential material is specifically disclosed in any pleading, motion, deposition transcript, videotape, exhibit, photograph, or other material filed with any court, counsel for any party may move the court to have such material placed in an envelope marked "Confidential Material Protected by Court Order," dated and kept under seal by the clerk of that court until further court order. Such confidential o highly confidential material shall, however, remain available to personnel authorized by that court and to authorize persons.

11.    DEPOSITIONS. If confidential or highly confidential material is used or referred to during depositions, counsel for any party may require that only authorized persons, the court reporter, and the camera operator (if the deposition is videotaped) shall be present for the portion of the deposition dealing with confidential material. Counsel for any party may also serve a copy of this Protective Order upon the deponent and require the deponent to sign the Promise of Confidentiality "Exhibit A" prior to further questioning. Counsel for any party may state on the record at the deposition that the deposition includes information claimed to be confidential or highly confidential material. The counsel who asserts that information disclosed during the deposition is confidential or highly confidential material

shall then designate, by page and line, the portions for which such claim is made after receipt of the completed deposition transcript, and given written notice of this designation to the court reporter and all other parties after the receipt of the completed deposition transcript. The designation shall be placed on the first page in the original transcript and all copies of the deposition by the court reporter and by counsel for the parties.

12.     EVIDENCE AT TRIAL. Confidential or highly confidential material may be introduced into evidence at trial, if otherwise admissible, provided that the party seeking to do so shall give sufficient advance notice to the Court and to the parties to allow arrangements to be made, if approved by the Court, for *in camera* treatment of the confidential or highly confidential material.

13.     INADVERTENT DISCLOSURE. Should any confidential or highly confidential material be disclosed to any unauthorized persons, through inadvertence of a party or though the act or omission of any person, the unauthorized person (a) shall be informed promptly of the provisions of this Protective Order by the party who first learns of the disclosure , and upon such notice shall be subject to the terms of this order ; (b) shall be identified immediately to all other parties ; and (c) shall be directed, if within the control of a party or otherwise asked, to sign the Promise of Confidentiality, "Exhibit A."

There are certain documents consisting of approximately 22 boxes of documents that were removed from building 3 of the premises that are the subject of this litigation under circumstances that are in dispute.  Those documents have been maintained in the possession of the defendants without any supervision by the plaintiffs since their removal from building 3.  The parties agree that those documents will be copied at the expense of the defendants and then the originals will be returned to the plaintiff..  The parties also

agree that those document shall be considered highly confidential under the terms of this agreement for a period of six months after delivery of the originals to the plaintiffs.   After the passage of the three months, unless Plaintiff has taken steps to designate those documents as either confidential or highly confidential under the terms of this agreement, the documents will be treated as documents produced in discovery without any designation of confidentiality.

14.     RETURN OF CONFIDENTIAL MATERIAL. Within thirty (30) days of the final termination of this action, those persons identified in Paragraphs 7 and 8, other than counsel for the parties who received confidential or highly confidential material, shall either (a) return to the disclosing party or person all confidential material produced, including all copies, notes, summaries, renderings, photographs, recordings, computerized disks , compact discs, and reproductions of every kind of such confidential material; or (b) destroy all such confidential or highly confidential material and provide a certificate of destruction to counsel for the disclosing party, if requested, within thirty (30) days after the final termination of this action. If requested, all signed Promises of Confidentiality shall also be forwarded to the appropriate counsel of record for each party as provided in Paragraph 9. This paragraph does not apply to counsel for the parties who are still required to be bound by the confidentiality agreement absent a court order and are entitled to keep copies of confidential material for their file.

15.     SURVIVAL OF OBLIGATIONS. All obligations and duties arising under this Protective Order shall survive the termination of this action and, in addition, shall be binding upon the parties to this action, their successors and assigns (whether in whole or in part).

DATED this _____ day of April, 2018.

                    HAWLEY TROXELL ENNIS & HAWLEY

                  By_____
                      Howard Burnett, Of the Firm
                      *Attorneys for Defendants/Counterclaimant*

DATED this _____ day of April, 2018.

                  ATKIN LAW OFFICES, P.C.

                  By_____
                      Blake S. Atkin, Of the Firm
                      *Attorneys for Plaintiff/Counterdefendants*

**EXHIBIT A**

**PROMISE OF CONFIDENTIALITY**

EXPERT WITNESS ACKNOWLEDGMENT
OF STIPULATED PROTECTIVE ORDER

I, _____, acknowledge that I have read the Stipulated Protective Order entered in this action, *Yellowstone Poky, LLC, an Idaho Limited Liability Company vs. First Pocatello Associates, L.P. and First Pocatello Associates, L.P. vs. Yellowstone Poky, LLC, Featherston Holdings, Inc., and Roger Featherston, Case No. 4:16-cv-00316-DCN*. I understand the terms of the Stipulated Protective Order, and I agree to be bound by it. I further understand that a violation of this Stipulated Protective Order may be punishable as a contempt of court.

Dated: _____          _____
                                                            [*Signature*]

**CERTIFICATE OF SERVICE**

The undersigned certifies that she caused to be served a true and correct copy of the

Stipulation for Protective Order as indicated below:

| | | | |
|---|---|---|---|
| Howard D. Burnett | ___U.S. Mail | X E-mail | X   CM/ECF |
| Hawley Troxell Ennis & Hawley | | | |
| PO Box 100 | | | |
| Pocatello, ID   83204 | | | |
| | | | |
| John K. Olson | __ U.S. Mail | __ E-mail | X   CM/ECF |
| Hawley Troxell Ennis & Hawley | | | |
| PO Box 1617 | | | |
| Boise, ID   83701-1617 | | | |
| | | | |
| U.S. District Court | __ U.S. Mail | __ E-mail | X   CM/ECF |
| 801 E. Sherman | | | |
| Pocatello, ID   83201 | | | |

Dated this          day of April, 2018.

# Exhibit I

TITLE 55
PROPERTY IN GENERAL
CHAPTER 2
ESTATES IN REAL PROPERTY

55-208.  TERMINATION OF TENANCY AT WILL. A tenancy or other estate at will, however created, may be terminated:

(1)  By the landlord's giving notice in writing to the tenant, in the manner prescribed by the code of civil procedure, to remove from the premises within a period of not less than one (1) month, to be specified in the notice; or

(2)  By the tenant giving notice in writing to the landlord that the tenant will be vacating the premises, on a date as specified in the notice, but not less than one (1) month from the date of notice.

History:

[(55-208) R.S., sec. 2857; reen. R.C. & C.L., sec. 3078; C.S., sec. 5346; I.C.A., sec. 54-208; am. 2002, ch. 295, sec. 1, p. 848.]