# Exhibit A

Blake S. Atkin ISB# 6903
Atkin Law Offices, P.C.
7579 North Westside Highway
Clifton, Idaho 83228
Telephone: (801) 533-0300
Facsimile: (801) 533-0380
Email: blake@atkinlawoffices.net

*Attorney for Plaintiff/Counterdefendants*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| YELLOWSTONE POKY, LLC, an Idaho Limited Liability Company, | |
| Plaintiff, | |
| vs. | |
| FIRST POCATELLO ASSOCIATES, L.P., EARL SWIFT and BARBARA WISCHERATH, | **THIRD AMENDED COMPLAINT AND JURY DEMAND** |
| Defendants. | Case No. 4:16-cv-00316-DCN |
| FIRST POCATELLO ASSOCIATES, L.P., | |
| Counterclaimant, | |
| vs. | |
| YELLOWSTONE POKY, LLC, FEATHERSTONE HOLDINGS, INC., and ROGER FEATHERSTON, | |
| Counterdefendants. | |

The Plaintiff, Yellowstone Poky, LLC (Yellowstone Poky), through counsel of record, Blake S. Atkin, Atkin Law Offices, P.C., complains against the Defendants, First Pocatello Associates, LP, (FPA), Earl Swift and Barbara Wischerath as follows:

## PARTIES

1.      Yellowstone Poky, LLC is an Idaho Limited Liability Company licensed and authorized to do business in Idaho whose principle place of business is Pocatello, Idaho.  Yellowstone Poky, LLC is the assignor of Featherston Holdings under the contract and with regard to the property that is the subject matter of this litigation.

2.      FPA is a New Jersey Limited Partnership whose principle place of business is New Jersey and which is authorized to do business and is doing business within the state of Idaho.

3.      Earl Swift is an individual resident of New Jersey.

4.      Barbara Wischerath is an individual resident of New Jersey.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the parties and this dispute pursuant to Idaho Code Section 5-514 and 28 U.S.C. section 1332 in that there is complete diversity of the parties and the amount in controversy exceeds $75,000.

6.      This is the proper venue pursuant to Idaho Code Sections 5-401 and 5-404.

## FACTUAL ALLEGATIONS

7.      FPA is the owner of real property located in Bannock County, Idaho, at 669 Quinn Road, Pocatello, Idaho 83201 (the Property). The Property is approximately 138.52 acres in size, contains 24 buildings, and is a commercial property with tenants. The entire property was represented to be encompassed within and is encompassed by a boundary chain link security fence.   The legal description for the Property is contained and set forth in Exhibit A attached hereto which has been derived from

the tax parcels provided by the Bannock County Assessor when asked for the legal description of the property that was described in the contract as RPCPP023305 . Exhibit A is incorporated by reference as if fully set forth herein.

8.   Featherston Holdings or Assigns began negotiating the purchase and sale of the Property with FPA in December 2015.

9.   On December 24, 2015, FPA and Featherston Holdings or Assigns, entered into a Real Estate Purchase and Sale Agreement (the Agreement) pertaining to the property. In the Agreement, Featherston Holdings or Assigns agreed to purchase the property for the price of $19,000,000.00 and agreed to pay $100,000.00 as earnest money to be held in escrow by First American Title Company. The Agreement sets the date for the transaction to close as June 28, 2016.

10.  When Plaintiff was a few days late getting the money deposited because of changes in wire instructions relating to outgoing wires preceding a weekend, Defendants took the opportunity to increase the sales price from $19 Million to $21 Million. Exhibit "B", p. 1.  In addition an additional $125,000 earnest money was required for a total of $225,000.  Also a $50,000 nonrefundable payment was made directly to the Defendants on January 28, 2016.  Exhibit "B", Addendum No. 4.

11.  On February 27, 2018, this Court ruled that the transaction contemplated by this agreement failed under the Idaho Statute of Frauds.

12.  In late February or March 2016, Roger Featherston and his associates toured buildings 10, 16, and 38 located on the Property with Earl Swift, FPA's authorized agent. FPA provided the buyer with limited documents that included only five drawings of the facilities located on the Property.  Plaintiff requested access to additional tenants including a taxidermist.  Mr. Swift refused access.

13.  In late January 2016, Roger Featherston contacted anchor tenants from the facilities that were not part of the Agreement to see if they were interest in being purchased as well.

14.     Featherston Holdings later received drawings of underground utilities from FPA.

Swift claimed all the other files were in New Jersey and wrote that everything

needed to be requested through the New Jersey office. On information and belief,

Swift's representations were not correct and the documents Featherston Holdings

requested are available through the Idaho-based offices.

15.     Swift specifically represented that he would provide Featherston Holdings with

traditional bank and institutional lending documents. FPA has never provided this

information to Featherston Holdings or its assigns. Swift did provide access to some

documents through dropbox but those documents do not include the original

agreement and addendums. Roger Featherston has offered to go back to New Jersey

to help with copying and documenting, but Swift has ignored the requests.

16.     On February 10, 2016, FPA entered into a new lease agreement with SME Steel, a

tenant, in derogation and breach of its contractual obligations arising under the

Agreement when the Lease was not due until October of that year. The original

SME lease agreement was a four-year lease agreement at rates 50% below market,

and failed to take into account substantial O/S plaintiff had identified that should

have been part of the leasehold.  This information was part of the trade secrets

stolen by the defendant which, on information and belief has now been exploited by

the defendants.

17.     Also, in February 2016, Featherston Holdings sent FPA a list of requesting

environmental documents, business bank statements, tax returns, estoppels from the

tenants, and the remaining 17 leases for tenants of the Property. FPA has only

provided Featherston Holdings with 18 of the 35 known lease agreements.  Plaintiff

responded that this was inadequate.  That was the last effort of the defendants to

provide leases.  Despite repeated requests plaintiff was never provided bank

statements, insurance policies or  a history of insurance claims, estoppels, or

decipherable financial statements, or current environmental.

18.     On February 29, 2016, FPA informed Featherston Holdings that it would not release

the 17 other lease agreements, balance sheets, or cost/expenses ledgers. Up to that

point, Featherston Holdings had received only a five-year consolidated expense

sheet with entries until October 2015 that failed to identify the individual or

company that prepared the consolidated expense sheet. Featherston Holdings then

requested a profit/loss sheet. The information provided was nonsensical, listing

utilities as both income and expenses and overstating income. Featherston Holdings

later received one year of bills from FPA and Idaho Power. The bills established

that FPA lost $250,000 on electricity.

19.     Roger Featherston sat in on a meeting between Swift and eight Idaho Power

representatives where the Idaho Power Corp.  Representatives presented a proposal

for $4,500 worth of changes. Roger Featherston requested that no infrastructure

changes be made according to the Agreement. The transaction's Broker

acknowledged in writing that they would not proceed with any infrastructure

changes or construction. However, notwithstanding the representations by the

Broker and FPA Roger Featherston discovered during the week of June 20, 2016,

that trench work was performed and a new panel was put up on building 10.

20.     Featherston Holdings received electricity and water details for the year 2014, but did

not receive all the required documentation. He also requested information about the

specific pesticides used each spring, which amount to $2400 in costs. He also asked

for a list of motorized vehicles, forklifts, scissor lifts, locomotive engine,

snowplows, and backhoe. He has also requested titles and car key locations, as the

inventory provided by FPA is inadequate.

21.     In May 2016, Featherston Holdings signed for an environmental package from FPA.

The cover letter stated that FPA had received it at an earlier date. It was the first

documentation he received with expanded balance sheets for 2014-2015. The

package did not contain a single environmental document dated in the 2000s, with

the most current document being dated in January 1997. The information was not

useful to the due diligence process because Featherston Holdings required

information for the immediately preceding three years.

22.   The Agreement provides for a period of time in which Featherston Holdings can

perform due diligence pertaining to the sale. The Agreement provides deadlines for

the performance of due diligence. The Agreement provides a due diligence deadline

of 90 days following the signing of the Agreement and also states that Featherston

Holdings has a one-time option to extend the due diligence deadline for sixty days

with five-day written notice.

23.   Section 15 of the Agreement requires that FPA disclose and provide copies if

available to Featherston Holdings of "any studies and/or reports that have previously

been performed in connection with or for the PROPERTY, including without

limitation, environmental reports, soil studies, seismic studies, site plans and

surveys." Section 15 also requires disclosure of "any notices relating to a violation

of applicable law including, without limitation, environmental law and laws relating

to land use, zoning or compliance with building codes."

24.   Section 17 of the Agreement provides Featherston Holdings with a right of due

diligence for Featherston Holdings. Featherston Holdings possessed the right to

perform tests, investigations, surveys, and other activities to perform his due

diligence. Featherston Holdings also had the right to request additional documents

from FPA.

25.   Section 20 prohibits FPA during the pendency of the Agreement from executing

leases or modifying existing leases, making substantial alterations or improvements

to the Property, and creating new monetary obligations or liens on the property.

26.   The parties executed a First Addendum to the Agreement on December 30, 2015,

wherein the purchase price was increased to $21,000,000.00.

27.   On December 31, 2015, the parties executed a Second Addendum to the Agreement.

28.     The parties prepared two additional addenda to the Agreement, one with an effective date of December 23, 2015 and another with effective date of December 30, 2015. The addenda were not signed by the parties.

29.     The parties prepared a document entitled Addendum No. 4 to Real Estate Purchase and Sales Agreement, effective December 30, 2015, wherein the parties modified the earnest money paragraph to provide that Featherston Holdings had an option to extend the due diligence deadline by sixty days by paying $125,000.00 additional as Earnest money.

30.     Featherston Holdings the original party to the Agreement with FPA, assigned its interest in the Agreement to Yellowstone Poky as specifically called for under the agreement and assigned and transferred all of the interest of "Featherston Holdings or Assigns" in the Agreement to Yellowstone Poky, effective March 15, 2016.

31.     Yellowstone Poky is the successor in interest to Featherston Holdings or Assigns. To the extent the allegations in this complaint refer solely to Yellowstone Poky it is intended to refer to Yellowstone Poky, and its assignor, Featherston Holdings, Inc.

32.     Roger Featherston paid an additional $125,000.00 to FPA in earnest money to extend the due diligence deadline.  Of that $50,000 was paid to the seller and the deal went hard.  The $50,000 became nonrefundable.

33.     Following the execution of the Agreement, Yellowstone Poky attempted to collect documents pertaining to the Property from FPA in order to conduct its due diligence. Yellowstone Poky made several requests for information pertaining to the due diligence and FPA has refused to provide the information requested.

34.     As stated above, FPA failed to provide its Seller Disclosures within 20 days of entering into the Agreement as identified in Section 15.

35.     FPA has not produced information identified in Section 15(a) or 15(b) of the Agreement.

36.     FPA produced only a small number of leases (11 of 35) notwithstanding the fact that

the Property has a number of tenants occupying various parts of the Property. Yellowstone Poky has requested information about the status of those tenants and their respective leases; yet, nothing has been produced by FPA.  On February 28, 2016 plaintiff responded with specific write ups of the deficiencies in the lease disclosures.  No further information was ever provided by the defendants.

37.   FPA has failed to produce accurate financial information concerning the property. FPA has failed to provide backing information for the financial information that it has provided notwithstanding requests for FPA to provide the information.

38.   Upon information and belief, FPA has entered into lease extensions or modifications with tenants after the parties had entered into the Agreement. For example, in February 2016, Yellowstone Poky received a copy of a lease between FPA and a tenant, SME Steel Contractors. The lease had been extended for two years when the prior lease was set to expire October 16, 2016. The new lease is undervalued and Yellowstone Poky was denied the opportunity to negotiate terms with SME notwithstanding the prohibitions on FPA to enter into new or modified lease terms with tenants.  That information was part of the trade secrets stolen by the defendants that on information and belief has now been employed by the defendants for personal gain.

39.   Upon information and belief, FPA is considering entering into additional lease modifications.

40.   Upon information and belief, FPA has entered into a new loan agreement affecting the Property in the approximate amount of $10,000,000.00.

41.   FPA has commenced installation of a new power controller panel off of Pole Line Road in violation of Section 20(d) of the Agreement.

42.   Plaintiff enjoyed a tenancy on the property in what is known as building 3.

43.   Defendants allowed Plaintiff to enter the property, specifically building 3 and establish offices in that building.  Those offices included 4950 square feet in which

multiple offices spaces were established, including a war room with trade secret planning documents on the walls, multiple computers with trade secret information accessible at the key board.

44.     Plaintiff spent over $200,000 on the value to be added to the property upon closing at the time defendants absconded with the property.

45.     With the knowledge and consent of the Defendants, Plaintiff paid nearly $700.00 to have building three cleaned and rendered inhabitable.

46.     Plaintiff had utility services provided to building 3.

47.     Yellowstone Poky set up utilities, telecommunications, and high-speed data. Yellowstone Poky used building 3 to house all of their documents and plans related to this project.

48.     Just a few days before unlawfully evicting Plaintiff from building 3, Defendants demanded that Plaintiff pay the outstanding utility bill of over $800.00.

49.     Plaintiff used the offices in building 3 to create a master plan for the future subdivision use, and marketing of the property.

50.     To that end Plaintiff engaged engineering firms to perform feasibility studies, engineering of the infrastructure needs of the development based on the master plan, prepare plat maps, layouts, and the planning documents that would be necessary to obtain local approvals of the subdivision and development plans.

51.     All of this work was specific to the Property that is the subject matter of this action, which, in the hands of the owner of this property had a value in excess of $200 million, intrinsic in its ability if followed to substantially enhance the value of the Property over the next ten years.

52.     Plaintiff had, in connection with the master plan, identified existing tenants who would be integral to the success of the master plan.  Plaintiff had begun discussions with those tenants, had begun negotiating modified lease agreements with those tenants, specifically with SME Steel, the Federal FBI.

53.   Despite saying he would never deal with the FBI, Defendant Earl Swift has now used Plaintiffs' trade secret information to negotiate with the FBI the very lease Plaintiff was proposing.

54.   Plaintiff had documents in building 3 that outlined and identified those tenants and the state of the negotiations with those tenants.  That information was part of the trade secret information converted by the Defendants and on which they are now profiting.

55.   In addition, Plaintiff had begun discussions with the City of Pocatello to seek approval of the Plaintiff's master plan for the Property.  Plaintiff had multiple meetings from the Mayor's office with support from the individual department heads and formal meetings with the City Planning Commission.

56.   Those discussions were favorable and Plaintiff had an expectation of early approval of the master plan upon closing the purchase of the Property.

57.   Plaintiff had documents in building 3 relating to Plaintiff's discussions with the City of Pocatello.  Defendants have presented those same trade secret ideas to the City of Pocatello and has benefited or seeks to benefit from the use of that property.

58.   When Plaintiff became a tenant of building 3, Idaho Power had plans to condemn certain of the Property in order to locate a substation on the Property at a location that would interfere with an integral part of the master plan.  The price Defendant had agreed upon to sell the property to Idaho Power was $188,000 for 3.75 acres including easements when comparable land prices were demonstrably over a million per acre.  More importantly, the location of a proposed substation would interfere with a major hotel project Plaintiff had designed for the property.

59.   Plaintiff through negotiations with Idaho Power in which he met with senior officers and directors at Idaho Power corporate in Boise, Idaho, and several follow up meetings, and meetings with city officials was successful in convincing Idaho Power to relocate the planned substation and drop its plans to condemn the property

for the substation.

60. Additional negotiations with Idaho Power were under way related to the location of easements and provision of power to the Property in order to meet the needs of the master plan.

61. Documents relating to the negotiations with Idaho Power were in Plaintiff's offices in building 3.

62. While Plaintiff was a tenant in building 3, and unknown to Plaintiff, Defendants entered the tenancy, invading Plaintiff's right to quiet and peaceable enjoyment of the tenancy, and then and there committed commercial espionage against the Plaintiff on multiple occasions and took pictures of the trade secret development and negotiation plans hanging on the walls of the offices.

63. Among other things, Defendants, through entry into the offices of the tenancy would have had access to confidential and proprietary information relating to the negotiations between the Plaintiff and tenants, the negotiations between Plaintiff and the City relating to the master plan, and negotiations between the Plaintiff and Idaho Power.

64. The information, including public information that was compiled, arranged, interpreted and made useful by the Plaintiff was not generally known or readily ascertainable.

65. Following up on their prior espionage Defendants unlawfully evicted Plaintiff from the tenancy and took possession and control of all of Plaintiff's confidential, proprietary and trade secret information located in the offices of building 3.

66. On June 2, 2016, Defendant Barbara Wischerath emailed Plaintiff that the locks to the offices it occupied in building 3 would be changed the next day and Plaintiff would be evicted from the tenancy.

67. True to their word, Defendants unlawfully changed the locks on June 3, 2016, evicting Plaintiff from its offices and taking possession and control of Plaintiff's

confidential, proprietary and trade secret property on the premises.

68.    Under Idaho law, whether the tenancy of the Plaintiff be considered a tenancy at will or otherwise, the tenancy could not legally be terminated with a one day notice. Even a tenancy at will requires at least 30 days' notice under Idaho law.

69.    After unlawfully terminating Plaintiff's tenancy on the Property with only one day notice, Defendants changed the locks on building 3 and took actual possession of Plaintiff's confidential, proprietary and trade secret information.

70.    Despite efforts to obtain return of it's confidential, proprietary, and trade secret information, Defendants have refused to simply return the property without retaining copies.

71.    On June 17, 2016, more than two weeks after the unlawful eviction, Defendants were still exercising control over Plaintiff's confidential, proprietary and trade secret property and rather than simply return the stolen property, or provide access to the locked offices, promised to "make arrangements" for return of the property. Plaintiff hired a lock smith in an attempt to obtain its property.  The lock smith refused to open the offices for the Plaintiff asking if Plaintiff knew the owner and insisting that he would not open the doors.

72.    Whenever Plaintiff or its attorneys contacted Defendants with regard to return of the Property, Defendant insisted on strings attached to the return such as allowing Defendants to copy the confidential, proprietary and trade secret property.

73.    To this date, the confidential, proprietary and trade secret property has not been returned even though Plaintiff agreed to allow the Defendants to make copies "for attorney's eyes only" and for use only in the prosecution of this case.

74.    Defendants have used or attempted to use Plaintiff's confidential, proprietary and trade secret information.

75.    For instance, shortly after the illegal eviction and confiscation of Plaintiff's confidential and trade secret property a document relating to Plaintiff's proposed

changes to the leasehold of the FBI appeared on the website of Defendants' broker advertising the property.

76.     Similarly, although Defendants repeatedly took the position they would not subdivide the property, Defendants have been speaking to City of Pocatello officials about a subdivision plan surprisingly similar to that pursued by the Plaintiff.

77.     FPA's actions were the subject of a companion suit, 4:16-CV-00315-BLW. This suit has been dismissed without prejudice with both sides bearing their own attorney fees and costs.

77.     Shortly after the Plaintiff filed this action, Defendants began representing to Plaintiff, both through their lawyers and in personal communication that the only thing that prevented closing on the deal was a concern that the Defendants had that Plaintiff could not perform the closing.

78.     It should be pointed out that this contract was never represented as a cash deal. Defendants knew that the Plaintiff needed to satisfy financial partners and investors in order to obtain the financing to secure the deal.

79.     Nonetheless, despite the differences that arose from Defendants' unlawful eviction of the Plaintiff and the allegations in the lawsuit, including the allegation that the contract was not enforceable because of the statute of frauds, back and forth, Defendants both through their attorneys and in personal communications represented that despite the issues raised in the litigation, if Plaintiff would satisfy Defendants that he had the ability to perform financially they would close "the deal."

80.     Even after this Court ruled that the contract was barred by the statute of frauds, Defendants continued to represent that if they had satisfactory proof of available funds to close "the deal" they would sell the Property to the Plaintiff.

81.     With great effort and substantial expense, Plaintiff arranged a phone conference with his financial partners and investors.

82.     Despite several attempts to arrange such a tet a tet, Defendants refused to hold the discussions that they represented were a prerequisite to closing the deal, and instead insisted on unacceptable concessions with regard to a proposed return of documents Defendants had stolen from the Plaintiff.

83.     On information and belief, when Defendants represented to Plaintiff that they would close the deal if the Plaintiff could provide satisfactory proof of funds, Defendants did not have the present intention to ever close the deal, but were instead making that representation in an attempt to defraud the Plaintiff of its substantial funds deposited in escrow, including $50,000 that went directly to the Defendant and became nonrefundable in January 2016.

84.     An additional goal of this fraudulent representation by the Defendants that upon proof of funds they would close the deal despite the legal issues, including the statute of frauds claim, asserted in the litigation was to obtain for their personal use Plaintiff's confidential proprietary and trade secret information.

### COUNT ONE: BREACH OF CONTRACT/BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

85.     Yellowstone Poky incorporates all prior paragraphs as if fully set forth herein.

86.     Yellowstone Poky, as the assignee of Roger Featherston d/b/a Featherston Holdings and Featherston Holdings, Inc., and FPA entered into the Agreement and the addenda as set forth, *supra*.

87.     Yellowstone Poky has fully performed its obligations arising under the Agreement and is not in material breach.

88.     FPA has failed to perform its obligations arising under the Agreement and has breached the contract by failing to provide documents and information requested by Yellowstone Poky to perform due diligence as contemplated and set forth in the Agreement and its addenda.

89.     Implied in every contract is a covenant of good faith and fair dealing.

90.     FPA's conduct has breached the implied covenant of good faith and fair dealing by

failing to provide the requested, necessary documentation and information to Yellowstone Poky in order for Yellowstone Poky to perform its due diligence and close on the transaction on time.

91.   FPA has also breached the implied covenant of good faith and fair dealing by also withholding Yellowstone Poky's personal property containing information vital to the transaction.

92.   FPA's breaches of contract are the proximate causes of Yellowstone Poky's harms.

93.   Yellowstone Poky is entitled to receive specific performance of the Agreement insofar as it involves the sale of unique, real property and specific performance is an appropriate remedy in such circumstances.

94.   Alternatively, Yellowstone Poky has been damaged in an amount to be established at trial and in excess of the jurisdictional minimum of the district court.

95.   Yellowstone Poky is entitled to its full, reasonable attorney fees and costs pursuant to the Agreement and Idaho Code § 12-120(3).

## COUNT TWO: UNJUST ENRICHMENT

96.   Yellowstone Poky incorporates all prior paragraphs by reference.

97.   Yellowstone Poky has conferred a substantial benefit on FPA and it would be unjust for FPA to retain the value of the benefit conferred by Yellowstone Poky.

98.   The benefit conferred on FPA includes all sums paid as earnest money that may be deemed to be non-refundable, plus prejudgment interest.

99.   In addition, the Plaintiff's confidential, proprietary and trade secret information that was pilfered and stolen by the Defendants has a substantial value in the hands of the seller, who according to the interlocutory decision of this Court is the owner of the Property.

100.  FPA has knowingly and voluntarily accepted the benefit conferred by Yellowstone Poky.

101.  Yellowstone Poky is entitled to recover the value of the benefit conferred on FPA.

102.   Yellowstone Poky is entitled to its full, reasonable attorney fees and costs pursuant

to Idaho Code § 12-120(3).

## COUNT THREE: MISAPPROPRIATION OF TRADE SECRETS

103.   Yellowstone Poky incorporates all prior paragraphs by reference.

104.   Yellowstone Poky's information that was located in his office space in Building 3

was confidential and proprietary to Yellowstone Poky. It had not been disclosed to

or any third-parties as of June 2016, when FPA locked Roger Featherston and

Yellowstone Poky out of Building 3. The information was not generally known nor

readily ascertainable by proper means by other persons who can obtain economic

value from its disclosure or use.

105.   Yellowstone Poky made reasonable efforts, under the circumstances, to maintain the

secrecy of its proprietary and confidential information pertaining to the property.

106.   Yellowstone Poky's information constitutes trade secrets pursuant to the Idaho

Trade Secrets Act (ITSA), Idaho Code § 48-801 through § 48-807.

107.   Yellowstone Poky's confidential and proprietary information actually exists.

108.   On information and belief, FPA has willfully misappropriated and used Yellowstone

Poky's trade secrets through improper means.

109.   Yellowstone Poky is entitled to an injunction against FPA's actual or threatened use

pursuant to Idaho Code Section 48-802(1).

110.   Yellowstone Poky is entitled to damages pursuant to Idaho Code Section 48- 803(1)

and exemplary damages pursuant to Section 48-803(2).

111.   Yellowstone Poky has been required to retain counsel to protect its rights.

Yellowstone Poky is entitled to attorney fees pursuant to Idaho Code § 12-120, or

any other applicable statute or provision.

## COUNT FOUR: CONVERSION

112.   Plaintiff incorporates all prior paragraphs above.

113.   As part of the transaction contemplated by the parties, the Plaintiff became a tenant

in what is known as "building 3" which became the nerve center of the Plaintiff's planning for the future development of the property and due diligence aiming toward closing the purchase of the property.

114.   Prior to Plaintiff's occupation of the premises building 3 had not been used for over 30 years.  Plaintiff paid nearly $700.00 to have the tenancy cleaned.  In that cleaning, they discovered 154 poisonous spiders, including black widows, brown recluse, and hobos.  Plaintiff was allowed to and did install phone services and other utilities in the tenancy.

115.   Over the course of several months, while a tenant in building 3, the Plaintiff amassed, organized, analyzed, and developed a large amount of data relating to the Property and plans for development of the property which contained highly confidential information and indeed trade secrets relating to Plaintiff's future development plans which are extremely valuable in the hands of the owner of the Property.

116.   It was Plaintiff's intention to keep the information contained in the documents used in building 3 confidential and secret.

117.   On June 2, 2016, the Defendants gave Plaintiff one day notice to vacate the premises and remove all the confidential and trade secret information from building 3.

118.   The next day the locks were changed.

119.   Three days before this unlawful eviction, Defendants had demanded and received from its tenant, in cash, the payment of $800.00 in utility bills incurred by the Plaintiff as a tenant of building 3.  Defendants demanded that the utility bills be paid in cash just days before their unlawful eviction.

120.   On June 17, 2016, without having followed the procedures required in Idaho for termination of Plaintiff's tenancy in building 3, the Defendants took possession and control of Plaintiff's confidential and trade secret documents being used and stored

on the premises.

121.  Defendants assert that the documents have been available for pick up by Roger

Featherston, and even assert that after the complaint had been amended to assert a

theft of trade secrets claim, they were willing to agree to return of the documents,

after copying, with an "attorney's eyes only" protective order.

122.  Plaintiff's counsel agreed to allow copying of the building 3 documents, for

purposes of this litigation only, upon entry of an appropriate protective order.

123.  Plaintiff then suggested that in order to expedite return of the building 3 documents

that an "attorney's eyes only" protective order be agreed to with respect to the

building 3 documents until such time as an appropriate general protective order be

entered.  Defendants refused.

124.  To date Defendants continue to exercise control and dominion over Plaintiff's

property.

125.  By unlawfully terminating Plaintiff' tenancy and changing the locks on the doors,

Defendants took custody, possession, and control of Plaintiff's confidential,

proprietary and trade secret property and have refused to return it without insisting

on keeping copies while steadfastly refusing to agree to a protective order necessary

to prevent the further exploitation by the Defendants.

126.  By their actions, Defendants have converted Plaintiff's confidential, proprietary,

and trade secret property and have put it to their own advantage.

127.  As a direct and proximate result of their conversion Defendants have been enriched

and Plaintiff has been damaged in the amount of the value of the converted

property, said amount to be proven at trial.

## COUNT FIVE: COMMERCIAL ESPIONAGE

128.  Plaintiff incorporates all prior paragraphs above.

129.  Plaintiff was taking reasonable precautions to maintain the secrecy of the

information housed in the offices in Plaintiff's tenancy in building 3.

130. By interfering with Plaintiff's quiet possession of building 3 through accessing the tenancy when Plaintiff was not there, and by performing an illegal eviction and changing of the locks on building 3 Defendants effectively obtained access to and knowledge of Plaintiff's confidential, proprietary, and trade secret information.

131. The means by which Defendants obtained Plaintiff's confidential, proprietary and trade secret information was improper.

132. Defendants used Plaintiff's confidential, proprietary and trade secret information for their own purposes in connection with the Property.

133. Defendant's conduct is the proximate cause of damage to the Plaintiff.

134. Plaintiff has been damaged in an amount equal to the value of the information in the hands of the owner of the property.

## COUNT FIVE: EQUITABLE ESTOPPEL

135. Plaintiff incorporates all prior paragraphs above.

136. Shortly after the Plaintiff filed this action, Defendants began representing to Plaintiff, both through their lawyers and in personal communication that the only thing that prevented closing on the deal was a concern that the Defendants had that Plaintiff could not perform the closing.

137. It should be pointed out that this contract was never represented as a cash deal. Defendants knew that the Plaintiff needed to satisfy financial partners and investors in order to obtain the financing to secure the deal.

138. Nonetheless, despite the differences that arose from Defendants' unlawful eviction of the Plaintiff and the allegations in the lawsuit, including the allegation that the contract was not enforceable because of the statute of frauds, back and forth, Defendants both through their attorneys and in personal communications represented that despite the issues raised in the litigation, if Plaintiff would satisfy Defendants that he had the ability to perform financially they would close "the deal."

139. Even after this Court ruled that the contract was barred by the statute of frauds, Defendants continued to represent that if they had satisfactory proof of available funds to close "the deal" they would sell the Property to the Plaintiff.

140. With great effort and substantial expense, Plaintiff arranged a phone conference with his financial partners and investors.

141. Despite several attempts to arrange such a tet a tet, defendants refuse to hold the discussions that they represented were a prerequisite to closing the deal, and instead insisted on unacceptable concessions with regard to a proposed return of documents Defendants had stolen from the Plaintiff.

142. On information and belief, when Defendants represented to Plaintiff that they would close the deal if the Plaintiff could provide satisfactory proof of funds, Defendants did not have the present intention to ever close the deal, but were instead making that representation in an attempt to defraud the Plaintiff of its substantial funds deposited in escrow, including $50,000 that went directly to the Defendant and became nonrefundable in January 2016.

143. An additional goal of this fraudulent representation by the Defendants that upon proof of funds they would close the deal despite the legal issues, including the statute of frauds claim, asserted in the litigation was to obtain for their personal use Plaintiff's confidential proprietary and trade secret information.

144. Defendants should be estopped from refusing to close the deal, and if a deal with regard to purchase of the Property cannot be closed, Defendants should be held for damages causes by their fraudulent, inequitable conduct including the cost to Plaintiff of arranging proof of funds and the value, in the hands of the Defendants as owners of the Property of the confidential, proprietary, and trade secret information Defendants now hold and have refused to return to the Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Yellowstone Poky prays for the following relief:

1.    Entry of judgment for Yellowstone Poky and against FPA in an amount to be determined at trial.

2.    Awarding Yellowstone Poky its full, reasonable attorney fees and costs pursuant to Idaho Rule of Civil Procedure 54, the Agreement, and Idaho Code § 12-120(3).

3.    Awarding Yellowstone Poky any additional and further relief deemed just and equitable under the circumstances.

## JURY DEMAND

Yellowstone Poky demands trial by jury pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Dated this 1st day of June, 2018.

Atkin Law Offices, P.C.
Blake S. Atkin

_____
Attorneys for the Plaintiff/Counterdefendants