Page 2

IN THE SIXTH JUDICIAL DISTRICT COURT IN AND FOR
BANNOCK COUNTY, STATE OF IDAHO

YELLOWSTONE POKY, LLC, an Idaho     )
Limited Liability Company,          ) Case No.
        Plaintiff,                  ) CV-2017-5013-OC
              vs.                   )
INTERMOUNTAIN REAL ESTATE IDAHO,    )
LLC d/b/a Coldwell Banker           ) REPORTER'S ROUGH
Commercial Advisors, a Delaware     ) DRAFT UNEDITED
Limited Liability Company; DON      ) REALTIME TRANSCRIPT
ZEBE, an Individual; John Does 1    )
through 5,                          )
        Defendants.                 )
_____ )

DEPOSITION OF EARL T. SWIFT
October 30, 2018

REPORTED BY:
COLLEEN P. DOHERTY, CSR 345
Notary Public

Page 4

1   APPEARANCES (Continued):
2  For the Defendant Intermountain Real Estate & Don Zebe:
3       ANDERSON, JULIAN & HULL, LLP
4       BY MR. MARK D. SEBASTIAN
5       CW Moore Plaza
6       250 S. Fifth Street, Suite 700
7       Boise, Idaho  83702
8       msebastian@ajhlaw.com
9  ALSO PRESENT: Barbara Wischerath
10          Roger Featherston
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1        THE DEPOSITION OF EARL T. SWIFT was taken on
2   behalf of the Plaintiff, at the offices of Hawley
3   Troxell Ennis & Hawley LLP, located at 412 West Center
4   Street, Pocatello, Idaho, commencing at 9:00 a.m., on
5   October 30, 2018, before Colleen P. Doherty, Certified
6   Shorthand Reporter and Notary Public within and for the
7   State of Idaho, in the above-entitled matter.
8                    APPEARANCES:
9   For the Plaintiff:
10          ATKIN LAW OFFICES, P.C.
11          BY MR. BLAKE S. ATKIN
12          7579 North Westside Highway
13          Clifton, Idaho  83228
14          blake@atkinlawoffices.net
15  For the Defendant Earl Swift:
16          HAWLEY TROXELL ENNIS & HAWLEY LLP
17          BY MR. HOWARD D. BURNETT
18          412 West Center Street
19          Pocatello, Idaho  83204
20          hburnett@hawleytroxell.com
21
22
23
24
25

Page 5

1                I N D E X
2  TESTIMONY OF EARL T. SWIFT                    PAGE
3  Examination by Mr. Atkin                        #
4  Examination by [!ATTORNEY SORT2]                #
5
6
7
8                E X H I B I T S
9  DESCRIPTION                                   PAGE
10 Exh 1 - Copy of RE-23 Commercial/Investment     #
11  Real Estate Purchase and Sale Agreement, 24
12  pages
13 Exh 2 - Copy of Exhibit A, Colored Map          #
14 Exh 3 - Copy of Exhibit A, Colored Map          #
15 Exh 4 - Copy of Letter to Earl Swift from       #
16  Roger Featherston, 9/21/2017
17 Exh 5 - Copy of Declaration of Earl T. Swift    #
18 Exh 6 - Copy of Coldwell Banker Exclusive       #
19  Sales Listing Agreement, November 4, 2015
20 Exh 7 - Copy of Corporation Warranty Deed of    #
21  First Pocatello Associates, L.P.
22
23
24
25

Page 10

1  Q. And when was that?
2  A. 1953.
3  Q. After graduating from high school, what did
4  you do?
5  A. Needed a job, and went into construction.
6  Q. And what kind of construction did you get
7  involved in?
8  A. Initially residential, and then expanded into
9  all different types of construction.
10 Q. Did you run your own company, or did you work
11 for someone?
12 A. I incorporated when I was about 24, I guess.
13 Q. Okay. What was the name of that corporation?
14 A. Galaxy Homes, Incorporated, G-a-l-a-x-y.
15 Q. And where is that corporation located?
16 A. New Jersey.
17 Q. Is it still in construction today?
18 A. Yes, we don't do any construction anymore. We
19 just take care of our own real estate.
20 Q. Is it still named Galaxy Homes, Incorporated?
21 A. Yes, still have employees that do maintenance
22 work.
23 Q. You said you went from residential
24 construction to commercial construction. When was that?
25 A. Oh, boy. I guess when I was 59.

Page 11

1  Q. Okay.
2  A. I did restaurants. I've done restaurants,
3  churches, fire houses, first aid buildings. I always
4  put a limit on the amount of the contract that I could
5  handle.
6  Q. When you say, you put a limit on the amount of
7  the contract you could handle. Did you take in
8  partners, or what do you mean by that?
9  A. No, I just felt that I could do a million
10 dollars and handle it all by myself.
11 Q. Okay.
12 A. And back it, and not be in trouble.
13 Q. So you limited on what projects you took on is
14 what you are saying?
15 A. That's right.
16 Q. And have there been other corporations or
17 entities that you have set up to do that work?
18 A. No.
19 Q. Have you been involved in other real estate
20 contracts, other than the one that's at issue in this
21 case?
22 A. Other real estate contracts?
23 Q. Yes.
24 A. Oh, I've bought and sold commercial buildings,
25 residential buildings, and so forth.

Page 12

1  Q. Okay.
2  A. But nothing like this.
3  Q. All right. How many times have you bought
4  real estate?
5  A. I don't know. Probably at least 50.
6  Q. So you've got extensive experience in
7  purchasing real estate?
8  A. Uh-huh.
9  Q. How often have you sold real estate?
10 A. I don't know. Probably half that time I
11 divested myself of it.
12 Q. So you've had extensive experience in both
13 purchasing and selling real estate?
14 A. That's right.
15 Q. Is that fair to say?
16 A. But not in the state of Idaho.
17 Q. Okay. We'll get to that in a minute. Where
18 have most of your real estate purchases been?
19 A. New Jersey.
20 Q. So you've purchased and sold real estate in
21 New Jersey. You've purchased at least one piece of
22 property in Idaho?
23 A. Yes.
24 Q. Right?
25 A. Yes.

Page 13

1  Q. Any others, besides this one, that you've
2  purchased in Idaho?
3  A. No.
4  Q. Okay.
5  A. Yes. Yes.
6  Q. Okay. What was that?
7  A. It was a residence.
8  Q. And we'll talk about that, because I think the
9  residence is referred to in one of the contracts.
10 A. That's right.
11 Q. But we'll talk about it. So other than this
12 property and your residence, have you ever bought any
13 other property in Idaho?
14 A. No.
15 Q. Do you know what a limited partnership is?
16 A. In what context?
17 Q. Well, for instance, First Pocatello
18 Associates, the owner of this property that we're
19 talking about, says that it's an LP, or a limited
20 partnership. Were you aware of that?
21 A. Yes.
22 Q. And do you know what kind of entity that is?
23 What's your understanding of what a limited partnership
24 is?
25 A. To tell you the truth, I don't remember at

Page 14

1  this point.
2      Q.  Okay.  Fair enough.  Let me ask you this.  My
3  understanding, and I might have it wrong, but my
4  understanding is that a limited partnership typically
5  will have limited partners, less the name.  And it also
6  has what's called a general partner.  Do you understand
7  that?
8      A.  Yes, I'm the general partner.
9      Q.  Okay.  And that was going to be my next
10 question.  So you, personally, Earl Swift, is the
11 general partner of First Pocatello Associates?
12     A.  Yes, sir.
13     Q.  And do you know when First Pocatello
14 Associates organized?
15     A.  It was after I had purchased this property, I
16 believe.
17     Q.  When did you purchase this property?
18     A.  I believe the closing was the end of '89,
19 beginning of '90.
20     Q.  And who did you purchase it from?
21     A.  Air Products and Chemicals in Allentown,
22 Pennsylvania, which was part of Raytheon, United
23 Engineers.
24     Q.  Okay.
25     A.  But all the work -- everything went through

Page 15

1  Air Products and Chemicals, I believe, with the
2  attorneys.
3      Q.  And did you have someone set up this limited
4  partnership for you?
5      A.  Oh, I'm sure I did.
6      Q.  Do you know who that was?
7      A.  That might -- again, that's a New Jersey
8  corporation, I believe.  So it would have to be Cole and
9  Danses, that firm.  They are all dead.
10     Q.  Okay.  Let's talk about the property.  I've
11 heard it referred to as Gateway.  How would you describe
12 the property that we are talking about?
13         MR. BURNETT:  By its name?
14         THE WITNESS:  A dba, Gateway West.
15     Q.  (BY MR. ATKIN)  Gateway West, is it GWIC, is
16 that how it's referred to sometimes, Gateway West
17 Industrial?
18     A.  I've never referred to it that.  I always
19 called it what it is.
20     Q.  Gateway West?
21     A.  Yes, sir.
22     Q.  And again, we're talking about the property
23 that you had entered into a contract with Roger
24 Featherston to sell to him.  And you would refer to it
25 as the Gateway West property?

Page 16

1      A.  Yes, sir.
2         MR. BURNETT:  For the record, I'm going to
3  object to the form of the question.  When you say,
4  "you," if you are referring to Mr. Swift, individually,
5  that would not be correct.
6      Q.  (BY MR. ATKIN)  And that's a good
7  clarification.  I sometimes get a little bit sloppy in
8  the way I ask the questions.  So when I say you in this
9  context, talking about this contract, I'm talking about
10 your company, First Pocatello Associates.  I appreciate
11 that clarification.
12         Describe for me what Gateway West entails?
13 How many buildings, for instance, are included in
14 Gateway West?
15     A.  I believe, approximately, 24.
16     Q.  And each of those buildings is numbered?
17     A.  Yes.
18     Q.  Are they numbered consecutively; 1 through 24?
19     A.  No.
20     Q.  But there are approximately 24 buildings?
21     A.  Yes.
22     Q.  How many acres of ground?
23     A.  150 acres, I understand, by the tax bills.
24     Q.  And is this Gateway West project that you were
25 selling to Roger Featherston, is it the whole property

Page 17

1  that you bought in the '89 and '90 time period?
2      A.  Yes.
3      Q.  And you or your company have owned it and
4  operated it through 1989 through present; you are still
5  operating it?
6      A.  Until now.
7      Q.  Now, tell me a little bit more about FPA, or
8  First Pocatello Associates.  Does it have limited
9  partners?
10     A.  Yes.
11     Q.  Who are the limited partners?
12     A.  New Jersey.  Where are they, did you say?
13     Q.  No.  Who are they?
14     A.  My children.
15     Q.  Okay.  How many children do you have?
16     A.  Four.
17     Q.  And each one of them owns a limited
18 partnership interest in First Pocatello Associates?
19     A.  Yes.
20     Q.  What are their names?
21     A.  Let's start with the oldest; Tom, Barbara,
22 Mark, Cindy.
23     Q.  You've mentioned that you are the general
24 partner of First Pocatello Associates?
25     A.  Yes, sir.

Page 18

1  Q. Are you the only general partner, or are there
2  other general partners?
3  A. I'm the only one.
4  Q. Your daughter, Barbara, participates with you
5  in the operation of First Pocatello Associates; is that
6  correct?
7  A. Yes, sir.
8  Q. What is her position?
9  A. Chief operating officer, I guess.
10 Q. Okay. She's your daughter, and she does what
11 you ask her to do; is that fair?
12 A. She's my daughter, and I'm old enough and wise
13 enough to know that most women don't tell what you tell
14 them to do.
15 Q. I didn't say that. I'm married, and I'm
16 almost as old as you are. So I understand what that
17 means.
18      You would describe her generally as the chief
19 operating officer?
20 A. Yes, sir. I'm getting up in years, and she's
21 taken quite of the burden off.
22 Q. Okay. When it comes to major decisions of the
23 partnership, does she consult with you about those
24 decisions?
25 A. Definitely.

Page 19

1  Q. Would you expect her to make any major
2  decisions with regard to the operation of the
3  partnership without consulting with you?
4  A. I don't believe she would do that.
5  Q. And if she were to sell the property belonging
6  to the partnership, would you expect her to consult with
7  you about that?
8  A. Yes.
9  Q. Likewise, if you were planning to sell this
10 property, would you consult with Barbara about that
11 before you sold it?
12 A. I would make her aware of it, but I would do
13 what I feel is in the best interest of the family and
14 myself.
15 Q. Okay. And you feel like you could do that
16 even if Barbara expressed some opposition to you doing
17 that?
18 A. I would be open to opinions. I've been known
19 to be wrong.
20 Q. But when it came right down to it, you have
21 the authority, you could do it even if there was
22 opposition from Barbara?
23 A. Yes.
24 Q. Or from anyone else?
25 A. Yes.

Page 20

1  Q. And I heard -- I don't even know where I heard
2  it. Well, you mentioned that you had a stroke recently.
3  A. Yes.
4  Q. Was that recently?
5  A. July.
6  Q. Okay. That's recent. But you are recovering
7  well from that?
8  A. I have certain limitations, but basically I'm
9  recovered.
10 Q. Those limitations would they affect your
11 competency to run First Pocatello Associates?
12 A. I don't believe so.
13 Q. Okay.
14 A. But I have a very capable assistant.
15 Q. All right. Barbara?
16 A. Yes.
17 Q. And has anybody suggested that you are not
18 competent to continue operating First Pocatello
19 Associates?
20 A. No.
21 Q. Given your involvement that you've described
22 in real estate purchases and sales, I'm going to ask you
23 some questions that you'll probably will think are silly
24 questions to be asked, but I need to make a record. So
25 if you'll indulge me.

Page 21

1      Do you understand the concept of due diligence
2  as it relates to the purchase or sale of real estate?
3  A. I believe so, yes.
4  Q. How would you describe the process of due
5  diligence in connection with the real estate purchase
6  and sale?
7  A. You would give the prospective buyer a period
8  of time to research and make himself comfortable with
9  what he was purchasing.
10 Q. So let me ask you this. In your experience in
11 real estate purchases and sales, due diligence usually
12 begins, doesn't it, with the seller making certain
13 disclosures to the buyer?
14 A. It's been my experience it usually begins when
15 the terms of the purchase agreement have been met.
16 Q. Okay. And maybe I didn't ask the question
17 correctly. But as part of that due diligence process,
18 doesn't the seller make certain disclosures to begin the
19 due diligence process?
20     MR. BURNETT: Asked and answered. I object to
21 the form of the question insofar that it's asked and
22 answered.
23     But if you have anything to add, Mr. Swift,
24 you may do so.
25 Q. (BY MR. ATKIN) And Howard will correct me if

Page 42

1  making a statement.
2      Q. There came a point in time where you wanted to
3  sell the Gateway West property?
4      A. Yes.
5      Q. Is that true?
6      A. Yes.
7      Q. And were you contacted by Don Zebe, or did Don
8  Zebe contact you?
9      A. I contacted Don Zebe --
10         MR. SEBASTIAN: I'm going to object to the
11  form of the question.
12         MR. BURNETT: Hang on.
13         MR. SEBASTIAN: Because you asked the question
14  in two different ways.
15     Q. (BY MR. ATKIN) Did Don Zebe contact you about
16  your desire to sell the property?
17     A. I don't know. I knew Don Zebe over the years.
18     Q. Oh, okay.
19     A. And he had been in and out from time to time.
20     Q. So the sale of the Gateway property was not
21  the first time that you had met Don Zebe?
22     A. No.
23     Q. What involvement had you had with Don Zebe
24  before that?
25     A. He had inquired about selling portions of the

Page 43

1  frontage property, which I told him, I was in no
2  interest of dividing it up. And I just dismissed his
3  ideas over the years. I did not want to take pieces off
4  the property.
5      Q. So your prior interaction with Don Zebe, he
6  had approached you trying to sell portions of the
7  property?
8      A. See if I would sell portions of the property,
9  and I said, no.
10     Q. And you had no interest in subdividing the
11  Gateway West property?
12     A. No, I did not.
13     Q. And that's what you told Don Zebe?
14     A. That's right.
15     Q. You would sell the whole thing, but not a
16  portion of it?
17     A. That's right. I've told many people that.
18     Q. Okay. Had you put the Gateway West property
19  up for sale before you met Don Zebe?
20     A. Yes.
21     Q. And when did you first put it up for sale?
22     A. I don't remember. It was with Coldwell
23  Banker, Rad Dye, out of Salt Lake City.
24     Q. Red Dye?
25     A. Yep.

Page 44

1          MR. SEBASTIAN: Rad Dye.
2          THE WITNESS: Rad, R-a-d, Dye.
3      Q. (BY MR. ATKIN) Do you know if he's still in
4  business?
5      A. He's one of the foremost realtors, commercial
6  realtors in the country.
7      Q. Okay.
8      A. As far as I know, he's still in business. He
9  worked for Coldwell Banker. It wasn't his business.
10     Q. Right. Approximately, how many years ago was
11  that? You don't remember exactly when it was, but can
12  you give me a ballpark?
13     A. Because he was a listing agent for rental, for
14  leases and rental.
15     Q. So he was your --
16     A. 15 years, 15 years prior.
17     Q. Okay.
18     A. And then I decided to sell it because of my
19  age.
20     Q. And so for 15 years, this Rad Dye had been
21  working as your listing agent for rentals on the
22  property?
23     A. Yeah.
24     Q. And then did you approach him to list it for
25  sale?

Page 45

1      A. I would imagine so.
2      Q. Told him --
3      A. Because already I spoke to him periodically.
4  So it would be --
5      Q. Basically told him --
6      A. Basically just said, hey --
7      Q. You were getting to the age where you wanted
8  to sell it, and so you had it listed?
9      A. Uh-huh.
10     Q. Did you tell him that you didn't have any
11  interest in selling just a portion of it, you wanted to
12  sell the whole thing?
13     A. I know he presented me with people that we
14  turned down. A record of which, I have somewhere. But
15  it was two or three other people had the same idea. Oh,
16  we'll buy it. But let us sell off these pieces, and
17  then subdivide it, sell it off, and then I'll have some
18  money to give you.
19     Q. I see.
20     A. Well, it doesn't make much sense to do that.
21     Q. So Rad Dye understood that you didn't have any
22  interest in selling a portion of it? It was all or
23  nothing?
24     A. That's right.
25     Q. Did he prepare Rad Dye or Coldwell Banker, did

Page 58

1  A. Yes.
2  Q. Now, let me ask you this. These documents
3  we've just looked at in Exhibit 1, do they constitute
4  all of the documents that made up the Real Estate
5  Purchase and Sale Agreement between your company, First
6  Pocatello Associates, L.P., and Featherston associates
7  or assigns for the purchase and sale of the Gateway West
8  property?
9      MR. BURNETT: Object to the form. Again, when
10 you refer to the Featherston associates and assigns, and
11 the name is Featherston Holdings or Assigns as shown on
12 the contract.
13 Q. (BY MR. ATKIN) Let me say it again. Does
14 what we've looked at in Exhibit 1, constitute all of the
15 contract between First Pocatello Associates, L.P. and
16 Featherston Holdings or Assigns for the purchase and
17 sale of the Gateway West property?
18     THE WITNESS: Barbara, is this it? Barbara,
19 is this all of it?
20     MR. ATKIN: I'll ask you tomorrow. You might
21 help him.
22     MS. WISCHERATH: Yes.
23     THE WITNESS: Yes.
24 Q. (BY MR. ATKIN) Now, while we're here, we
25 talked about this. You mentioned earlier that you had

Page 59

1  another piece of property that you owned in Pocatello,
2  besides the Gateway West property that you were selling
3  to Roger Featherston?
4  A. Yes.
5  Q. And if you look at Exhibit 2.
6      MR. BURNETT: Let me interrupt. Just so the
7  record is clear, when you refer to Exhibit 2, that's a
8  cover page within Exhibit 1. So we may want to do this
9  somehow by a different reference.
10     MR. ATKIN: Yes.
11     MR. BURNETT: Let me suggest this.
12     MR. ATKIN: Okay. Go ahead.
13     MR. BURNETT: At the top of what you've
14 labeled for this deposition purposes as Exhibit 1, there
15 is the federal court docket notation that contains pages
16 1 of 24. Do you see that?
17     MR. ATKIN: Okay.
18     MR. BURNETT: And the last page of this packet
19 of documents is 24 of 24. And so maybe for ease of
20 reference, we could just refer to the upper right-hand
21 corner page number of this packet that constitutes
22 Exhibit 1.
23     MR. ATKIN: Thank you. That's clearer.
24 Q. (BY MR. ATKIN) Let's look at the addendum to
25 the real estate purchase agreement, and the second page

Page 60

1  of that addendum, which is page 12 of 24.
2      MR. BURNETT: You are on it.
3  Q. (BY MR. ATKIN) And there it says under No. 7,
4  "Items Specifically Excluded in This Sale. The
5  following items are specifically excluded from sale
6  under the agreement." And A you have, "The seller's
7  personal residence commonly described as 1499 Partridge
8  Cove, Pocatello, Idaho."
9      Is that the home that you are talking about?
10 A. Yes.
11 Q. That's the only other property --
12 A. I own in Idaho.
13 Q. -- that you owned in Pocatello?
14 A. Yes.
15     MR. BURNETT: The only other real property.
16 Q. (BY MR. ATKIN) Right, the only other real
17 property. And all of the rest property of the real
18 property that you owned in Pocatello, you were selling
19 to Roger Featherston under this contract; correct?
20 A. Yes.
21 Q. Let me back up. The contract included not
22 only the sale of the real estate, but also the sale of
23 some vehicles related to the operation of the Gateway
24 West property. Do you recall that?
25 A. Yes.

Page 61

1  Q. And so this exclusion No. 7, on page 12 of 24
2  that we just looked at, in Part B, it says, the seller's
3  personal vehicles: a 2009 white Ford F-150 pickup
4  truck; and a 2014 red Ford F-350 pickup truck; and a
5  2013 red Ford Explorer; and a Gooseneck trailer. You
6  were excluding those from the sale, because those were
7  your personal vehicles --
8  A. Yes.
9  Q. -- rather than related to the operation of
10 Gateway West?
11 A. Yes.
12     MR. BURNETT: Let him finish the question
13 before you answer the question.
14 Q. (BY MR. ATKIN) Did you answer the question?
15 You said, "yes"?
16     MR. BURNETT: He did. He did.
17 Q. (BY MR. ATKIN) All right. Now, who prepared
18 the documents that are Exhibit 1? And let me back up.
19 There are some obvious forms that are used here. But
20 who filled out the form, and put in the specifics
21 relating to who the purchaser was, who the seller was,
22 what the price of the sale was, and what the description
23 of the property was? Who filled out those forms?
24 A. I believe Rad Dye did.
25 Q. Okay. Or was it Don Zebe at this point?

Page 70

1  earnest money required went from 225,000 to 100.  It was
2  just a different configuration of how it was to be paid.
3      Q.  (BY MR. ATKIN)  A good clarification.  Let's
4  look at that.  Do you see the handwritten notation
5  starts with No. 5, "Upon conclusion of due diligence
6  buyer to deposit $125,000 additional non-refundable
7  earnest money to be credited at closing."
8      So those changes with regard to earnest money
9  were both made at the same time; is that right?
10     A.  I believe that they were.
11     Q.  Okay.  So it went from an initial deposit of
12 225,000 to a deposit of 100,000, and then another 125
13 upon completion of due diligence?
14     A.  This was I believe between -- well, I think
15 that's what Mr. Featherston asked for.
16     Q.  Okay.
17     A.  It wasn't something that I asked for.  I don't
18 know.  I think Mr. Featherston asked for it broken into
19 two places.
20     Q.  And so the changes we see on this first page
21 were, you we're going to get an additional two million
22 dollars, and Mr. Featherston was going to be able to
23 break the earnest money deposit into two pieces of
24 100,000, and then 125,000 later?
25     A.  I don't think it was a condition of it.

Page 71

1  That's just the way it went.
2      Q.  That's the way it was changed?
3      A.  Yeah.
4      Q.  And so those two changes, and my question is,
5  did those two changes happen simultaneously, you know?
6      A.  I would think probably.
7      Q.  Okay.
8      A.  Or the -- no, they probably -- I would say,
9  because of the way that the changes are initialed, I
10 would say, it was probably done simultaneously.
11     Q.  Okay.  Now, in the contract, if you look at
12 paragraph 1, it says, "Buyer:  Featherston Holdings or
13 Assigns (hereinafter called "Buyer") agrees to purchase,
14 and seller, First Pocatello Associates, L.P.
15 (hereinafter called 'Seller') agrees to sell the
16 following described real estate hereinafter referred to
17 as 'Property' commonly known as 669 Quinn Road."
18     Let me back up and say.  Is that something
19 that Don Zebe put into the contract documentation?
20     A.  I believe so.  I didn't.  I didn't have
21 anything to do with it.
22     Q.  Okay.  What does the reference "669 Quinn
23 Road" mean to you?
24     A.  Well, basically that's the property.
25     Q.  Okay.

Page 72

1      A.  You know, and it's not the --
2      Q.  The 150 acres?
3      A.  Yeah, I would say, because it's the mailing
4  address, and the entrance, and the office.
5      Q.  So when you read this at the time that you
6  signed it, you thought that referred to the Gateway West
7  property you were selling in the entirety; right?
8      A.  Uh-huh, yes.
9      Q.  And then it goes on to say, "Legal descriptor
10 attached as Exhibit A site map."  And I wanted you to
11 get a good picture of it.
12         MR. ATKIN:  This is attached to Exhibit 1 that
13 we've looked at.  But this is a better copy of it.  And
14 so I'm going to have her mark this as Exhibit No. 2, if
15 you would.
16         (Exhibits 2 and 3 marked.)
17     Q.  (BY MR. ATKIN)  Let me have you look at what's
18 been marked Exhibit 2.  And these are just good color
19 copies of those Exhibit A, that exist in Exhibit No. 1?
20         MR. BURNETT:  That's this one, and that's that
21 one.
22         THE WITNESS:  Okay.
23     Q.  (BY MR. ATKIN)  Let's get that on the record.
24 If you look at the first one, Exhibit No. 2, can you
25 tell me what that is showing?

Page 73

1      A.  I don't know what these numbers are.  I can't
2  read them, but...  It would be basically the property by
3  the perimeter it would mean more than anything.
4      Q.  And do you know who prepared that exhibit?
5      A.  No, not me.  I never saw one of these.
6      Q.  Okay.  I'll find another witness that knows.
7  Now, let me ask you about Exhibit 3.  Tell me what that
8  is, if you know?
9      A.  That's an aerial photograph of the property.
10     Q.  The Gateway West property?
11     A.  The Gateway West.
12     Q.  And you'll notice there are some pencil
13 drawings that are -- I don't know if they are pencils,
14 but there is an orange outline.  Do you see that?
15     A.  Yeah, that would match this one here
16 (indicating).
17     Q.  Okay.  And is that orange the perimeter of the
18 Gateway West property that was being sold?
19     A.  Yes.  Yes.
20     Q.  Is the property surrounded by a fence, or is
21 it enclosed somehow?
22     A.  It's all fenced in.
23     Q.  What kind of fence?
24     A.  Chain-link fence.
25     Q.  It goes all the way around the property?

Page 74

1  A. Yes.
2  Q. So you can tell where the perimeter is on the
3  ground by walking the fence?
4  A. Yes. As a matter of fact, that's how the
5  determination when I bought it, they were trying to say
6  what was included. I said the easiest thing is
7  everything inside the fence.
8  Q. So the fence was there when you bought the
9  property?
10  A. Yes.
11  Q. It's been there for a long time. Okay.
12     Now, with respect to the earnest money, if you
13  look at page 11 -- or not 11. Hold on a second. I'm
14  getting my bearings here. Go to Addendum No. 3, it's
15  page 21 of 24 of Exhibit 1. It says, "Earnest Money"
16  paragraph 4. It says, "First deposit of earnest money
17  of $100,000 to be deposited on or before the 26th of
18  January, 2016, which shall be the effective date of the
19  agreement." Do you see that?
20  A. Yes.
21  Q. And so I take it from that, that there was no
22  earnest money deposited before the time of this addendum
23  on January 14th of 2016? This document was signed the
24  14th of January, 2016; right?
25  A. Yes.

Page 75

1  Q. And so by that date, there had been no earnest
2  money deposit made?
3     MR. BURNETT: If you know.
4     THE WITNESS: I don't know.
5  Q. (BY MR. ATKIN) Okay. This document appears
6  to set a deadline for the deposit of the first $100,000
7  to be deposited on or before January 26th, 2016. My
8  question is, do you know whether that earnest money got
9  deposited on or before January 26th, 2016?
10     MR. BURNETT: If you know.
11     THE WITNESS: I don't know.
12  Q. (BY MR. ATKIN) Okay. Did you ever have any
13  discussions with Roger Featherston about his failure to
14  deposit earnest money according to the schedule required
15  in the contract?
16  A. I believe there are.
17  Q. Okay. What do you remember about discussions
18  with him about that?
19  A. This whole thing has lingered on so long. I
20  don't remember.
21  Q. And "I don't remember" is a perfectly
22  acceptable answer if that's the truth.
23  A. That's the truth. There is no reason for me
24  to lie.
25  Q. We all have memories that are more or less,

Page 76

1  you know, we remember, or we don't. So "I don't
2  remember" is an okay answer.
3     Earl, did there ever come a time when Roger
4  Featherston missed the deposit of earnest money that
5  resulted in you requesting that he pay more money for
6  the purchase of the property?
7  A. There was at one time when things were getting
8  really testy.
9  Q. And so my question is, the increase in the
10  purchase price from 19 to 21 million, did that have
11  anything to do with not making an earnest money deposit?
12  A. That increase was done initially before it was
13  even entered into.
14  Q. Okay. When you received this offer from Roger
15  Featherston, his company --
16     MR. FEATHERSTON: Featherston Holdings.
17  Q. (BY MR. ATKIN) -- Featherston Holdings or
18  Assigns, when you received this offer that we're talking
19  about, did you read the entire document?
20  A. To tell you the God's honest truth, I don't
21  think I did.
22  Q. Okay. Did you have somebody read the document
23  before you signed it?
24  A. I don't think so. I don't recall, but I don't
25  think so. Again, I've never been quite involved in

Page 77

1  anything like this in all my years of experience.
2  Q. Tell me how this transaction was different
3  from the other substantial real estate transactions that
4  you've done in the past?
5  A. The offers were made. They accepted. The
6  agreement and everything was made. They presented the
7  money. Closed on the date they were supposed to close.
8  And that was the end of it.
9  Q. What things did you experience here that were
10  out of the ordinary for you?
11  A. The whole thing.
12  Q. Okay. Well, there was an offer made?
13  A. There was an offer made. And it didn't seem
14  like anything was lived up to as far as the monetary
15  part, the deadlines, anything. It wasn't a good kind of
16  a feeling, the whole thing.
17  Q. And when did you start to feel that?
18  A. Well, I kept asking for proof of funds. That
19  we asked for proof of funds for months, and months, and
20  months. And according to that agreement, we should have
21  got it within, what; 90 days or something. It's three
22  years, and we don't have it yet.
23  Q. Let's talk about that a little bit. Let's go
24  back to this contract, first. Go to the first page of
25  this document page 2 of 24, again, if you would. So I

Page 138

1  should be made available?
2      MR. BURNETT: Counsel, the witness has just
3  answered your question in advance because there was on
4  September 14th, 2017, a misappropriation of trade
5  secrets allegation made against his company.
6      MR. ATKIN: I understand that.
7      MR. BURNETT: So defending against that claim
8  is an important aspect of reviewing those documents to
9  see if there is any factual basis for any such claim.
10     Q. (BY MR. ATKIN) But did you see any reason why
11 you would need to review any of those documents?
12     A. Me?
13     Q. Yes.
14     A. No. I've got 30 years of experience and
15 expense, I don't think there is anything I need. And if
16 it's super wonderful at 84 years old, I don't care if I
17 do another one.
18     Q. Let me broaden the question a little bit. Do
19 you see any reason why your company or your daughter
20 Barbara or your company First Pocatello Associates would
21 need to review those documents?
22     A. I don't believe so. I believe it would be
23 more for attorneys for our attorney to just to protect
24 us.
25     Q. Okay. Are you aware that Mr. Featherston's

Page 139

1  lawyers offered to have these documents copied if they
2  were labeled attorneys' eyes only and kept for attorneys
3  only to look at?
4      A. I don't remember hearing that.
5      MR. BURNETT: Counsel, I'm going to object to
6  the whole line of questioning, because this goes to an
7  issue in the federal court lawsuit. This has nothing,
8  whatsoever, to do by the state court action by
9  Yellowstone Poky against Don Zebe, and the real estate
10 company. And you are seeking discovery on a matter that
11 has nothing to do with the case at issue.
12     MR. ATKIN: You know, on that one, you might
13 be right that. I've disagreed with you all day, but
14 that one might just relate to the Featherston.
15     THE WITNESS: You might as well get all you
16 can get; right?
17     MR. ATKIN: I'll move on. Let's take a few
18 minute break.
19     (Recess.)
20     MR. ATKIN: I'm done.
21     MR. SEBASTIAN: I guess for the record then
22 you are done with your questions.
23     MR. ATKIN: I am.
24           EXAMINATION
25 QUESTIONS BY MR. SEBASTIAN:

Page 140

1      Q. Mr. Swift, my name is Mark Sebastian. I am
2  the attorney representing Intermountain Real Estate LLC
3  and Mr. Zebe?
4      A. Right.
5      MR. SEBASTIAN: And I hopefully this will just
6  go very quickly I would like to mark this as Exhibit 6.
7      (Exhibit 6 marked.)
8      Q. (BY MR. SEBASTIAN) Do you recognize let me
9  give you actually a moment to glance over the document?
10     A. Okay. (Witness complying.)
11     (Off the record.)
12     MR. SEBASTIAN: Back on the record.
13     Q. (BY MR. SEBASTIAN) Mr. Swift?
14     A. Yes, sir.
15     Q. In looking at Exhibit No. 6, do you recognize
16 that document?
17     A. No, I don't to tell you the truth I know
18 basically what it is.
19     Q. And turning to the second page, there are --
20     A. That is my signature.
21     Q. That is your signature. Okay. That is all I
22 wanted with regard to that.
23     MR. SEBASTIAN: I'm going to hand you another
24 copy or another document we'll have this marked as
25 Exhibit 7.

Page 141

1      (Exhibit 7 marked.)
2      Q. (BY MR. SEBASTIAN) And if you can let me know
3  when you've had a chaps to finish reading through that?
4      A. What's that?
5      Q. If you can let me know when you are finished
6  reading through it?
7      A. (Witness complying.) This is a legal special
8  description, I believe.
9      MR. BURNETT: Okay.
10     THE WITNESS: Okay. Yes, sir.
11     Q. (BY MR. SEBASTIAN) Do you recognize the
12 document marked Exhibit 7?
13     A. No, not particularly, I don't. I know what it
14 is.
15     Q. What is it?
16     A. It's a warranty deed. It's a legal
17 description from Pioneer Title if I'm not mistaken.
18     Q. Okay. And turning to the second page of the
19 deed, do you recognize whose signature that is?
20     A. Yes, it's mine.
21     Q. Now, this deed as I understand the document,
22 this was a deed transferring real certain real property
23 from early T Swift corporation to First Pocatello
24 Associates; is that correct?
25     A. Yes, sir.

Page 142

 1   Q. And again, as I understand the deed, it's
 2  referring to an address called 669 West Quinn. And it
 3  says Building No. 2 Pocatello -- or, no, that's your
 4  business address. What I want to ask you is, is this
 5  deed for 669 West Quinn --
 6   A. Yes.
 7   Q. -- the whole property?
 8   A. Yes.
 9   Q. And is the same property that --
10   A. Our picture.
11   Q. -- was described in Exhibit No. 1 on page 2,
12  where it says, 669 Quinn Road?
13       MR. BURNETT: Object to the form of the
14  question; insofar as the description in Exhibit No. 1
15  has been held by a federal judge not to constitute an
16  adequate description of the property under the Idaho
17  Statute of frauds.
18   Q. (BY MR. SEBASTIAN) That's fine. In your
19  mind, is the property that's referenced in the warranty
20  deed the property that was referenced as 669 Quinn Road
21  in the real estate agreement?
22       MR. BURNETT: The same objection but you may
23  answer.
24       THE WITNESS: Yes.
25   Q. (BY MR. SEBASTIAN) Okay. And that's the

Page 143

 1  property that's been illustrated in an outline form on
 2  Exhibit 3 and No. 2 and 3?
 3       MR. BURNETT: The same objection insofar as
 4  those exhibits also have been held by a federal judge
 5  not to constitute an adequate description of the
 6  property under Idaho Statute of frauds.
 7       Subject to that objection, you may answer.
 8       THE WITNESS: Yes.
 9   Q. (BY MR. SEBASTIAN) Okay. And at least from
10  your perspective, was there in regard to the real estate
11  and purchase sale agreement, did you have any question
12  in your mind that when it referred to the 669 Quinn Road
13  it was not the whole of the property that we've just
14  talked about that was in Exhibit this last Exhibit No. 7
15  and Exhibits 2 and 3?
16       MR. BURNETT: The same objection.
17       You may answer.
18       THE WITNESS: I believe it, you know, that
19  covers it. The address covers, but I don't know if the
20  address 669, the metes and bounds, but it refers to
21  basically that property.
22   Q. (BY MR. SEBASTIAN) Let me rephrase it then
23  slightly. In entering into the purchase and sale
24  agreement your intent was to to sell that property?
25   A. In its entirety.

Page 144

 1   Q. In its entirety. Okay. Thank you very much.
 2  The and I apologize if this goes over ground that's
 3  already been covered. At the time that
 4  Mr. Featherston's company was kicked out of Building
 5  No. 3, my understanding is that Mr. Featherston's
 6  company had documents and other items in Building No. 3
 7  that were boxed up; is that correct?
 8       MR. BURNETT: Objection; form of the question.
 9       THE WITNESS: I don't know if it.
10       MR. BURNETT: Mischaracterizes the the earlier
11  the testimony but.
12   Q. (BY MR. SEBASTIAN) Okay let me ask. At the
13  time that Mr. Featherston's companies was kicked out of
14  Building No. 3, his company had documents still in
15  Building No. 3?
16   A. Yes.
17   Q. And those documents were boxed up; correct?
18   A. Yes.
19   Q. Do you know who boxed up those documents?
20   A. I believe it was the two girls in our office
21  and my daughter's supervision.
22   Q. All right. And then what happened to those
23  boxes there after?
24   A. They were put in the vestibule in the front of
25  Building 3. It is a locked hallway and locked and

Page 145

 1  secured.
 2   Q. Okay. Who has keys to access that invest to
 3  you Buhl?
 4   A. Oh, myself, my maintenance man and the lady in
 5  the office.
 6   Q. Do you know if anyone accessed any of those
 7  documents?
 8   A. I don't believe -- as far as I know nobody had
 9  accessed the hallway or were told to keep it locked and
10  stay away. You know, it's secured.
11   Q. Okay.
12   A. So I don't think anybody went in there.
13   Q. Are those boxes of documents, are they still
14  in that location, or are they moved?
15   A. No, they had to be moved.
16   Q. And do you know where those are currently?
17   A. They are, yes, they are in Building 19, a
18  section of Building 19 secured in a separate section.
19   Q. And who has access or keys?
20   A. The same.
21   Q. Okay.
22   A. Just we have -- we have a master key. And
23  that is the maintenance man, myself and the office.
24  Other than that, nobody else has master keys.
25   Q. Okay. And in this new location in Building 19